**UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **CHARLES ANGELL and ANGELL EXPEDITIONS, LLC,**<br><br>***Plaintiffs*,**<br><br>**v.**<br><br>**MARKWAYNE MULLIN, The Secretary of U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; RODNEY S. SCOTT, Commissioner of U.S. Customs and Border Protection; U.S. CUSTOMS AND BORDER PROTECTION; JOSH B. BARRETT, Acting Chief Patrol Agent of the United States Border Patrol's Big Bend Sector; LIEUTENANT GENERAL WILLIAM H. GRAHAM, Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; and UNITED STATES ARMY CORPS OF ENGINEERS,**<br><br>***Defendants*.** | § § § § § § § § § § § § § § § § § § § § § § § | **CIVIL ACTION NO. 5:26-cv-5580** |

**PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION**

Plaintiffs Angell Expeditions, LLC and Charles Angell (collectively, "Plaintiffs"), by and through their undersigned counsel, file this Application for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction ("Application") against Markwayne Mullin, The Secretary of Homeland Security (the "Secretary"); Department of Homeland Security (the "Department"); Rodney S. Scott, Commissioner of U.S. Customs and Border Protection (the "Commissioner"); U.S. Customs and Border Protection; Josh B. Barrett, Acting Chief Patrol Agent of the United States Border Patrol's Big Bend Sector; Lieutenant General William H. "Butch" Graham, Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; and

United States Army Corps of Engineers (the "USACE" or the "Corps") (collectively, "Defendants") as follows:[1]

## I. INTRODUCTION

1. Plaintiffs seek a temporary restraining order, preliminary injunction, and permanent injunction enjoining Defendants from commencing or continuing any construction, blasting, excavation, road-building, or ground disturbance activities on Plaintiffs' property, on Mariscal Mountain, or within Big Bend National Park and surrounding areas pending resolution of this action on the merits. Plaintiffs further seek a permanent injunction should they prevail on their constitutional claims challenging Section 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), as amended (8 U.S.C. § 1103 note), and the July 27, 2026 Determination made by the Secretary (91 Fed. Reg. 46,939).

## II. FACTUAL BACKGROUND

### A. The Project

2. Defendant Markwayne Mullin through the Department of Homeland Security ("DHS") has conducted a project to build a portion of a border wall on the United States-Mexico border running through Big Bend National Park, the surrounding areas, and Plaintiffs' property (the "Project").

3. Big Bend National Park includes acres of protected land, wildlife, plants, and is bordered by the Rio Grande River.[2]

4. Not only is the continued risk of greater harm imminent, but harm has also already occurred. Mobilization, staging, and construction of the Project has already started. With much

---

[1] Plaintiffs hereby incorporate their Complaint in its entirety filed contemporaneously herewith.
[2] *See Big Bend National Park Fact Sheet*, https://www.nps.gov/bibe/learn/management/statistics.htm (last updated Jan. 1, 2026).

more work to be done, if the Project is allowed to continue, this harm will increase exponentially as damage to Charles Angell's property and Expeditions' business as well as to Big Bend National Park, Big Bend Ranch State Park, and surrounding areas will become permanent and irreversible.

**B. Section 102(c) of IIRIRA**

5. Section 102(c)(1) of IIRIRA, as amended (8 U.S.C. § 1103 note), putatively, grants the Secretary the authority to "waive all legal requirements"—a phrase that on its face encompasses the United States Constitution, all provisions of the United States Code, and all U.S. jurisprudence, including judicial precedent and case law—in the Secretary's "sole discretion." 91 Fed. Reg. 46,939. No criteria guide this power. No procedures constrain it. No court may review it except for bare constitutional violations. In addition to these structural constitutional defects, Defendants have initiated condemnation proceedings to seize private property including Plaintiff Charles Angell's property(s) for border-wall construction in the Big Bend Sector when it is not authorized by statute, without providing constitutionally adequate notice or procedural safeguards, and without tendering just compensation as required by the Fifth Amendment.

6. Section 102(c) is unconstitutional in that it achieves precisely that accumulation: it vests in one executive officer the legislative power to make, amend, and nullify law, the executive discretion to decide when and where to do so, and immunity from judicial review. By his actions, Section 102(c) also results in amending the law: this is not a delegation of executive power. It is a surrender of legislative power—an abdication of Article I duties. The provision must be severed and struck down.

