**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **CHARLES ANGELL and ANGELL EXPEDITIONS, LLC** | § | |
| | § | |
| ***Plaintiffs*,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 5:26-cv-05580-JKP** |
| | § | |
| **MARKWAYNE MULLIN, The Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; RODNEY S. SCOTT, Commissioner of U.S. Customs and Border Protection; U.S. CUSTOMS AND BORDER PROTECTION; JOSH B. BARRETT, Acting Chief Patrol Agent of the United States Border Patrol's Big Bend Sector; LIEUTENANT GENERAL WILLIAM H. GRAHAM, Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; and UNITED STATES ARMY CORPS OF ENGINEERS** | § | |
| | § | |
| ***Defendants*.** | § | |

**<u>PLAINTIFFS' FIRST AMENDED COMPLAINT</u>**

Plaintiffs Charles Angell ("Angell") and Angell Expeditions, LLC (collectively, "Plaintiffs"), by and through their undersigned counsel, file this First Amended Complaint against Defendants Markwayne Mullin, The Secretary of Homeland Security (the "Secretary"); Department of Homeland Security (the "Department"); Rodney S. Scott, Commissioner of U.S. Customs and Border Protection (the "Commissioner"); U.S. Customs and Border Protection; Josh B. Barrett, Acting Chief Patrol Agent of the United States Border Patrol's Big Bend Sector; Lieutenant General William H. "Butch" Graham, Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; and United States Army Corps of Engineers (the "USACE" or the "Corps") (collectively, "Defendants"), and allege as follows:

# I. INTRODUCTION

1. Section 102(c)(1) of Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), as amended (8 U.S.C. § 1103 note), grants the Secretary of Homeland Security ("the Secretary") the authority to "waive all legal requirements"—a phrase that on its face encompasses the United States Constitution, all provisions of the United States Code, and all U.S. jurisprudence, including judicial precedent and case law—in the Secretary's "sole discretion." No criteria guide this power. No procedures constrain it. No court may review it except for bare constitutional violations. In addition to these structural constitutional defects, Defendants have initiated condemnation proceedings to seize private property for border-wall construction in the Big Bend Sector when it is not authorized by statute.

2. James Madison warned "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." THE FEDERALIST NO. 47, at 301 (James Madison) (Clinton Rossiter ed., 1961). Section 102(c)(1) achieves precisely that accumulation: it vests in one executive officer the legislative power to make, amend, and nullify law, the executive discretion to decide when and where to do so, and immunity from judicial review. This is not a delegation of executive power. It is a surrender of legislative power—an abdication of Article I duties. The provision must be severed and struck down.

3. Specifically, the challenged statutory text provides:

> *Notwithstanding any other provision of law*, the Secretary of Homeland Security *shall have the authority to waive all legal requirements* such Secretary, *in such Secretary's sole discretion*, determines necessary to ensure expeditious construction of the barriers and roads under this section [*amending this section*]. Any such decision by the Secretary shall be effective upon being published in the Federal Register.

***

> A cause of action or *claim may only be brought alleging a violation of the Constitution* of the United States… Any…claim s*hall be filed not later than 60 days* after the date of the…decision made by the Secretary…An interlocutory or final *judgment may be reviewed only upon petition for a writ of certiorari* to the Supreme Court of the United States.

IIRIRA § 102(c) (1–2) (emphasis added). As set forth herein, this provision is unconstitutional both facially and as applied to the Big Bend Sector of the Texas-Mexico border.

## II. PARTIES

### A. Plaintiffs

4. Charles Angell is an individual residing in Presidio County at 302 El Polvo Road, P.O. Box 165, Redford, Texas 79846.

5. Angell Expeditions, LLC is a Texas limited liability company located in Presidio County at 302 El Polvo Road, P.O. Box 165, Redford, Texas 79846. Charles Angell is the sole managing member of Angell Expeditions, LLC.

### B. Defendants

6. Defendant Markwayne Mullin is an individual who, at all times relevant to this First Amended Complaint, served as the Secretary of the U.S. Department of Homeland Security. Mullin is sued in his official capacity only. Mullin possesses authority to direct, suspend, modify, or terminate the challenged DHS actions and is therefore an appropriate defendant for prospective declaratory and injunctive relief.

7. Defendant U.S. Department of Homeland Security is an agency of the United States Government with responsibility for border security and the administration and enforcement of federal immigration and border laws. DHS has invoked § 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended, as authority for the challenged

construction of physical barriers, roads, excavation, grading, lighting, cameras, sensors, and related activities in the Big Bend Sector.

8. Defendant Rodney S. Scott is an individual who, at all times relevant to this First Amended Complaint, served as Commissioner of the U.S. Customs and Border Protection ("CBP"). Scott is sued in his official capacity only. As Commissioner, Scott is the senior official responsible for the operations of CBP, including the border-security activities challenged in this action. Scott has authority over CBP's implementation of border-barrier and associated infrastructure projects and is an appropriate defendant for prospective declaratory and injunctive relief.

9. Defendant U.S. Customs and Border Protection is an agency of the United States Government with responsibility for securing the Nation's borders and administering border-enforcement operations. Through the United States Border Patrol and its Big Bend Sector in Texas, CBP is responsible for border-enforcement operations throughout the affected region and is participating in the planning, authorization, implementation, and construction of the challenged border infrastructure.

10. Defendant Josh B. Barrett is the Acting Chief Patrol Agent of the United States Border Patrol's Big Bend Sector and is sued in his official capacity only. Barrett is the senior Border Patrol official responsible for operations within the Big Bend Sector and exercises operational authority over Border Patrol activities within the geographic area in which the challenged project is being undertaken. He is an appropriate defendant because officers, employees, contractors, and agents operating under CBP and Border Patrol authority within the Big Bend Sector are implementing or facilitating the challenged construction.

11. Defendant Lieutenant General William H. "Butch" Graham, Jr. is the Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers. He is sued in his official capacity only. Lieutenant General Graham is the senior official at the U.S. Army Corps of Engineers responsible for operations within the Big Bend Sector and exercises operational authority over real property and eminent domain proceedings for land acquisition, public infrastructure, and natural resources science and management within the Big Bend Sector.

12. Defendant U.S. Army Corps of Engineers is an agency of the United States Government with responsibility for real property and eminent domain proceedings for land acquisition, public infrastructure, project management, and natural resources science and management within the Big Bend Sector.

## III. JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including the Fifth Amendment (Due Process Clause and Takings Clause); Article I, Section 1; Article II, Section 3; and the separation of powers doctrine embodied in the Constitution.

14. This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201-2202.

15. This Court, likewise, has jurisdiction for judicial review of this action under 8 U.S.C. § 1103(c)(2) because it alleges only violations of the Constitution of the United States

and is brought within sixty (60) days of the Determination of the Secretary pursuant to Section 102 of IIRIRA effective July 27, 2026, 91 Fed. Reg. 46,939 (the "Determination").[1]

16. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because the Big Bend Sector of the Texas-Mexico border, which is the geographic focus of the challenged agency action, is located within this District, and a substantial part of the events giving rise to this claim occurred in this District.

17. This action is timely filed. The Secretary's Determination was published in the Federal Register on July 27, 2026. *See* 91 Fed. Reg. 46,939. This First Amended Complaint is filed within sixty (60) days of that publication.

## IV. STANDING

18. Charles Angell is an individual residing in Presidio County, Texas, in the vicinity of where the border wall is being built. Exhibit A, ¶ 1. He is also the sole managing member of Angell Expeditions, LLC ("Expeditions"), a Texas limited liability company that operates river, mountain biking, and birding trips as well as hiking and driving tours in the Big Bend National Park and surrounding area. Exhibit A, ¶ 2. He resides at, and Expeditions is located at, 302 El Polvo Road, Redford, Presidio County, Texas. Exhibit A, ¶ 1. He is a frequent and regular user of Big Bend National Park, Big Bend Ranch State Park, and the surrounding areas for recreational and business purposes, including hiking, mountain biking, camping, rafting the Rio Grande, bird watching, and off-roading. Exhibit A, ¶¶ 4–5, 8. He has personally lived and worked in the Big

[1] Plaintiffs also contend however, the Determination revitalized the ability to challenge earlier determinations by announcing the waiver of July 27 "does not revoke or supersede any other waiver determination" and by reestablishing "[s]uch waivers shall remain in full force and effect in accordance with their terms." 91 Fed. Reg. 46,941.

Bend region since 2008 and has used and enjoyed these lands and waters since 2001. Exhibit A, ¶ 4.

19. On February 20, 2026, Mr. Angell received a "Notice of Interest" letter from U.S. Customs and Border Protection identifying his property as the subject of condemnation in connection with the Project, and construction has already begun on the border wall in Big Bend National Park. Exhibit A, ¶¶ 9, 11. If his property is condemned, it will block his access to the Rio Grande River, prevent him from launching boats, disrupt his ability to live and work during construction, and diminish both his property value and the value of Expeditions. Exhibit A, ¶ 10.