7. Specifically, the challenged statutory text provides:

> *Notwithstanding any other provision of law*, the Secretary of Homeland Security *shall have the authority to waive all legal requirements* such Secretary, *in such Secretary's sole discretion*, determines necessary to ensure expeditious construction of the

> barriers and roads under this section [*amending this section*]. Any such decision by the Secretary shall be effective upon being published in the Federal Register.
>
> ***
>
> A cause of action or *claim may only be brought alleging a violation of the Constitution* of the United States… Any…claim *shall be filed not later than 60 days* after the date of the…decision made by the Secretary…An interlocutory or final *judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari* to the Supreme Court of the United States.

IIRIRA § 102(c)(1–2) (emphasis added). This provision is unconstitutional both facially and as applied to the Big Bend Sector of the Texas-Mexico border for at least seven reasons.

8. First, it violates U.S. Const. art. I, § 1 of the nondelegation doctrine. Section 102(c) violates Article I, Sections 1, 7, and 8 of the United States Constitution by delegating the exclusively legislative power to enact, amend, and nullify enacted law without any intelligible principle to guide the Secretary's discretion. It authorizes the Secretary to "waive all legal requirements"—a phrase that on its face encompasses the United States Constitution, all provisions of the United States Code, and all U.S. jurisprudence, including judicial precedent and case law—in the Secretary's "sole discretion."

9. Second, Section 102(c) violates the separation of powers embodied in Articles I and II of the United States Constitution by vesting in one executive officer the legislative power to amend, repeal, nullify, and enact law, the executive discretion to decide when and where to do so, and immunity from judicial review. This accumulation of such powers is "the very definition of tyranny." THE FEDERALIST NO. 47, at 301 (James Madison) (Clinton Rossiter ed., 1961).

10. Third, IIRIRA § 102 violates the Take Care Clause, U.S. Const. art. II, § 3, as applied. The statute authorizes barriers and roads only where the Secretary determines it necessary to "deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a).

Big Bend Sector's approximately 3,000 apprehensions in FY 2025 cannot credibly constitute "high illegal entry" when compared to Del Rio Sector's 1,410,330 apprehensions over a 4 or 5 year period. U.S. Customs & Border Control, *Illegal border crossings in Big Bend Sector fall significantly in FY 2025* (Dec. 5, 2025), https://www.cbp.gov/newsroom/local-media-release/illegal-border-crossings-big-bend-sector-fall-significantly-fy-2025; 91 Fed. Reg. 46,939. The Secretary's decision to combine Big Bend with Del Rio into a single "project area" constitutes statistical sophistry, redefining without basis the geographic delineation of the Big Bend to include two sectors goes beyond sole discretion and violates due process as well as the Take Care Clause.

11. Fourth, IIRIRA § 102(c) violates the major questions doctrine as applied. A reading of IIRIRA § 102(c) that grants one officer power to nullify the United States Constitution, all provisions of the United States Code, and all U.S. jurisprudence—including judicial precedent and case law—within a defined geographic area is precisely the kind of sweeping claim the major questions doctrine was designed to police. *See Biden v. Nebraska*, 600 U.S. 477, 501 (2023). The Secretary's interpretation of § 102(c) as authorizing the border wall and road construction in areas that are not areas of high illegal entry, the combination of disparate border sectors to manufacture a "high illegal entry" finding, and bestowing the power to waive the United States Constitution, all provisions of the United States Code, all U.S. jurisprudence (including judicial precedent and case law), and all state and local legal requirements affecting such areas, claims vast power without clear congressional authorization, in violation of the major questions doctrine as applied.

12. Fifth, Section 102 of IIRIRA—and specifically the terms "high illegal entry," "all legal requirements," "any other provisions of law," "sole discretion," "necessary," and "expeditious construction"—is unconstitutionally void for vagueness, both facially and as applied to the Big Bend Sector, in violation of the Due Process Clause of the Fifth Amendment. The failure

to give definition to at least six (6) material terms makes the section unenforceable as well as incapable of understanding all in violation of Plaintiffs' Fifth Amendment due process rights.

13. Sixth, Defendants' failure to provide Plaintiffs with adequate notice, an opportunity to be heard, or other required procedural safeguards prior to and in connection with the condemnation of his property constitutes a violation of the Due Process Clause of the Fifth Amendment to the United States Constitution.