20. Angell and Expeditions have concrete, particularized interests that are threatened by the Project and the failure of the Defendants to comply with constitutional law. Their harms are imminent and occurring presently; the harms are also concrete, and not merely speculative. Accordingly, Charles Angell and Angell Expeditions, LLC have standing to bring this action.

## V. FACTUAL BACKGROUND

### A. The Statutory Framework: IIRIRA § 102

21. In 1996, Congress enacted IIRIRA, Pub. L. No. 104-208, div. C, § 102, 110 Stat. 3009-554 (codified as amended at 8 U.S.C. § 1103 note). Section 102(a) provides in relevant part: "The Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a).

22. In 2005, Congress amended § 102 through the REAL ID Act, Pub. L. No. 109-13, div. B, § 102, 119 Stat. 306. As amended, § 102(c)(1) provides "notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal

requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section [amending this section]."

23. The delegation by Congress under Section 102 includes an express delegation that the Secretary's actions in his sole discretion result in "[amending this section]." IIRIRA § 102(c)(1). This delegation of legislative power is unconstitutional under Article I, Sections 7 and 8.

24. Any decision by the Secretary under § 102(c)(1), including "amending this section [Section 102]," becomes effective upon publication in the Federal Register.

25. The provision contains an unconstitutional, express delegation of unquestioned legislative power to the Executive Branch. In addition, despite the all encompassing breadth of the delegation, there are no criteria guiding the Secretary's exercise of this power and no procedures constraining it. Section 102(c)(2) further provides:

> (A) In general.—The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or *claim may only be brought alleging a violation of the Constitution of the United States*. The court shall not have jurisdiction to hear any claim not specified in this subparagraph. (B) Time for filing of complaint.—Any cause or claim brought pursuant to subparagraph (A) *shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security*. A claim shall be barred unless it is filed within the time specified. (C) Ability to seek appellate review.—*An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States*.

IIRIRA § 102(c) (2) (emphasis added). Congress thus limited judicial review to constitutional claims, imposed a sixty-day filing deadline, and channeled appellate review of both interlocutory orders and final judgments exclusively through discretionary review at the Supreme Court.

**B. The Determination**

26. The Determination purports to be issued under IIRIRA as well as the Secure Fence Act and the Department of Homeland Security Appropriations Act of 2008. However, the Secretary's Determination relies only on Section 102.

27. Within the Determination, the Secretary admits:

> Congress provided that the Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossing in areas of high illegal entry into the United States.

91 Fed. Reg. 46,940.

28. By unambiguous statute the Secretary's authority "to install additional barriers and roads" is limited to the purpose of deterring illegal crossings "in areas of high illegal entry into the United States." *See* IIRIRA § 102(a).

29. As set forth more fully herein, installing physical barriers and roads in the Big Bend Sector exceeds the authority given to the Secretary because the Big Bend Sector is not one of the "areas of high illegal entry." *Id.*

30. Even the Secretary's sole discretion is limited—in his own Determination—to the language of Section 102(c).

31. In reciting his power to waive all legal requirements, the Secretary notes "I, in my sole discretion, determine necessary to ensure the expeditious construction of barriers and roads authorized by Section 102 of IIRIRA." 91 Fed. Reg. 46,940. What the Secretary fails to acknowledge is that he is only authorized by Section 102 of IIRIRA to construct such barriers in "areas of high illegal entry." *See* IIRIRA § 102(a). Once again, his repeated reliance on Section

102 reinforces the fact that Section 102 restricts the Secretary's geographic reach, and his authority extends only to "areas of high illegal entry." *See id.*

32. In Section 1 of his Determination, the Secretary declares, "the United States Border Patrol Big Bend and Del Rio Sectors are areas of high illegal entry." *Id.* This statement is false. Big Bend and Del Rio Sectors are not "areas" of high illegal entry. Del Rio may be an area of high illegal entry; Big Bend is not. Neither the Secretary's sole discretion, nor his apparent putative ability to amend the law and "waive" all legal requirements includes a delegation to change reality.

33. The so-called evidence of Big Bend as an area of high illegal entry is that from 2021 through 2025, the Big Bend Sector "apprehended over 89,000 illegal aliens attempting to enter the United States[.]" *Id*. During that same time, Border Patrol "apprehended over 1,410,330 illegal aliens" attempting to enter the United States over border crossings in the Del Rio Sector. *Id.*

34. Not satisfied to warp the truth with that false conclusion, the Secretary continues with the following inaccurate justification:

> As the statistics cited above demonstrate, the Big Bend and Del Rio Sectors are areas of high illegal entry where illegal aliens regularly attempt to enter into the United States and smuggle illicit drugs, and given my mandate to achieve and maintain operational control of the Border, I must use my authority under Section 102 of IIRIRA to install additional barriers and roads in the Big Bend and Del Rio Sectors.

*Id.*

35. To conclude, as the Secretary does, that "as the statistics cited above demonstrate" the Big Bend is an area of high illegal entry would be laughable were it not for the abuse of power associated with declaring it. There is no statute, calculation, or fiction that supports the claim that Big Bend Sector is an "area of high illegal entry." It is imaginary and unsupported by fact.

36. The statement that the Secretary "must use [his] authority under Section 102 of IIRIRA to install additional barriers and roads in the Big Bend" is a complete fiction—no such authority exists.

37. Even in a world of untrammeled power, the Secretary relies on "my authority under Section 102 of IIRIRA." That authority only exists in areas of high illegal entry which do not include the Big Bend Sector. In the Determination, the Secretary attempts to establish a geographic area by GPS coordinates, and in justifying his actions to construct "additional physical barriers and roads" he relies once again on IIRIRA, in this instance both Sections 102(a) and 102(b), specifically. And, in ensuring "the expeditious construction of additional physical barriers and roads," the Secretary limits his authority to that which "is vested in me by Section 102(c) of IIRIRA." *Id.*

38. Even in executing the almost unlimited power he has, the Secretary goes beyond it in the language of his Determination. There, he waives not only "all of the following statutes," but oversteps his bounds by then stating: "including all federal, state, or other laws, regulations and legal requirements of, deriving from, or related to the subject of the following statutes as amended . . . ." *Id.* The Secretary then lists no less than 31 statutes. The problem with the Secretary's Determination is it is made unenforceable and constitutionally void for vagueness by claiming to waive the unidentified and undefined "other laws, regulations and legal requirements of, deriving from, or related to the subject of, the following statutes as amended."

39. The Secretary's Determination confirms by his own admission he is limited to the authority he possesses under Section 102. That authority does not extend to any areas other than those classified as areas of high illegal entry. The Big Bend falls outside such an area and the

Secretary has no authority to construct the border walls, roads or any of the other attendant features it describes in the Determination.[2]

### C. The Apprehension Data: Big Bend Is Not an Area of 'High Illegal Entry'

40. At the heart of the determination is that the Secretary insists on building the Border Wall through the Big Bend when he is not authorized by statute to do so, because the Big Bend Sector is not an area of high illegal entry as demonstrated by the Border Patrol's own statistics.

41. In FY2025, the Big Bend Sector recorded approximately 3,000 apprehensions—representing just 1.3% of all southern-border apprehensions. This figure represents a 74% decline from FY2023 levels.[3]

---

[2] Each time the Secretary recognizes he is acting under Section 102, he confirms, affirms, his authority only extends to the unambiguous grant—admittedly unconstitutional—of authority to only construct such barriers, roads and the like in areas of high illegal entry.

[3] Information used to create this chart is from the following sources: (i) 91 Fed. Reg. 7,297-98 (Feb. 17 2026); (ii) 91 Fed. Reg. 27,969-70 (May 15, 2026); (iii) 91 Fed. Reg. 34,831-33 (June 9, 2026); (iv) 91 Fed. Reg. 40,550-51 (July 2, 2026); (v) 91 Fed. Reg. 46,939-41 (July 27, 2026); (vi) U.S. Customs and Border Prot., *Lowest fiscal year for Border Patrol apprehensions since 1970* (October 7, 2025), http://cbp.gov/newsroom/national-media-release/lowest-fiscal-year-border-patrol-apprehensions-1970 (last visited Aug. 28, 2026).




42. By contrast, the Del Rio Sector recorded approximately 1,410,330 apprehensions from FY2021 through FY2025. Del Rio's apprehension rate far exceeds Big Bend's.

43. No reasonable reading of "area of high illegal entry" encompasses the Big Bend Sector. Its apprehension figures are the lowest of any sector on the southern border. Its vast geography, extreme terrain, and lack of transportation infrastructure on both sides of the border make it among the least attractive corridors for illegal crossing. And Charles Angell's Declaration demonstrates personal observations belying the Secretary's conclusions. *See* Exhibit A, Angell Declaration.

**D. The July 27, 2026 Determination: Manufacturing a Predicate Through Sector Combination**

44. In a transparent effort to inaccurately classify the Big Bend Sector as "high illegal entry" and in a tacit, if not direct, acknowledgment that Section 102 only applies to "high illegal entries," on July 27, 2026, the Secretary published the Determination at 91 Fed. Reg. 46,939. For the first time in the history of § 102(c)(1), the Secretary combined two previously distinct Border Patrol sectors—Big Bend and Del Rio—into a single sector for purposes of manipulating his unsupported conclusion and finding that the Big Bend is a high illegal entry area. His "high illegal entry" determination intentionally creates a false, alternative scenario in an effort to build the Border Wall through Big Bend.