14. Charles Angell holds a constitutionally protected property interest in his land identified by the United States Customs and Border Protection ("CBP") as parcels BBT-PRS-2055 and BBT-PRS-2055-1. Exhibit A (Angell Aff.), at ¶ 9. This property interest is indisputable: Charles Angell holds fee simple title to the land. On or about February 20, 2026, CBP sent Charles Angell a "Notice of Interest" letter identifying his property as located near planned border barrier system construction projects and stating that CBP had "tentatively identified" that it may need to enter his property "for either construction or access purposes." *Id*; *see* Exhibit A-2. The letter stated that if Charles Angell and CBP are "unable to reach a negotiated purchase or easement agreement" (although no negotiations have taken place) CBP would refer the matter to the Department of Justice "to initiate the eminent domain/condemnation process." Exhibit A-2. The letter further stated CBP "may proceed to refer the matter to DOJ to acquire any necessary property interest(s) through the exercise of eminent domain, in accordance with the Declaration of Taking Act (40 U.S.C. §§ 3113 and 3114)." *Id*. Defendants failed to provide Charles Angell with constitutionally adequate notice of the planned condemnation or any meaningful opportunity to be heard. Charles Angell received no formal written notice identifying the specific property interest to be acquired, the legal authority for the taking, or the basis for the government's determination that his property was necessary for border-wall construction. The government's actions in condemnation to date do

not satisfy the requirements of Federal Rule of Civil Procedure 71.1 and 49 C.F.R. §§ 24.101(b), 24.102(a), 24.102(b).[3]

15. Seventh, Defendants' condemnation of Charles Angell's property without valid statutory authority, without serving a genuine public use, and without providing just compensation violates the Takings Clause of the Fifth Amendment to the United States Constitution. Defendants' threatened condemnation of Charles Angell's property for the construction of border barriers, patrol roads, and related infrastructure constitutes a physical taking of private property. The CBP letter of February 20, 2026, expressly threatened eminent domain proceedings under the Declaration of Taking Act if Charles Angell did not agree to a voluntary access or any other arrangement, thereby placing Charles Angell under imminent threat of appropriation of his fundamental right to exclude others from his land—"one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979).

**C. The Affected Environment and Plaintiffs' Interests**

16. The Project threatens an interconnected conservation corridor encompassing Big Bend National Park (more than 801,000 acres),[4] Big Bend Ranch State Park (more than 300,000

---

[3] Because the use of eminent domain power is constitutional all procedures required to utilize the power must be followed or due process violations occur. *See Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 236–37 (1897) ("The mere form of the proceeding instituted against the owner, even if he be admitted to defend, cannot convert the process used into due proces[s] of law, if the necessary result be to deprive him of his property without compensation.")

[4] National Park Services, *How Big is it?*, https://www.nps.gov/bibe/learn/management/park_sizes.htm (last updated Dec. 14, 2018).

acres),[5] the 196-mile Rio Grande Wild and Scenic River,[6] and the more than 100,000-acre Black Gap Wildlife Management Area.[7] These protected lands include terrains and wilderness that would be permanently altered if construction continues on the Project.[8] Big Bend is also home to the Mexican long-nosed bat and the federally listed Big Bend gambusia, along with Chihuahuan Desert ecosystems and riparian corridors that support them. *See* 50 C.F.R. § 17.11(h).[9] The park includes Mariscal Mountain, which as part of the Project, will be blasted, permanently altering its geological formations and canyon setting while also causing excavation and debris placement in and above Mariscal Canyon and into the Rio Grande River below. *See* Letter from Rep. Doggett et al. to Sec'y Rubio et al. (Aug. 7, 2026). This also poses an ongoing risk of violating treaty obligations with Mexico or actually changing the Texas-Mexico boundary. *See id*. Further, Big Bend contains archaeological sites and sacred sites of Tribal Nations, which are historic structures

[5] Tex. Parks & Wildlife Dep't, *Big Bend Ranch State Park: History*, https://tpwd.texas.gov/state-parks/big-bend-ranch/history (last visited Aug. 27, 2026).
[6] Nat'l Park Serv., U.S. Dep't of the Interior, *Rio Grande Wild and Scenic River: Final General Management Plan/Environmental Impact Statement* (Aug. 2004), https://www.nps.gov/rigr/learn/management/upload/RIGR_gmp-eis.pdf; 16 U.S.C. § 1274(a)(17).
[7] Tex. Parks & Wildlife Dep't, *Black Gap WMA*, https://tpwd.texas.gov/huntwild/hunt/wma/find_a_wma/list/?id=2 (last visited Aug. 27, 2026).
[8] Grahme Jones, Nat'l Wildlife Fed'n, *Physical Border Wall in Big Bend is Ineffective; Threatens Wildlife, Working Lands*, https://www.nwf.org/Home/Latest-News/Press-Releases/2026/3-2-2026-Border-Wall-in-Big-Bend-Threatens-Wildlife (Mar. 2, 2026).
[9] *See* Tex. Parks & Wildlife Dep't, *Mexican Long-nosed Bat (Leptonycteris nivalis)*, https://tpwd.texas.gov/huntwild/wild/species/mexlongnose/ (last visited Aug. 27, 2026); Tex. Parks & Wildlife Dep't, *Big Bend Gambusia (Gambusia gaigei)*, https://tpwd.texas.gov/huntwild/wild/species/bbgambus/ (last visited Aug. 27, 2026); Nat'l Park Serv., U.S. Dep't of the Interior, *Big Bend National Park Fact Sheet*, https://www.nps.gov/bibe/learn/management/statistics.htm (last updated Jan. 1, 2026); Tex. Parks & Wildlife Dep't, *Trans-Pecos West Texas Habitat: Wildlife Management: Endangered Species*, https://tpwd.texas.gov/landwater/land/habitats/trans_pecos/endangered_species/ (last visited Aug. 27, 2026).