45. This combination served one purpose: to allow Del Rio's apprehension figures to be attributed to the combined area, thereby manufacturing the statistical predicate for a Determination that Big Bend's own data could never support.

46. No provision of IIRIRA authorizes combining two sectors—one that satisfies the statutory predicate and one that does not—to manufacture a single "high illegal entry" finding.

**E. The Big Bend Sector: A Landscape of Ecological and Cultural Significance**

47. The Big Bend Sector encompasses approximately 510 miles of the Texas-Mexico border, stretching from the western boundary of the Del Rio Sector to the eastern boundary of the El Paso Sector. It is among the most remote and ecologically significant landscapes in North America.

48. Within and adjacent to the Sector lie Big Bend National Park (over 801,000 acres), Big Bend Ranch State Park (over 300,000 acres), [4] the Rio Grande Wild and Scenic River (196

[4] Tex. Parks & Wildlife Dep't, *Big Bend Ranch State Park: History*, https://tpwd.texas.gov/state-parks/big-bend-ranch/history (last visited Aug. 27, 2026).

miles),[5] and Black Gap Wildlife Management Area (over 100,000 acres).[6] Together with protected areas in Mexico, these lands form part of one of North America's largest transboundary protected areas and a conservation landscape that includes more than 3 million acres of protected Chihuahuan Desert resources and hundreds of miles of protected river corridor.[7]

49. The region provides critical habitat for federally listed species, including the Mexican long-nosed bat and the Big Bend gambusia. *See* 50 C.F.R. § 17.11(h).[8] Its riparian corridors, Chihuahuan Desert ecosystems, and limestone canyonlands support biodiversity found nowhere else in the United States.[9]

50. The Sector also contains archaeological sites, historic structures protected under the National Historic Preservation Act, and sacred sites of Tribal Nations whose cultural patrimony would be destroyed by barrier construction.

[5] Nat'l Park Serv., U.S. Dep't of the Interior, *Rio Grande Wild and Scenic River: Final General Management Plan/Environmental Impact Statement* i (Aug. 2004), https://www.nps.gov/rigr/learn/management/upload/RIGR_gmp-eis.pdf (last visited Aug. 27, 2026); 16 U.S.C. § 1274(a)(17).

[6] Tex. Parks & Wildlife Dep't, *Black Gap WMA*, https://tpwd.texas.gov/huntwild/hunt/wma/find_a_wma/list/?id=2 (last visited Aug. 27, 2026).

[7] *Big Bend National Park Fact Sheet*, https://www.nps.gov/bibe/learn/management/statistics.htm (last visited Aug. 27, 2026).

[8] Tex. Parks & Wildlife Dep't, *Mexican Long-nosed Bat (Leptonycteris nivalis)*, https://tpwd.texas.gov/huntwild/wild/species/mexlongnose/ (last visited Aug. 27, 2026); Tex. Parks & Wildlife Dep't, *Big Bend Gambusia (Gambusia gaigei)*, https://tpwd.texas.gov/huntwild/wild/species/bbgambus/ (last visited Aug. 27, 2026).

[9] *See* Nat'l Park Serv., U.S. Dep't of the Interior, *Big Bend National Park Fact Sheet*, https://www.nps.gov/bibe/learn/management/statistics.htm (last updated Jan. 1, 2026); Tex. Parks & Wildlife Dep't, *Trans-Pecos West Texas Habitat: Wildlife Management: Endangered Species*, https://tpwd.texas.gov/landwater/land/habitats/trans_pecos/endangered_species/ (last visited Aug. 27, 2026).

### F. The 1970 Boundary Treaty and 1944 Water Treaty Issue

51. CBP's published border infrastructure mapping shows a patrol road alignment through the Mariscal Canyon area. The terrain of Mariscal Mountain, through which the Canyon cuts, would require the new road be dynamited and bulldozed across Mariscal Mountain. No engineering documentation has been made public for the Mariscal Mountain alignment. Mariscal Canyon is narrow, and its walls rise roughly 1,400 feet above the Rio Grande. Rock removed to carry a road across the rim above that canyon must be disposed of somewhere. *See* Letter from Rep. Doggett et al. to Sec'y Rubio et al. (Aug. 7, 2026).

52. On steep ground, the ordinary and least expensive method of disposal is cut-and-fill with side-casting, in which excavated material is pushed over the downhill edge rather than hauled off the mountain. The prime contractor for the Big Bend work is Southwest Valley Constructors. This same contractor used that method on comparably steep ground at Guadalupe Canyon, Arizona, in 2020, where debris was documented crossing into Mexican territory. As there, here, the discharge of materials across the border violates the 1970 Boundary Treaty and 1944 Water Treaty. The likelihood such conduct and outcomes may occur is real. Not even the Secretary is allowed to violate and amend treaties, and any such ostensible delegation would be unconstitutional. *See* Letter from Rep. Doggett et al. to Sec'y Rubio et al. (Aug. 7, 2026).

53. Section 102(c) of IIRIRA does not and cannot waive these treaty obligations. These concerns were also raised in an August 7, 2026 letter from twelve Members of Congress—Representatives Lloyd Doggett, Jared Huffman, Greg Casar, Joaquin Castro, Jasmine Crockett, Veronica Escobar, Lizzie Fletcher, Sylvia R. Garcia, Vicente Gonzalez, Julie Johnson, Christian D. Menefee, and Donald S. Beyer Jr.—to Secretary of State Marco Rubio, Secretary of Homeland Security Markwayne Mullin, CBP Commissioner Rodney S. Scott, and International Boundary

and Water Commission ("IBWC") Commissioner W. C. "Chad" McIntosh (the "August 7 letter"). The August 7 letter explains blasting a road across Mariscal Mountain could send spoil into the Rio Grande, potentially violating the treaties. The August 7 letter also notes authority under Section 102(c) does not reach modifying or breaching United States obligations arising under the 1944 or 1970 treaties.

54. According to the August 7 letter, the proposed road would sit approximately 1,700 feet above the border in one of the least-trafficked stretches of the entire southern border, where anyone crossing would first have to climb 1,400-foot cliffs to access the road. An existing road just north of Mariscal Mountain is regularly patrolled and is sufficient for Border Patrol operations. The proposed road provides no meaningful additional border security benefit, would cause irrevocable damage to the mountain, and risks Treaty violations with Mexico.

### G. The Scope of "All Legal Requirements": The Constitutional Impossibility of a Literal Reading

#### 1. The Statute's Text Admits No Limit

55. Section 102(c)(1) grants the Secretary the unilateral power to waive all legal requirements—every statute, every regulation, every constitutional protection—in his sole discretion. The statute provides, in full: "notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." IIRIRA § 102(c)(1), 8 U.S.C. § 1103 note (as amended by the REAL ID Act of 2005, Pub. L. No. 109-13, div. B, § 102, 119 Stat. 302, 306). The phrase "all legal requirements" names no category of waivable law, sets no standard for "necessary," and gives affected landowners, regulated entities, and state and local governments no way to know which legal protections survive the Secretary's pen stroke.

56. Nothing in the text narrows that breadth. Unlike delegations that identify specific statutes subject to waiver or confine waivers to defined regulatory regimes, Section 102(c)(1) lists no waivable laws and excludes no category of legal authority. "To ensure expeditious construction" states only a policy objective, not a limiting standard. "Necessary" and "expeditious" are left to whatever the Secretary chooses them to mean in the Secretary's "sole discretion."

**2. A Literal Reading Encompasses the Constitution Itself**

57. If "all legal requirements" means what it says—every requirement imposed by law, without limitation—then a Secretary, acting in his sole discretion, can claim authority to override all three pillars of American law: (i) the United States Constitution, which imposes the supreme "legal requirements" binding all governmental actors; (ii) all judicial opinions and orders, which impose binding requirements on the parties and the government; and (iii) the entirety of the United States Code, every provision of which constitutes a "legal requirement" within the Secretary's geographic reach. And what else could it mean?

58. No limiting language qualifies this reach—no carve-out for constitutional provisions, no exception for judicial decrees, no exclusion of criminal laws. Taken at face value, § 102(c)(1) vests one person, acting in his sole discretion, with the power to suspend the Constitution, nullify the entire United States Code, and override all judicial orders within a defined geographic area. Under the government's reading, the Secretary could waive the Fifth Amendment's just-compensation requirement,[10] override a federal court's injunction, and suspend the Endangered Species Act's protections for the Big Bend gambusia—all by a single Federal Register notice, without a hearing, without a court order, and without any affected person's

---

[10] Section 102(b)(1)(C)(ii)(II) states "[n]othing in this subparagraph may be construed to affect the eminent domain laws of the United States or of any State." Can the Secretary's power to amend the statute and waive any legal requirements allow waiver of this provision?

knowledge. No statute in American history has claimed such authority. No constitutional structure can sustain it. As the Supreme Court has recognized, "[a]t some point the responsibilities assigned can become so extensive and so unconstrained that Congress has in effect delegated its legislative power." *FCC v. Consumers' Research*, 606 U.S. 656, 703 (2025) (Kavanaugh, J., concurring) (quoting *Loving v. United States*, 517 U.S. 748, 777 (1996)) (alteration in original). Section 102(c)(1) has reached—and surpassed—that point.