protected under the National Historic Preservation Act and Archeological Resources Protection Act of 1979.[10] *See* 54 U.S.C. §§ 300101 *et seq.*; 16 U.S.C. §§ 470aa *et seq*.

17. Charles Angell is a resident of Redford, Texas near Big Bend National Park along the border of the Rio Grande River. *See* Exhibit A (Angell Aff.), at ¶ 1. He is the sole managing member of Angell Expeditions, LLC, a guide company that provides guided tours of the surrounding Big Bend parks and private lands. *Id.* at ¶ 2. Expeditions operates river, mountain biking, and birding trips as well as hiking and driving tours in Big Bend National Park and surrounding areas. *Id.* Angell has concrete, personal, and business interests in the waters, lands, and natural resources that will be adversely impacted by the Project. *Id*. at ¶ 3. He has long used the Big Bend National Park, Big Bend State Park, and the surrounding areas for his recreational use and aesthetic enjoyment as well as for his business use. *Id*. These interests are threatened by the Project and the failure of the Defendants to comply with constitutional law. *Id*. The Project will affect Angell's business, recreational, aesthetic, and environmental interests by affecting the operation of his business and the recreational use of his property by blocking his access to the Rio Grande River, preventing him from launching boats off the Rio Grande River, and disrupting his ability to live and work during the construction of the border wall through or nearby his property. *Id*. at ¶ 10. The presence of the border wall on his property or nearby will also diminish his property value and value of his business. *Id.* Angell will suffer concrete injury from the construction and operation of the Project and its impacts on Big Bend National Park, Big Bend State Park, wildlife

[10] Nat'l Park Serv., *Archaeology in Big Bend*, https://www.nps.gov/bibe/learn/historyculture/archaeology-in-big-bend.htm (last updated Apr. 29, 2025); Nat'l Park Serv., *Big Bend's First Inhabitants*, https://www.nps.gov/bibe/learn/historyculture/archeology.htm (last updated June 16, 2023).

habitats, and the surrounding environment. *Id.* at ¶ 13. His use and enjoyment of these areas will be diminished by the Project. *Id.*

## III. STANDARD FOR INJUNCTIVE RELIEF

18. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## IV. ARGUMENTS & AUTHORITIES

### A. Plaintiffs are Likely to Succeed on the Merits of Their Claims

19. **Plaintiffs are likely to succeed on their nondelegation claim.** Section 102(c) of IIRIRA does not merely authorize the Secretary to implement a policy Congress enacted. It authorizes him to waive "all legal requirements"—a phrase that encompasses the United States Constitution, all provisions of the United States Code, and all U.S. jurisprudence, including judicial precedent and case law—that he, in his "sole discretion," determines necessary to expedite construction. The same section allows the Secretary by his conduct to engage in "amending this Section of law." Only Congress can enact, amend, or repeal legislation.[11] *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952); *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."). A delegation of this quintessential legislative power is unconstitutional. The language supplies no intelligible principle distinguishing laws that may be waived from laws that must remain in force, no criteria governing when a determination is necessary, and no procedural

[11] The ability to "amend" a federal law is the broadest congressional power associated with legislation. An amendment to an existing federal statute includes (i) repeal of existing law; (ii) a change to the existing law; and (iii) enactment of a new law.

safeguard against arbitrary selection. The statute therefore transfers to one executive officer the legislative power to determine which enacted laws will apply to a project and which will not.

20. The delegation is also self-consuming. The authority applies to barriers and roads "under this section," which includes the statutory conditions governing where construction may occur, including the requirement that construction be in an "area[] of high illegal entry" and the geographic limits of § 102. IIRIRA § 102(a), 102(c)(1). If the Secretary may waive those conditions as "legal requirements" whenever he deems them inconvenient, the provisions that supposedly guide his discretion can be erased by the same discretion. A standard that the delegate may nullify at will is not an intelligible principle. The breadth of the delegation confirms the constitutional problem. In *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 541–42 (1935), and *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935), the Supreme Court rejected delegations that lacked meaningful standards even when they addressed discrete industries. Section 102(c) goes further: it permits the Secretary to nullify the United States Constitution, all provisions of the United States Code, all U.S. jurisprudence (including judicial precedent and case law), and every state and local statute, regulation, and administrative order within a geographic area.