### 3. No Constitutional Principle Permits Such Power

59. The United States Constitution cannot be waived by an executive officer—not by one acting under a statutory delegation, not by one acting in his "sole discretion," and not by one whose determination becomes effective upon Federal Register publication without judicial review. That principle is not debatable. It is the structural foundation of American constitutional law, and it renders § 102(c)(1) unconstitutional.

60. The Supremacy Clause declares "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. In *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), Chief Justice Marshall held the Constitution is "a superior, paramount law, unchangeable by ordinary means" and "a legislative act contrary to the constitution is not law[.]" If Congress cannot override constitutional requirements through ordinary legislation, a fortiori an executive officer acting under a congressional delegation cannot waive them by an administrative determination published in the Federal Register. Section 102(c)(1) fails that test.

61. Separation of powers and Article III likewise foreclose reading "all legal requirements" to include judicial orders. Article III vests the "judicial Power" in the courts, including authority to interpret the Constitution and issue binding orders. As Justice Story

explained, no state court or legislature may "annul the judgments of the courts of the United States, or destroy the rights acquired under them[,]" or "reverse a determination, once made, in a particular case[.]" 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES §§ 1751–53 (1833). That rule binds the Executive with equal or greater force. If the Secretary could waive a judicial order, the Executive would override Article III and collapse the tripartite structure of American government into a unitary executive authority over both law and judgment.

62. The Presentment Clause and bicameralism compel the same result. In *Clinton v. City of New York*, 524 U.S. 417, 438 (1998), the Supreme Court held "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." The Court emphasized the power to enact statutes may only "be exercised in accord with a single, finely wrought and exhaustively considered, procedure." *Id.* at 439–40 (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983)). Congress "cannot alter the procedures set out in Article I, § 7, without amending the Constitution." *Id.* at 446. Even as the President cannot unilaterally repeal or amend statutes—even with Congress's express but unconstitutional authorization—the Secretary cannot accomplish the same result with the Constitution by Federal Register Declaration waiver. That is precisely what § 102(c)(1) purports to authorize. Congress cannot delegate what it does not itself possess: the power to suspend the Constitution by executive fiat.

63. In *INS*, 462 U.S. at 952, the Court held an action is "essentially legislative in purpose and effect" when it "alter[s] the legal rights, duties, and relations of persons . . . outside the legislative branch." The Secretary's waiver of federal, state, and local legal requirements within the project area does exactly that: it alters the legal rights, duties, and relations of every person within that area, as it does with his actions "[amending this section [102]]." These accomplished what only the Article I process can do—a selective repeal of diverse provisions of

the United States Code with concurrent preemption of state and local laws. That is legislation. One officer's sole discretion does not change its character.

64. Defendants would ask this Court to accept Congress accomplished by delegation what it could not do directly—the effective nullification of constitutional limits on governmental power. Hamilton answered that claim 239 years ago: "every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void. No legislative act, therefore, contrary to the Constitution, can be valid." THE FEDERALIST NO. 78, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Section 102(c)(1) is such an act. It is void.

**4. The Statute Defeats Itself**

65. A literal reading of "all legal requirements" is self-defeating. Section 102(c)(2)(A) preserves jurisdiction to hear claims alleging "a violation of the Constitution of the United States." 8 U.S.C. § 1103 note, § 102(c)(2)(A). That provision assumes the Constitution still constrains the Secretary—that his sole discretion does not reach the fundamental law itself. Otherwise, constitutional review would be meaningless: the Secretary's sole discretion would have erased the very standard the Court is asked to enforce.

66. The canon against surplusage confirms that conclusion. If "all legal requirements" includes constitutional requirements, then § 102(c)(2)(A)'s preservation of constitutional claims becomes a dead letter: the Secretary's sole discretion would waive the very constitutional right that provision authorizes courts to enforce. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012) ("[E]very word and every provision is to be given effect . . . . None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence."). Only a reading that excludes the Constitution from the Secretary's sole discretion gives effect to both § 102(c)(1) and § 102(c)(2)(A).

67. The delegation is self-consuming. "Under this section" incorporates § 102 as a whole—including § 102(a)'s "high illegal entry" predicate, § 102(b)'s geographic limits, and § 102(c)(2)'s judicial review provisions. If the Secretary may waive "all legal requirements" without qualification, he may erase the very statutory constraints that supply the delegation's intelligible principle. A standard the delegatee may waive at will is no standard at all. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 541–42 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935).

**5. The Statute Provides No Guidance for the Power It Claims**

68. If "all legal requirements" cannot encompass the Constitution—and it cannot—then the phrase's claimed limitlessness is false. The phrase has boundaries the Secretary's "sole discretion" cannot override. Those boundaries must come from the statute's text, structure, and constitutional context. Yet § 102(c)(1) provides no principled way to identify them: no enumeration of waivable categories, no standard for necessity, no geographic or temporal boundaries, no procedural safeguards, and no substantive criterion for choosing which laws to waive and which to honor. The inevitable conclusion is § 102(c)(1) is unconstitutional. It purports to vest in a single executive officer—acting in his "sole discretion," without notice, without process, and without meaningful judicial review—the unilateral authority to nullify the supreme law of the land, the entire body of enacted federal law, and binding judicial orders. No prior statute in the history of the Republic has claimed such power. No constitutional principle has ever or will ever permit it.

69. Because § 102(c) is unconstitutional in its breadth and design, every cause of action following is a distinct pathway to the same result: invalidation. The nondelegation doctrine (Count I) addresses Congress's failure to provide an intelligible principle for power of this magnitude.

The separation of powers claim (Count II) addresses the unconstitutional accumulation of legislative, executive, and quasi-judicial power in a single officer acting in his sole discretion. The Take Care Clause claim (Count III) addresses the Executive's failure to faithfully execute the very statute it invokes. The major questions doctrine (Count IV) demands clear congressional authorization for assertions of vast economic and political significance—and there can be no assertion of greater significance than the power to suspend the supreme law of the land at one person's sole discretion. The vagueness claim (Count V) addresses the impossibility of predicting which laws will be suspended when the statute's terms have no definition or clarity, and its only constraint is the will of a single official. The due process and takings claims (Counts VI and VII) address the deprivation of constitutionally protected interests without constitutionally adequate process—injuries made inevitable by the Secretary acting outside his authority, and an executive regime eliminating all procedural safeguards by design. Each count follows from the same root defects, and each independently warrants relief.

70. The adequate remedy is invalidation of § 102(c) and vacatur of the July 27, 2026 Determination and all waiver therein regarding the Big Bend Sector, together with declaratory and injunctive relief preventing Defendants from relying on this unconstitutional provision to bulldoze a national park while suspending the Constitution, the United States Code, and the judgments of the federal courts.

## VI. CAUSES OF ACTION

### COUNT I: Violation of the Nondelegation Doctrine
### U.S. Const. art. I, § 1 — Facial Challenge

71. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

72. Article I, Section 1 of the Constitution provides "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." Congress may not delegate its

legislative power to the Executive Branch without providing an "intelligible principle" to guide the delegatee's exercise of discretion.

73. Section 102(c)(1) authorizes the Secretary to "waive all legal requirements"—a phrase facially encompassing the United States Constitution, all provisions of the United States Code, and all U.S. jurisprudence, including judicial precedent and case law—in the Secretary's "sole discretion." This is not a delegation of executive power to execute the law—it is a surrender of legislative power to nullify law. It also expressly allows him to amend Section 102 in his sole discretion.

74. The Supreme Court has held "repeal of statutes, no less than enactment, must conform with Art[icle] I." *INS*, 462 U.S. at 954. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton*, 524 U.S. at 438. And yet, Section 102(c)(1) authorizes the Secretary to amend section 102 based upon his actions.[11]

75. Section 102(c)(1) provides no intelligible principle to guide the Secretary's discretion. Its sole directional language—"to ensure expeditious construction"—is a bare policy objective, not a limiting standard. The intelligible-principle test asks whether Congress has "la[id] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)) (second alteration in original). Section 102(c)(1) fails that test because its sole directional language supplies no standard distinguishing laws that may be waived from laws that must remain in force.

[11] The delegated power to amend a statute actually encompasses the broadest possible legislation. The power to amend also, *ipso facto*, includes the powers to change, repeal, and also the power to enact.