21. As the Supreme Court has recognized "[a]t some point the responsibilities assigned can become so extensive and so unconstrained that Congress has in effect delegated its legislative power." *See FCC v. Consumers' Research*, 606 U.S. 656, 703 (2025) (Kavanaugh, J., concurring) (quoting *Loving v. United States*, 517 U.S. 748, 777 (1996)) (alteration in original). This is such a delegation. The determination power also functions as a repeal or suspension mechanism, which an executive officer cannot exercise. *INS v. Chadha*, 462 U.S. 919, 954 (1983) holds that amendment and repeal of statutes must comply with Article I, and *Clinton*, 524 U.S. at 438,

confirms that the President has no power to enact, amend, or repeal statutes. Section 102(c)(1) cannot be read to let a subordinate executive officer accomplish the same result by Federal Register notice. At minimum, Plaintiffs are likely to prevail because the Secretary's interpretation raises the same Article I defect those decisions prohibit.

22. **Plaintiffs are likely to succeed on their Separation of Powers claim.** Section 102(c) of IIRIRA concentrates legislative power to nullify the United States Constitution, all provisions of the United States Code, and all U.S. jurisprudence—including judicial precedent and case law—together with executive power to decide when and where to do so, and immunity from ordinary judicial review, in a single executive officer. The Secretary decides when the statutory scheme applies, selects which legal requirements to nullify, directs the construction that follows, and obtains a decision insulated from ordinary judicial review except for constitutional claims. That combination permits one officer to make the governing rule, execute it, and shield the result from the branch charged with saying what the law is.

23. Nor is this merely an aggressive exercise of executive discretion. Executive officials may enforce or administer laws, but they may not choose the laws' content or decide that enacted protections will have no force. The Secretary's power to make a unilateral Federal Register determination effective, while barring ordinary judicial review, collapses the constitutional distinctions among lawmaking, execution, and adjudication. It is the accumulation of powers Madison called "the very definition of tyranny." THE FEDERALIST, NO. 47, at 301.

24. **Plaintiffs are likely to succeed on their Take Care Clause claim.** Section 102(a) authorizes construction only in "areas of high illegal entry." That limitation is a substantive command, not a suggestion that the Secretary may manipulate the geographic unit until the

required predicate appears. The Secretary's July 27, 2026 Determination did not faithfully execute that command.

25. The Determination manipulated the predicate by claiming to combine the Big Bend and Del Rio Sectors. Big Bend recorded approximately 3,000 apprehensions in FY2025, while Del Rio recorded approximately 1,410,330 over a five-year period.[12] Big Bend's own figure was the lowest on the southern border and could not reasonably be characterized as "high" by comparison with Del Rio or any other sector.[13] By treating the two distinct sectors as one project area, the Secretary attributed Del Rio's numbers to Big Bend and produced a fabricated "double sector" to produce a falsified "high illegal entry" finding that Big Bend's data alone could not support. *See* 91 Fed. Reg. 46,939.

26. That maneuver is a rewriting of the statutory condition. The Executive may not broaden the relevant geographic area, import a different sector's statistics, and then invoke the resulting aggregate as authority to waive the laws and engage in practices that are outside of that authority. As *Youngstown Sheet & Tube Co.*, 343 U.S. at 637 (Jackson, J., concurring), teaches, executive authority is at its "lowest ebb" when the Executive acts contrary to Congress's expressed limitations.

27. **Plaintiffs are likely to succeed on their major questions doctrine claim.** Section 102(c) cannot reasonably be interpreted to confer the kind of sweeping authority Defendants assert

[12] *See* Media Release, U.S. Customs & Border Control, *Illegal border crossings in Big Bend Sector fall significantly in FY 2025* (Dec. 5, 2025), https://www.cbp.gov/newsroom/local-media-release/illegal-border-crossings-big-bend-sector-fall-significantly-fy-2025; 91 Fed. Reg. 46,939.
[13] *See* U.S. Customs and Border Protection, *Southwest Land Border Encounters (By Component)*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters-by-component (last modified Aug. 14, 2026).

through modest, standardless language. That is an extraordinary delegation and claim of regulatory power with consequences far beyond ordinary border construction.