76. The delegation is self-consuming: the phrase "under this section" incorporates the entirety of § 102—including § 102(a)'s "high illegal entry" predicate—meaning the Secretary possesses the authority to waive the very constraints that purportedly supply the delegation's intelligible principle. A standard the delegatee may waive at will provides no more guidance than no standard at all. *Cf. Gundy v. United States*, 588 U.S. 128, 153 (2019) (Gorsuch, J., dissenting) ("The framers understood, too, it would frustrate 'the system of government ordained by the Constitution' if Congress could merely announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals. Through the Constitution, after all, the people had vested the power to prescribe rules limiting their liberties in Congress alone. No one, not even Congress, ha[s] the right to alter that arrangement.") (citations omitted). Even the *Gundy* plurality recognized the delegatee's discretion could not be "unguided" and "unchecked" where the delegatee could "change her policy for any reason and at any time"; otherwise, "we would face a nondelegation question" because the delegatee could set aside the statutory requirements at her sole discretion. *Id.* at 136 (plurality opinion).

77. "The degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 475. Where, as here, the scope reaches the Constitution, all federal statutory law, and all judicial precedent within a geographic area, the limiting principle must be proportionally more specific—yet here it is less so than in any delegation the Court has upheld. Section 102(c)(1) has become so extensive and so unconstrained there can be no conclusion other than Congress has delegated its legislative power.

78. The whole-text and surplusage canons confirm the constitutional defect. If "sole discretion" to waive "all legal requirements"—including the United States Constitution, all provisions of the United States Code, all U.S. jurisprudence, and even § 102—is given literal force,

it renders §§ 102(a) and (b), the "high illegal entry" predicate, the geographic limits, the specific mandates, entirely superfluous. The Secretary need not comply with any constraint because he may waive all of them. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012) ("[e]very word and every provision is to be given effect"). The Supreme Court has consistently enforced this principle. *See Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012) (expressing "our general 'reluctan[ce] to treat statutory terms as surplusage'") (quoting *Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 788 (2011)) (alteration in original); *Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017) (the canon against superfluity rests on the presumption Congress is a careful drafter and each word "is there for a reason").

79. The self-referential paradox further seals the constitutional defect. The Determination extends to "all legal requirements . . . necessary to ensure expeditious construction of the barriers and roads under this section." IIRIRA § 102(c)(1) (emphasis added). The phrase "under this section" incorporates the entirety of § 102—including § 102(a)'s "high illegal entry" predicate and § 102(b)'s geographic mandates. If those provisions are themselves "legal requirements" relating to barrier construction "under this section," then the Secretary possesses the authority to waive the very constraints that purportedly supply the delegation's intelligible principle. The delegation is self-consuming: the standards Congress wrote to confine the Secretary's discretion are themselves subject to the Secretary's discretion. A construction permitting the delegation to amend and then nullify the very standards confining his authority cannot be reconciled with the statute read as a whole. The Secretary's interpretation violates the foundational principle "the words of a statute must be read in their context with a view to their

place in the overall statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (alteration in original).

80. The nondelegation doctrine serves to prevent both the concentration of power and its counterpart: the abdication of legislative authority to a single executive officer.

81. Justice Story recognized legislative power is uniquely dangerous because of its breadth: "[I]ts constitutional powers are more extensive, and less capable of being brought within precise limits, than those of either of the other departments." 2 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 533 (1833). Precisely because legislative power is the most extensive, its delegation must be the most constrained. An unconstrained delegation of the most far-reaching governmental power is not a delegation at all—it is an abdication.

82. Section 102(c)(1) violates Article I, Sections 1, 7, and 8 of the United States Constitution by delegating the exclusively legislative power to enact, amend, and nullify enacted law without any intelligible principle to guide the Secretary's discretion.[12]

83. Prior courts have upheld § 102(c)(1) against nondelegation challenges by relying on § 102(a)'s "high illegal entry" predicate and the "expeditious construction" purpose as supplying adequate guidance. *See Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 127–28 (D.D.C. 2007); *Center for Biological Diversity v. Noem*, 2025 WL 4083346, No. 4:24-cv-00557 (D. Ariz. Dec. 2, 2025). But those courts did not confront the unconstitutional, self-consuming structure at issue here: the Secretary's asserted power to amend or repeal §§ 102(a) and 102(b) themselves—thereby erasing the very standards those courts relied upon as the intelligible principle. No prior decision has addressed this overarching issue involving a delegation in which

[12] The delegation to the Secretary to amend Section 102 also violates Article I Section 7 authorizing laws to be enacted, amended, or repealed according to the procedures set forth in that section of Article I.

the delegatee can nullify the statutory constraints purportedly guiding the delegation. The delegation of legislative power in Section 102 makes it unconstitutional on its face.

**COUNT II: Violation of the Separation of Powers**
**U.S. Const. arts. I, II — Facial Challenge**

84. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

85. The Constitution establishes a government of separated powers, dividing legislative, executive, and judicial authority among three coordinate and equal branches.

86. Section 102(c)(1) violates the separation of powers by vesting in one executive officer the legislative power to amend, repeal, nullify, and enact law, the executive discretion to decide when and where to do so, and immunity from meaningful judicial review. This accumulation of such powers is "the very definition of tyranny." THE FEDERALIST NO. 47, at 301 (James Madison) (Clinton Rossiter ed., 1961).

87. As the English Revolution abolished and the American Founders rejected, the dispensing power—the authority to suspend laws "without consent of parliament"—is "illegal." 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *185 (1765); *see also* English Bill of Rights of 1689, 1 W. & M., sess. 2, c. 2, § 1.

88. As Chief Justice Marshall established, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury*, 5 U.S. at 177. A provision authorizing one executive officer to erase law and judicial decisions under the undefined phrase "all legal requirements" by publication in the Federal Register subverts the very premise of judicial review, and separation of powers.

89. Section 102(c)(2) compounds the separation-of-powers violation by stripping the judiciary of ordinary review. In addition to the waiver of over thirty laws, the provision expressly

limits cognizable claims to constitutional violations, channels appellate review exclusively to the Supreme Court by certiorari, and imposes a sixty-day (60) statute of limitations—all with the express purpose of ensuring judicial review does not "delay the expeditious construction of border security infrastructure." H.R. Rep. No. 109-72, at 172 (2005). The resulting framework permits one executive officer to nullify any law, while the only appellate review available is a discretionary petition to the Supreme Court. However salutary the goal of expeditious construction, the constitutional structure does not permit Congress to functionally insulate the exercise of legislative power from the ordinary mechanisms of judicial review while simultaneously stripping every substantive legal protection from the affected geographic area. *See Marbury*, 5 U.S. at 178 ("[T]he constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply. . . . The judicial power of the United States is extended to all cases arising under the constitution.").

90. Section 102(c)(2)(C) eliminates intermediate appellate review as of right, channeling all appeals to discretionary Supreme Court certiorari. IIRIRA § 102(c)(2)(C). Unlike statutes that direct review to an Article III court of appeals hearing cases as of right, this provision transforms appellate review from an entitlement into discretionary grace. Because the Supreme Court grants certiorari in only a small fraction of cases, a single district court's decision becomes the practical final word on the constitutionality of the most sweeping delegation in the Republic's history. This is not "meaningful review" under Article III. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 10–11 (2012); *cf. Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 & n.20 (1994) (finding meaningful judicial review when the Court of Appeals could review statutory and constitutional claims). Here, no Article III appellate court will ever hear these constitutional challenges as of right.

91. The Supreme Court has recognized structural limits on Congress's power to restrict constitutional protections through jurisdictional legislation. In *Boumediene v. Bush*, the Court held "[t]o hold the political branches have the power to switch the Constitution on or off at will" would "permit a striking anomaly in our tripartite system of government[.]" 553 U.S. 723, 765 (2008). The writ of habeas corpus is "an indispensable mechanism for monitoring the separation of powers" whose scope "must not be subject to manipulation by those whose power it is designed to restrain." *Id.* at 765–66. This structural principle extends beyond the Suspension Clause: where the Constitution limits governmental power, Congress may not structure judicial review to render those limits practically unenforceable. *See Webster v. Doe*, 486 U.S. 592, 603 (1988). Section 102(c)(2) implicates this principle through three interlocking restrictions: express substantive preclusion of all non-constitutional claims under § 102(c)(2)(A); temporal preclusion through the sixty-day deadline in § 102(c)(2)(B), which may expire before concrete injury or adequate notice; and appellate preclusion through § 102(c)(2)(C)'s certiorari-only review. Together, these restrictions create a structure in which the constitutional limits on the Secretary's waiver power are unlikely to receive the appellate scrutiny Article III contemplates.

92. The sixty-day filing deadline in § 102(c)(2)(B) independently raises constitutional concerns as applied to Plaintiff Angell's property claims. Section 102(c)(2)(B) runs from "the date of the action or decision made by the Secretary of Homeland Security"—i.e., the date of the Federal Register publication—not from the date of the plaintiff's injury. IIRIRA § 102(c)(2)(B). A Federal Register notice is not reasonably calculated to apprise individual landowners in the remote Big Bend Sector of the pendency of executive action affecting their constitutional rights. *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (determining due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of

the pendency of the action and afford them an opportunity to present their objections.”). To the extent § 102(c)(2)(B) bars Angell’s constitutional claims before he has suffered the injury giving rise to those claims, or before he has received constitutionally adequate notice, the deadline is unconstitutional as applied.