28. The Supreme Court has rejected comparable attempts to discover transformative authority in vague statutory language. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022), explains that "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle devices.'" (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). Here, no less the six material phrases are powerful but left undefined, as well as being vague beyond the point of enforcement. *See* Paragraph 12, *supra.* The question in such a case is not merely whether a policy should be pursued, but who has the authority to pursue it. *See Biden*, 600 U.S. at 504–05.

29. Here, the asserted power reaches the United States Constitution, the entire United States Code, and all U.S. jurisprudence—including judicial precedent and case law—within the Determination's geographic scope and becomes effective by Federal Register notice, without a clear statement from Congress identifying that consequence or supplying standards to cabin it. The Secretary's combination of sectors to manufacture a "high illegal entry" finding only magnifies the problem. The major questions doctrine therefore forecloses the interpretation on which the challenged construction depends.

30. **Plaintiffs are likely to succeed on their procedural due process claim.** Defendants initiated condemnation proceedings and threatened eminent domain proceedings under the Declaration of Taking Act against Angell's property—all without providing constitutionally adequate notice identifying the specific property interest to be acquired, the legal authority, the compensation offered, or the procedures available to challenge the taking, or following proper procedure of Federal Rule of Civil Procedure 71.1 and 49 C.F.R. §§ 24.101(b), 24.102(a),

24.102(b). The D.C. Circuit has held that a Fifth Amendment procedural due process claim lies where DHS uses private property for border-wall construction without appropriate procedural protections. *See N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1265 (D.C. Cir. 2020). Plaintiffs' claim is even stronger: here, Defendants did not merely occupy the property but are formally condemning it through judicial proceedings while withholding the most basic procedural safeguards.

31. **Plaintiffs are likely to succeed on their Takings Clause claim.** The condemnation rests on a statutory predicate—"high illegal entry"—that was in part manufactured by combining the Big Bend and Del Rio Sectors. *See* 91 Fed. Reg. 46,939. Because the statutory authorization for construction in Big Bend is absent, the condemnation of Angell's property lacks valid legislative authorization. Moreover, the estimated compensation deposited pursuant to the Declaration of Taking fails to account for any compensation or severance damages that would include loss of Rio Grande access, habitat destruction, and diminution in the value and utility of the remaining acreage. Just compensation requires "a full equivalent for the property taken." *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 326 (1893).

### B. Plaintiffs Will Suffer Irreparable Harm

32. For purposes of a preliminary injunction, an injury is deemed irreparable if it cannot be undone through monetary remedies. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). The injuries threatened here meet that standard. Continued mobilization, construction, and development by the Secretary in and around the Big Bend would destroy the opportunity for meaningful review before irreversible work occurs; once the mountain is blasted, the ground disturbed, or protected habitat fragmented, no later damages award can restore the

landscape or recreate the lost ecological and cultural values. Nor could the constitutional genie be put back in the bottle.

33. The proposed work threatens an interconnected conservation corridor encompassing Big Bend National Park (more than 801,000 acres),[14] Big Bend Ranch State Park (more than 300,000 acres),[15] the 196-mile Rio Grande Wild and Scenic River,[16] and the more than 100,000-acre Black Gap Wildlife Management Area.[17] Construction, excavation, and road-building and related activities across or adjacent to these protected lands would cause permanent alteration of terrain, soils, drainage patterns, viewsheds, and wilderness character. Those injuries cannot be reduced to a compensable monetary amount or repaired after the fact.

34. The damage also threatens the Mexican long-nosed bat and the federally listed Big Bend gambusia, along with Chihuahuan Desert ecosystems and riparian corridors that support them. *See* 50 C.F.R. § 17.11(h).[18] Disturbance to habitat, watercourses, and migration or feeding areas risks injury to species and ecological relationships that cannot be reliably restored once construction has begun. The loss of habitat and the opportunity to protect it before disturbance are irreparable harms.

35. Mariscal Mountain presents a particularly acute risk. The proposed road alignment would require dynamiting and blasting across steep mountain terrain, with excavation and debris placement in and above Mariscal Canyon. Once the mountain is blasted, its geological formations

---

[14] National Park Services, *supra* note 4.

[15] Tex. Parks & Wildlife Dep't, *How Big is it?*, *supra* note 5.

[16] Nat'l Park Serv., U.S. Dep't of the Interior, *Rio Grande Wild and Scenic River: Final General Management Plan/Environmental Impact Statement*, *supra* note 6.

[17] Tex. Parks & Wildlife Dep't, *Black Gap WMA*, *supra* note 7.