93. Section 102(c)(2)(C) also creates a structural paradox ensuring constitutional questions arising under § 102(c)(1) may never receive authoritative appellate resolution. By eliminating circuit-court review, the provision prevents the development of the very circuit split the Supreme Court frequently requires before granting certiorari. *See* Sup. Ct. R. 10(a) (identifying conflict among courts of appeals as a primary consideration for certiorari). The result is a Catch-22: the constitutional validity of § 102(c)(1) cannot be authoritatively resolved because the appellate mechanism that would typically generate the predicate for Supreme Court review has been eliminated. As Justice Story recognized, “[t]he power of interpreting the laws involves necessarily the function to ascertain, whether they are conformable to the constitution, or not; and if not so conformable, to declare them void and inoperative[,]” for “otherwise the acts of the legislature and executive would in effect become supreme and uncontrollable, notwithstanding any prohibitions or limitations contained in the constitution; and usurpations of the most unequivocal and dangerous character might be assumed, without any remedy within the reach of the citizens.” 2 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1570 (1833). A review structure preventing the judiciary from performing this constitutionally assigned function is itself a violation of the separation of powers.

94. Congress possesses broad authority to structure federal court jurisdiction. *Patchak v. Zinke*, 583 U.S. 244, 252–53 (2018). But the Supreme Court has identified limits: Congress may not employ jurisdictional rules to “direct the result” by prescribing legal standards it is “powerless”

to impose directly. *Bank Markazi v. Peterson*, 578 U.S. 212, 228 (2016); *United States v. Klein*, 80 U.S. (13 Wall.) 128, 147 (1872) (by directing the Court to dismiss an action if a particular finding is made "Congress has inadvertently passed the limit which separates the legislative from the judicial power."). Section 102(c)(2) raises this concern because it does not merely channel review from one Article III court to another—it eliminates intermediate appellate review in an Article III court entirely, and substitutes discretionary certiorari providing no assurance of appellate consideration. The resulting structure differs in kind from upheld jurisdiction-channeling provisions, which preserved review before an Article III tribunal competent to adjudicate claims as of right. *See Elgin*, 567 U.S. at 10–11, 23 (recognizing the statute lawfully permitted administrative review and judicial review before the Federal Circuit of both statutory and constitutional claims, even though it precluded district court jurisdiction). As Hamilton observed, constitutional "[l]imitations . . . can be preserved in practice no other way than through the medium of courts of justice." THE FEDERALIST NO. 78, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Where a jurisdictional scheme forecloses all statutory review, compresses the period for constitutional challenge, and eliminates appellate review as of right, Article III's structural safeguards are substantially diminished. Section 102(c)(2) exceeds Congress's jurisdictional authority for that reason.

95. Section 102(c)(1), together with the review restrictions in § 102(c)(2), violates the separation of powers embodied in Articles I, II, and III. The provision vests legislative power in the Executive, insulates its exercise from meaningful judicial review, and permits constitutional protections to be switched on or off at a single officer's discretion—the very arrangement the Founders designed the separation of powers to prevent. *See, e.g.*, *Boumediene*, 553 U.S. at 742 ("The Framers' inherent distrust of governmental power was the driving force behind the

constitutional plan that allocated powers among three independent branches. This design serves not only to make Government accountable but also to secure individual liberty."); *Clinton*, 524 U.S. at 438 (holding "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."); *Marbury,* 5 U.S. at 177 (recognizing "the constitution controls any legislative act repugnant to it[.]").

96. Section 102(c) violates the separation of powers embodied in Articles I and II of the United States Constitution.

**COUNT III: Violation of the Take Care Clause**
**U.S. Const. art. II, § 3 — As-Applied Challenge**

97. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

98. The Take Care Clause requires the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

99. When the executive manufactures the factual predicate for statutory action, he is not faithfully executing the law. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) (executive authority is "at its lowest ebb" when the President acts contrary to congressional will).

100. IIRIRA § 102(a) authorizes barriers and roads only where the Secretary determines it is necessary to deter illegal crossings in "areas of high illegal entry into the United States." IIRIRA § 102(a). Big Bend Sector's approximately 3,000 apprehensions in FY2025 cannot

credibly constitute "high illegal entry" when compared to Del Rio Sector's 1,410,330 apprehensions over a four- or five-year period.[13]

101. Three canons of construction reinforce this conclusion. First, *expressio unius*: "[T]he expression of one thing implies the exclusion of others." SCALIA & GARNER, READING LAW 107 (2012); *see also N.L.R.B. v. SW General, Inc.*, 580 U.S. 288, 302 (2017) ("The *expressio unius* canon applies only when 'circumstances support[ ] a sensible inference that the term left out must have been meant to be excluded.'") (alteration in original); *see also Russello v. United States*, 464 U.S. 16, 23–24 (1983) ("Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended."). Congress specified "high" illegal entry—necessarily excluding all other areas. Second, ordinary meaning: "high" is comparative and presupposes areas that are not high. Big Bend's approximately 89,000 apprehensions over five years cannot be "high" when Del Rio records over 1,410,330 in the same period. Third, the surplusage canon: "[e]very word and every provision is to be given effect." SCALIA & GARNER, READING LAW 174 (2012); *see also Marx v. General Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used.") (citations omitted). If the term "high" were to include all areas regardless of actual entry rates, it means nothing and would be surplusage.

[13] *See* U.S. Customs & Border Control, *Illegal border crossings in Big Bend Sector fall significantly in FY 2025* (Dec. 5, 2025), https://www.cbp.gov/newsroom/local-media-release/illegal-border-crossings-big-bend-sector-fall-significantly-fy-2025 (last visited Aug. 28, 2026); 91 Fed. Reg. 46,939.

102. The Secretary's decision to combine Big Bend with Del Rio into a single "project area" constitutes statistical sophistry, redefining without basis the geographic delineation of the Big Bend to include two sectors goes beyond sole discretion and violates due process as well as the Take Care clause.

103. An agency must "defend its actions based on the reasons it gave when it acted" and may not rely on post hoc rationalizations. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020). A predicate manufactured by geographically gerrymandering two disparate sectors is the antithesis of faithful execution.

104. The Secretary has not faithfully executed Section 102. Instead, he attempts to circumvent it, in violation of the Take Care Clause.

**COUNT IV: Violation of the Major Questions Doctrine**
**As-Applied Challenge**

105. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

106. Without waiver of any other argument or Count set forth herein, the major questions doctrine provides "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *West Virginia*, 597 U.S. at 723 (alteration in original).

107. An interpretation of IIRIRA § 102(c)(1) granting one officer power to nullify the United States Constitution, all provisions of the United States Code, and all U.S. jurisprudence—including judicial precedent and case law—within a defined geographic area is exactly the kind of sweeping claim the major questions doctrine was designed to police. *See Biden v. Nebraska*, 600 U.S. 477, 501 (2023) (rejecting the government's broad reading of waiver authority because "[t]he question here is not whether something should be done; it is who has the authority to do it").

108. The Secretary's interpretation of § 102(c)(1) as authorizing the Border Wall and road construction in areas that are not areas of high illegal entry, the combination of disparate border sectors to manufacture a "high illegal entry" finding, and to waive the United States Constitution, all provisions of the United States Code, all U.S. jurisprudence (including judicial precedent and case law), and all state and local legal requirements affecting such areas, claims vast power without clear congressional authorization, in violation of the major questions doctrine as applied.

109. In *A.L.A. Schechter Poultry Corp.*, 295 U.S. at 541-42, and *Panama Refining Co.*, 293 U.S. at 430, the Court struck down delegations limited to a single industry. In contrast, Section 102(c)(1) reaches all law—every federal, state, and local statute, regulation, administrative order, and judicial decisions within its geographical scope. It delegates "the very essence of legislative choice"—"[d]eciding what competing values will or will not be sacrificed to the achievement of a particular objective[.]" *Rodriguez v. United States*, 480 U.S. 522, 526 (1987). No prior delegation has ever reached so far with so few constraints. Effective delegation, when particularly broad, should be accompanied by clear guidance on its method of application and must involve an overlay of an intelligible principle to guide its exercise. Here, the opposite exists.

110. The principle courts must exercise independent judgment in interpreting statutes—rather than deferring to an agency's expansive reading of its own authority—applies with full force here. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) (overruling *Chevron* deference and holding courts bear the obligation to determine the best reading of a statute). This Court should not accept the Secretary's sweeping construction of § 102(c)(1) merely because the text is broad. It must independently determine whether Congress intended to confer the unprecedented authority the Secretary claims—the discretion to set aside the United States Constitution, all provisions of

the United States Code, all U.S. jurisprudence (including judicial precedent and case law), and even the authorizing statute's own limits—to build the Border Wall.

111. Section 102(c) is unconstitutional.

**COUNT V: Void for Vagueness**
**U.S. Const. amend. V — Facial and As-Applied Challenge**

112. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

113. The Due Process Clause of the Fifth Amendment provides no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. A statute violates due process when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). The void-for-vagueness doctrine thus serves as "a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not." *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (citing *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983)).