[18] *See* Tex. Parks & Wildlife Dep't, *Mexican Long-nosed Bat (Leptonycteris nivalis)*, *supra* note 9; Nat'l Park Serv., U.S. Dep't of the Interior, *Big Bend National Park Fact Sheet*, *supra* note 9; Tex. Parks & Wildlife Dep't, *Trans-Pecos West Texas Habitat: Wildlife Management: Endangered Species*, *supra* note 9.

and canyon setting cannot be returned to their original condition. The risk is not speculative: the same contractor used side-casting at Guadalupe Canyon, Arizona, in 2020, where debris was documented crossing into Mexican territory. *See* Letter from Rep. Doggett et al. to Sec'y Rubio et al. (Aug. 7, 2026). Once debris is in the canyon and the river, "no remedy restores the river's prior condition," and "[m]aterial placed in a channel does not merely obstruct flow it can relocate the line of the deepest channel, and the internal boundary in this reach is in the middle of the channel occupied by the river's normal flow." *Id*. Side-casting at Mariscal Mountain could likewise place debris in the Rio Grande or Mexican territory and create an ongoing risk of violating treaty obligations with Mexico or actually changing the Texas-Mexico boundary. *See id*. Article IV of the November 23, 1970 Treaty to Resolve Pending Boundary Differences and Maintain the Rio Grande and the Colorado River as the International Boundary obliges each country to "*prohibit* the construction of works in its territory which, in the judgment of the Commission, may cause deflection or obstruction of the normal flow of the river or of its flood flows," and it provides that any of the works constructed found to have that adverse effect on the territory of either state must be removed or modified at the expense of the constructing country, with repair of or compensation for resulting damage. Treaty to Resolve Pending Boundary Differences and Maintain the Rio Grande and the Colorado River as the International Boundary art. IV(B)(1)-(2), November 23, 1970, 23 U.S.T. 371, T.I.A.S. No. 7313. Not even the Secretary under Section 102(c) has been authorized to break or modify treaties.

36. Ground disturbance would also threaten archaeological sites, historic structures protected under the National Historic Preservation Act, the Archaeological Resources Protection

Act of 1979, and sacred sites of Tribal Nations.[19] *See* 54 U.S.C. §§ 300101 *et seq.*; 16 U.S.C. §§ 470aa *et seq*. The scientific, historical, and spiritual value of those resources depends on their location, context, and physical integrity.

37. Finally, Plaintiffs face irreparable constitutional injury. The challenged determination and statute permits an executive officer to exercise legislative power, to suspend enacted law and replace it with his own *ad hoc* decision making, masked in the standard in sole discretion, and then to insulate that decision from established judicial review. *See* IIRIRA § 102(a), 102(c). Such a violation of structural constitutional protections is per se irreparable: damages cannot restore the separation of powers or give Plaintiffs the benefit of lawful decision-making. The Court should not permit additional border building activities to proceed while that constitutional injury becomes permanent.

**C. Balance of the Equities Favors an Injunction**

38. The balance of the equities favors an injunction. Plaintiffs face the combined prospect of irreparable constitutional, environmental, and cultural harm if construction proceeds, while Defendants face at most a halt in any construction and/or related expenditures associated with demobilization and departure from the park. The threatened injuries to protected lands, species, cultural resources, and constitutional structure outweigh construction of a wall/barrier in an area that is not one of high illegal entry in violation of Section 102(a).

39. Defendants suffer no cognizable harm from maintaining the status quo. A restraining of activities does not prevent future construction if Plaintiffs' constitutional claims fail; it simply preserves existing conditions while the Court determines whether Defendants possess

[19] Nat'l Park Serv., *Archaeology in Big Bend*, *supra* note 10; Nat'l Park Serv., *Big Bend's First Inhabitants*, *supra* note 10.

valid constitutional authority to proceed. By contrast, allowing construction and other activities to continue will ultimately eliminate the possibility of preserving a national park in its current undisturbed condition.

40. Any security-related effect of a stop to the construction is nonexistent or minimal. The Big Bend Sector has the lowest apprehension rate on the southern border, and the empty existing road north of Mariscal Mountain is regularly patrolled and is sufficient for Border Patrol operations. Defendants cannot show prohibiting them from constructing an un-accessed road through one of the least-trafficked stretches of the border will create any harm.

41. To the extent Defendants claim harm from any delay, that harm is of their own making, and is self-afflicted. Defendants chose to commence construction going beyond the overbroad authority that permits the executive branch the power to make legislation and deny judicial orders under the vague enforcement to "waive all legal requirements" and that rests only on a geographically manufactured predicate, and no other. Defendants cannot convert the consequences of pursuing constitutionally infirm construction into an equity against preserving the status quo.