114. Section 102(a) of IIRIRA conditions the Secretary's authority to construct barriers on the existence of "areas of high illegal entry into the United States." 8 U.S.C. § 1103 note. Yet the statute provides no definition of "high illegal entry," no quantitative threshold, no comparative benchmark, and no methodology for measuring or determining what level of illegal entry qualifies as "high illegal entry." The term is standardless. A person of ordinary intelligence—or, indeed, a federal officer charged with executing the provision—cannot ascertain from the statutory text alone whether a sector with 3,000 apprehensions, or 30,000, or 300,000, constitutes an area of "high illegal entry." As the Supreme Court has warned, "[a] vague law impermissibly delegates

basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis[.]" *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *see also Kolender*, 461 U.S. at 358 ("the more important aspect of vagueness doctrine" is "the requirement that a legislature establish minimal guidelines to govern law enforcement").

115. Section 102(c)(1) compounds this deficiency by authorizing the Secretary to "waive all legal requirements"—a phrase plainly encompassing the United States Constitution, all provisions of the United States Code, and all U.S. jurisprudence, including judicial precedent and case law—that the Secretary, "in such Secretary's sole discretion," deems "necessary to ensure expeditious construction." IIRIRA § 102(c)(1). The phrase "all legal requirements" is boundless: it identifies no category of law subject to waiver, or not subject to waiver, it establishes no criteria for determining when a waiver is "necessary," and provides no standard by which any person—including the affected landowners, regulated entities, and state and local governments whose laws are nullified—can predict which legal protections will be suspended and which will remain in force. It arguably includes not only all laws and regulations, but judicial decisions as well. This is the kind of "standardless sweep" that "allows policemen, prosecutors, and juries to pursue their personal predilections" and facilitates arbitrary enforcement. *Kolender*, 461 U.S. at 358.

116. Other material terms in § 102 are similarly undefined. The statute does not define "all laws," "barriers," "roads," or the phrase "in the vicinity of the United States border," leaving the Secretary with unconstrained discretion to determine the meaning of each phrase or Clause, as well as the geographic scope, physical form, and extent of construction authorized under the provision. Nor does § 102 define "expeditious construction" or provide any temporal, budgetary, or engineering standard by which the necessity of a waiver may be measured. The cumulative effect of these undefined terms is a statute providing no ascertainable standard—either for the

executive officer exercising the waiver power or for the citizens, landowners, and sovereigns whose rights are affected or even extinguished by its exercise.

117. The vagueness of § 102 is not merely an interpretive ambiguity susceptible to judicial construction. It is an unconstitutional delegation of standardless discretion to the Executive by the Legislature. As the Supreme Court has recognized, "our doctrine prohibiting vague laws is an outgrowth and 'corollary of the separation of powers,'" and "most any challenge to a legislative delegation can be reframed as a vagueness complaint[.]" *Gundy*, 588 U.S. at 168 (Gorsuch, J., dissenting) (quoting *Sessions*, 584 U.S. at 156). A statute failing to provide standards that "are sufficiently definite and precise to enable Congress, the courts and the public to ascertain whether the [Secretary] … has conformed to those standards" presents a delegation problem and provides impermissibly vague guidance to affected citizens. *Yakus v. United States*, 321 U.S. 414, 426 (1944); *see also West Virginia*, 597 U.S. at 723–24 (agencies may not discover "unheralded power" in "vague language" that "had rarely been used in the preceding decades"); *Biden*, 600 U.S. at 505–06 (2023) ("Because the interpretation of the provision was 'a question of deep 'economic and political significance' that is central to [the] statutory scheme,' … we would not assume that Congress entrusted that task to an agency without a clear statement to that effect.") (quoting *King v. Burwell*, 576 U.S. 473, 474 (2015)) (alteration in original).

118. Where, as here, the claimed authority is so sweeping it permits a single officer to nullify the entire U.S. Constitution, United States Code, body of U.S. jurisprudence, and other "legal requirements" within a defined geographic area, the absence of any ascertainable standard renders the provision void for vagueness under the Fifth Amendment.

119. The structural harms of this vagueness are not abstract. As Hamilton warned, while "liberty can have nothing to fear from the judiciary alone," it has "every thing to fear from" the

union of judicial and legislative powers. THE FEDERALIST NO. 78, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Section 102(c)(1) effects that dangerous consolidation: it vests in one executive officer the discretion to determine which laws apply and which do not, without any statutory standard to restrict discretion and with judicial review limited to constitutional claims. The result is a regime in which the content of governing law within the waiver area depends entirely on the will or whim of a single official—the very evil the vagueness doctrine, the nondelegation doctrine, and the constitutional structure were designed to prevent.

120. Section 102 of IIRIRA—and specifically the terms "high illegal entry," "all legal requirements," "any other provisions of law," "sole discretion," "necessary," and "expeditious construction"—is unconstitutionally void for vagueness, both facially and as applied to the Big Bend Sector, in violation of the Due Process Clause of the Fifth Amendment.

**COUNT VI: Violation of Procedural Due Process**
**U.S. Const. amend. V — As-Applied Challenge**

121. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

122. The Fifth Amendment to the United States Constitution provides no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Procedural due process requires, at a minimum, the government provide notice and a meaningful opportunity to be heard before depriving a person of a protected property interest. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Mullane*, 339 U.S. at 314. "Individual freedom finds tangible expression in property rights[,]" and the right to prior notice and a hearing before seizure of real property "is central to the Constitution's command of due process." *United States v. James Daniel Good Real Prop*., 510 U.S. 43, 61, 53 (1993).

123. Angell holds a constitutionally protected property interest in his land in Presidio County, Texas identified by CBP as parcels BBT-PRS-2055 and BBT-PRS-2055-1. This property interest is indisputable: Angell holds fee simple title to the land, which has been in his family for four generations.

124. On or about February 20, 2026, CBP sent Angell a "Notice of Interest" letter identifying his property as located near planned border barrier system construction projects and stating CBP had "tentatively identified" it may need to enter his property "for either construction or access purposes." *See* Exhibit A-1. The letter stated if Angell and CBP were "unable to reach a negotiated purchase or easement agreement," CBP would refer the matter to the Department of Justice "to initiate the eminent domain/condemnation process." The letter further stated CBP "may proceed to refer the matter to DOJ to acquire any necessary property interest(s) through the exercise of eminent domain, in accordance with the Declaration of Taking Act (40 U.S.C. §§ 3113 and 3114)." Pursuant to 49 CFR 24.102(b) the delivery of this correspondence starts the federal condemnation process.

125. Here through the power of eminent domain the Secretary seeks to take property he cannot use to build the Border Wall because it is not an area of high illegal entry.

126. Because the Secretary cannot build a barrier or a road at the location, a taking of Angell's property is not authorized and that makes it impossible to conclude the taking is for a public use.

127. Defendants failed to provide Angell with constitutionally adequate notice of the planned condemnation or any meaningful opportunity to be heard. Angell received no formal written notice identifying the specific property interest to be acquired, the legal authority for the

taking, or the basis for the government's determination his property was necessary for border-wall construction.

128. The CBP letter was not reasonably calculated to apprise Angell of the nature and scope of the planned deprivation or afford him a meaningful opportunity to present objections. *See Mullane*, 339 U.S. at 314 ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."); *Jones v. Flowers*, 547 U.S. 220, 226 (2006) (same).

129. Defendants also failed to engage in bona fide negotiations with Angell prior to commencing condemnation proceedings. The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 requires, among other things, "every reasonable effort shall be made to acquire expeditiously real property by negotiation," the acquiring agency "shall have the property appraised" before negotiations, and the owner be provided "a written statement of, and summary of the basis for, the amount ... established as just compensation." 42 U.S.C. § 4651(1)–(3). This Court has enforced these requirements in analogous border-fence condemnation actions. *See United States v. 1.04 Acres of Land, More or Less, Situate in Cameron Cnty., Tex.*, 538 F. Supp. 2d 995, 1010–11 (S.D. Tex. 2008) (holding the government must make "a bona fide effort" to purchase property before commencing condemnation). Defendants' form letter satisfied none of these requirements.

130. A Fifth Amendment procedural due process claim lies where DHS occupies or uses private property for border-wall construction without appropriate procedural protections. *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1265 (D.C. Cir. 2020) ("A procedural due process violation under the Fifth Amendment occurs when a government official deprives a person of property

without appropriate procedural protections—protections that include, at minimum, the basic requirements of notice and an opportunity to be heard.") (citation omitted).

131. Defendants' failure to provide Angell with adequate notice, an opportunity to be heard, or other required procedural safeguards prior to and in connection with the condemnation of his property constitutes a violation of the Due Process Clause of the Fifth Amendment to the United States Constitution.

**COUNT VII: Violation of the Takings Clause**
**U.S. Const. amend. V — As-Applied Challenge**

132. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

133. The Takings Clause of the Fifth Amendment provides: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. "When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021) (citation omitted).