**D. Public Interest Strongly Favors an Injunction**

42. The public interest strongly favors an injunction. The public has a paramount interest in preserving constitutional separation of powers and ensuring executive officials remain within the authority delegated to Congress and which Congress lawfully delegated to the executive branch. The public interest is served when courts require federal actors to comply with governing legal limits; that interest is especially strong when the challenged action threatens structural constitutional guarantees.

43. The public also has a compelling interest in preserving irreplaceable national parkland, wilderness areas, the Rio Grande corridor, federally listed species, archaeological resources, historic structures, and Tribal sacred sites. Once those resources are destroyed, the public loses values held in trust for future generations, and no damages award can restore them.

44. When the government is a party, the balance of equities and public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The same facts therefore control both inquiries: Plaintiffs' irreversible injuries and the public's interest in lawful, careful stewardship of protected lands and constitutional structure strongly favor maintaining the status quo.

45. A temporary restraining order does not require the Court to choose between border security and the Constitution. It requires only that construction pause until the Court determines whether the Constitution has been violated. The public interest is never served by permitting irreversible harm under an unconstitutional delegation of authority and action beyond even it.

**E. Bond Requirement Should be Nominal**

46. Rule 65(c) of the Federal Rules of Civil Procedure typically requires a party that seeks a restraining order or preliminary injunction to provide security, typically in the form of a bond, to pay for costs and damages sustained by a wrongfully enjoined or restrained party. However, in light of the important public interest and constitutional protections, the bond requirement may be waived or only a nominal bond may be required. *See Richland/Wilkin Joint Powers Authority v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016) (citing *Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002)); *Sierra Club v. Froehlke*, 359 F. Supp. 1289, 1386 (S.D. Tex. 1973), *rev'd on other grounds*, 499 F.2d 982 (5th Cir. 1974). Moreover, no bond should be so high it precludes a party from exercising its right to sue for unconstitutional acts and conduct.

47. An excessive bond would prevent Plaintiffs from fully exercising their rights to bring suit and seek redress for constitutional wrongs.

48. Pursuant to Federal Rule of Civil Procedure 65(c), Plaintiffs respectfully request that the Court waive the security requirement or impose a nominal bond.

## V. REQUESTED RELIEF

**WHEREFORE,** Plaintiffs respectfully request an expedited hearing be held on their application for temporary restraining order and preliminary injunction, and that this Court grant the following relief:

49. An order enjoining Defendants from commencing or continuing any construction, blasting, excavation, road-building, or ground disturbance activities on or across Plaintiffs' property pending resolution of this action;

50. A temporary restraining order, preliminary injunction, and permanent injunction enjoining within the Big Bend Sector all ground disturbance, blasting, excavation, wall barrier, or wall-panel installation, new road construction, vegetation clearing, staging expansion, spoil disposal, mobilization for work, and other irreversible commitments by Defendants;

51. An order directing the Department of Homeland Security to disclose all contracts, funding sources, property interests, technical plans, environmental surveys, state-law permits, and International Boundary and Water Commission submissions; to complete National Environmental Policy Act review; to complete Endangered Species Act consultation without violating Section 7(d); to complete National Historic Preservation Act and cultural-resource review; to complete treaty and International Boundary and Water Commission coordination; and only permitting Department of Homeland Security the opportunity to seek leave to resume construction on a

segment-specific showing of lawful authority and compliance when all restored requirements are complete;

52. A temporary restraining order, preliminary injunction, and permanent injunction enjoining Defendants from commencing or continuing any construction, blasting, excavation, road-building, or ground disturbance activities on Mariscal Mountain within the Big Bend Sector;

53. A mandatory prospective injunction requiring Defendants to restore any harm or damage caused by activities performed by the Secretary or Department on Angell's property, the Big Bend National Park, or in the Big Bend Sector;

54. Such other and further relief as the Court deems just and proper.

Dated: August 28, 2026

Respectfully submitted,

*/s/ Frederick W. Addison, III*
Frederick W. Addison, III
Texas State Bar No. 00903350
raddison@munsch.com
Randall W. Miller
Texas State Bar No. 24092838
rwmiller@munsch.com
Emily C. Means
Texas State Bar No. 24137036
emeans@munsch.com
Caroline Rumbolo
Texas State Bar No. 24131637
crumbolo@munsch.com
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**COUNSEL FOR PLAINTIFFS**

## REQUEST FOR EXPEDITED HEARING

Plaintiffs do not seek ex parte injunctive relief. Plaintiffs respectfully request that the Court set a hearing on their application for a temporary restraining order or preliminary injunction, on the papers or through live testimony, at the Court's earliest convenience.

*/s/ Frederick W. Addison, III*
Frederick W. Addison, III