134. The government commits a physical taking when it "exercises the power of eminent domain" to acquire private property—whether a fee simple interest or a lesser estate such as a leasehold—thereby "substitut[ing] itself in relation to the physical thing in question in place of him who formerly bore the relation to that thing, which we denominate ownership." *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945). "[A] permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982). The Takings Clause "prevents the public from loading upon one individual more than his just share of the burdens of government, and says when he surrenders to the public something more and different from that which is exacted

from other members of the public, a full and just equivalent shall be returned to him." *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 326 (1893). Indeed, "[t]he Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

135. Defendants' threatened condemnation of Plaintiff's property for the construction of border barriers, patrol roads, and related infrastructure constitutes a physical taking of private property. The CBP letter of February 20, 2026, expressly threatened eminent domain proceedings under the Declaration of Taking Act if Angell did not agree to a voluntary access arrangement, thereby placing Angell under imminent threat of appropriation of his fundamental right to exclude others from his land—"one of the most essential sticks in the bundle of rights that are commonly characterized as property[.]" *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979).

136. The taking of Plaintiff's property is improper for multiple independent reasons. First, IIRIRA § 102(a) authorizes construction only in "areas of high illegal entry." As alleged herein, the Big Bend Sector does not qualify as an area of high illegal entry; its approximately 3,000 apprehensions in FY2025 were the lowest on the southern border. The Secretary's determination the Big Bend Sector satisfies this statutory predicate was manufactured by combining Big Bend with the Del Rio Sector—a statistical manipulation without precedent or statutory authorization. Because the statutory predicate for construction is absent, the condemnation of Plaintiff's property lacks valid legislative authorization and exceeds the scope of delegated power.

137. Second, the taking fails to serve a valid "public use" as required by the Fifth Amendment. The "public use" requirement is a constitutional limitation on the eminent domain power, not a mere policy preference. *See Kelo v. City of New London*, 545 U.S. 469, 477 (2005). While courts apply a deferential standard to public-use determinations, that deference presupposes a valid legislative authorization. Where, as here, the statutory predicate for construction of being in an area of high illegal entry was manufactured by combining disparate sectors, the taking lacks a genuine public purpose sufficient to satisfy the Fifth Amendment. The proposed border-wall construction in the Big Bend Sector—and specifically through Plaintiff's property—will provide no meaningful border-security benefit. The existing road north of Mariscal Mountain is regularly patrolled and sufficient for Border Patrol operations. The proposed construction would sit approximately 1,700 feet above the border in one of the least-trafficked stretches of the entire southern border. In addition, here, Defendants seek to condemn property in an area other than one of high illegal alien entry. Defendants have no authority to do so. This is much more than *ultra vires*, because no such action serves a public purpose because the purpose of eminent domain in this context cannot be cured—no public purpose exists to permit the use of eminent domain for obtaining real property in an area other than one that is in the vicinity of a high illegal alien entry area. And the invocation of the power of eminent domain violates the Fifth Amendment to the Constitution to do so.

## VII. CONCLUSION

138. As demonstrated above, Section 102(c) is unconstitutional on its face and as applied to Plaintiff.

139. Because Section 102(c) is unconstitutional, DHS retains only Sections 102(a) and 102(b) authority to pursue barriers, roads, and technology in *areas of high illegal entry*, but no freestanding waiver of otherwise applicable law.

140. With Section 102(c)(2)'s review limits invalidated, plaintiffs may pursue ordinary Administrative Procedure Act ("APA") review—final agency action, statutory authority, record sufficiency, arbitrary-and-capricious decisionmaking, and action not in accordance with law—and DHS must defend on contemporaneous reasons and the record it had when it acted, including the Big Bend high-illegal-entry predicate, route selection, funding choices, technical analyses, and consultation record, without post hoc rationalization.

141. Before construction may resume, DHS and the remaining Defendants must complete the federal, state, and treaty-based processes the invalid waiver purported to bypass. The restored federal obligations fall into three groups: environmental statutes—including National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), the Wild and Scenic Rivers Act, the Wilderness Act, the Migratory Bird Treaty Act, the Fish and Wildlife Coordination Act, the Clean Air Act, Resource Conservation and Recovery Act ("RCRA"), the Safe Drinking Water Act, and the Noise Control Act; cultural-resource statutes—including the National Historic Preservation Act ("NHPA"), the Antiquities Act, Archaeological Resources Protection Act ("ARPA"), Native American Graves Protection and Repatriation Act ("NAGPRA"), and related historic-preservation and archaeological-data laws and park, refuge, and land-management statutes— including the National Park Service Organic Act, Federal Land Policy and Management Act ("FLPMA"), National Wildlife Refuge System authorities, and federal right-of-way and park-access rules.

142. DHS and the remaining Defendants must also coordinate through the IBWC and comply with U.S. treaty obligations with Mexico before work affecting Rio Grande flow, flood flows, levees, channel stability, boundary preservation, spoil placement, or Mexican territory.

143. This remedial structure does not punish the Executive or nullify Congress's border-security objectives. Instead, it enforces the constitutional architecture that makes those objectives lawful in the first place. Because a construction mandate whose legality depends on unconstitutional delegation of waiver power cannot be separated from the constitutional limits Congress was required to honor when it delegated that power, the appropriate judicial remedy is to not permit continued irreversible harm but to hold the project to the rule-of-law framework within which both political branches must operate.

## VIII. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs Charles Angell and Angell Expeditions, LLC respectfully request this Court enter judgment in their favor and against Defendants, and grant the following relief:

144. A declaration IIRIRA § 102(c) violates Article I, Sections 1, 5, 7, and 8 of the United States Constitution;

145. A declaration IIRIRA § 102(c) violates the separation of powers embodied in Articles I and II of the United States Constitution;

146. A declaration the Secretary's July 27, 2026 determination violates the Take Care Clause of Article II, Section 3;

147. A declaration the Secretary's interpretation of IIRIRA § 102(c) violates the major questions doctrine;

148. An order vacating the Secretary's July 27, 2026 Determination published at 91 Fed. Reg. 46,939, as unconstitutional and void;

149. A declaration IIRIRA § 102 is unconstitutionally void for vagueness, both facially and as applied to the Big Bend Sector, in violation of the Due Process Clause of the Fifth Amendment;

150. A declaration Defendants' threatened condemnation of Plaintiffs' property violates the Due Process Clause of the Fifth Amendment for failure to provide constitutionally adequate notice and a meaningful opportunity to be heard;

151. A declaration Defendants' threatened condemnation of Plaintiffs' property violates the Takings Clause of the Fifth Amendment because the taking lacks valid statutory authorization, fails to serve a public use, and was threatened without just compensation;

152. A declaration IIRIRA § 102 only authorizes construction of barriers and roads in areas of high illegal entry;

153. A declaration the Big Bend Sector is not an area of high illegal entry;

154. An order enjoining Defendants from commencing or continuing any construction, blasting, excavation, road-building, or ground disturbance activities on or across Plaintiff's property pending resolution of this action;

155. A temporary restraining order, preliminary injunction, and permanent injunction enjoining within the Big Bend Sector all ground disturbance, blasting, excavation, wall barrier, or wall-panel installation, new road construction, vegetation clearing, staging expansion, spoil disposal, mobilization for work, and other irreversible commitments by Defendants;

156. An order directing the Department of Homeland Security to disclose all contracts, funding sources, property interests, technical plans, environmental surveys, state-law permits, and International Boundary and Water Commission submissions; to complete National Environmental Policy Act review; to complete Endangered Species Act consultation without violating Section

7(d); to complete National Historic Preservation Act and cultural-resource review; to complete treaty and International Boundary and Water Commission coordination; and only permitting Department of Homeland Security the opportunity to seek leave to resume construction on a segment-specific showing of lawful authority and compliance when all restored requirements are complete.

157. A temporary restraining order, preliminary injunction, and permanent injunction enjoining Defendants from commencing or continuing any construction, blasting, excavation, road-building, or ground disturbance activities on Mariscal Mountain within the Big Bend Sector;

158. A mandatory prospective injunction requiring Defendants to restore any harm or damage caused by activities performed by the Secretary or Department on Angell's property, the Big Bend National Park, or in the Big Bend Sector;

159. An award of just compensation to Angell for the taking of his property, in an amount to be determined at trial, including all severance damages, consequential damages, and other compensation required by the Fifth Amendment;

160. An award of attorneys' fees, costs, and expenses as permitted by law; and

161. Such other and further relief as this Court deems just and proper.

Dated: August 31, 2026

Respectfully submitted,

*/s/ Frederick W. Addison, III*
Frederick W. Addison, III
Texas State Bar No. 00903350
raddison@munsch.com
Randall W. Miller
Texas State Bar No. 24092838
rwmiller@munsch.com
Emily C. Means
Texas State Bar No. 24137036
emeans@munsch.com
Caroline Rumbolo
Texas State Bar No. 24131637
crumbolo@munsch.com
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**COUNSEL FOR PLAINTIFFS**

## REQUEST FOR EXPEDITED HEARING

Plaintiffs do not seek ex parte injunctive relief. Plaintiffs respectfully request that the Court set a hearing on their application for a temporary restraining order or preliminary injunction, on the papers or through live testimony, at the Court's earliest convenience.

*/s/ Frederick W. Addison, III*
Frederick W. Addison, III