# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| CHARLES ANGELL and ANGELL EXPEDITIONS, LLC<br><br>*Plaintiffs,*<br><br>*v.*<br><br>MULLIN, et al.<br><br>*Defendants.* | Civil Action No. 5:26-CV-05580 |

**DECLARATION OF PAUL ENRIQUEZ**

I, Paul Enriquez, declare as follows:

1. I am the Director, Infrastructure Portfolio, U.S. Border Patrol Program Management Office Directorate ("PMOD"), U.S. Customs and Border Protection ("CBP"), an agency of the Department of Homeland Security ("DHS"). I have held this position since January 2023 and support the planning and execution of border infrastructure projects from construction to maintenance. From May 2021 to December 2022, I served as the Deputy Director for the Infrastructure Portfolio. From August 2018 to May 2021, I served as the Real Estate and Environmental Director for the Infrastructure Portfolio. From 2013 to August 2018, I was the Real Estate and Environmental Branch Chief for the Border Patrol and Air and Marine Program Management Office ("BPAM"), Facilities Management and Engineering, Office of Facilities and Asset Management. From 2011 to 2013, I was employed as an Environmental

Protection Specialist in the BPAM office. In that role, I performed environmental analyses for various border infrastructure projects. From 2008 to 2011, I was a contractor assigned to the BPAM office and provided environmental support on various border infrastructure projects.

2. CBP is the DHS component with primary responsibility for border security. CBP constructs, operates, and maintains border infrastructure necessary to deter and prevent illegal entry on the southern border.

3. Within CBP, PMOD has expertise in managing and executing border infrastructure projects. PMOD is tasked with managing the schedule, finances, real estate acquisition, environmental planning, and construction of the border infrastructure system along the U.S. border.

4. Based upon my current and past job duties, I am familiar with the funding appropriated to CBP for barrier system construction and CBP's planned and on-going border barrier construction on the southern border, including the border barrier construction at issue in this litigation.

5. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

6. Physical barriers are an essential component to the United States Border Patrol's ("USBP") layered border security approach and provide numerous benefits including: (1) protection of USBP agents, (2) assistance with USBP gaining and maintaining operational control of the border, and (3) support for safe and secure border communities. Border barriers allow USBP agents to gain more control and situational awareness in the area near the U.S.-Mexico border. Barriers deter and impede smugglers and aliens from entering the U.S. illegally and increase the effectiveness of USBP.

7. There are over 768 miles of primary border barrier, over 157 miles of secondary barrier, and over 45 miles of water barrier along the United States – Mexico border. CBP also has over 40 barrier projects currently in various stages of planning and construction.

8. Among the projects currently being executed by CBP are multiple border barrier system

projects that will be executed in the USBP Big Bend Sector (the "Big Bend Sector"). These projects include the Big Bend 1, Big Bend 2, Big Bend 3, Big Bend 4, and Big Bend 5 projects. None of the Big Bend barrier system projects involve the installation of waterborne barrier in the Rio Grande River.

**BIG BEND SECTOR BARRIER PROJECTS**

9. As part of the Big Bend 1 project, CBP will construct approximately 47 miles of barrier system in Hudspeth County, Texas. The elements of the barrier system include 30-foot bollard-style pedestrian barrier, a patrol road, and barrier system attributes, including, as appropriate to each area, cameras, lights, sensors, and other detection technology. The contract for the Big Bend 1 project was awarded on March 5, 2026.

10. As part of the Big Bend 2 project, CBP will construct approximately 61 miles of barrier system in Presidio County, Texas. The contract for the Big Bend 2 project was awarded on March 5, 2026. The Big Bend 2 project includes the construction of barrier system near the town of Redford, Texas.

11. As part of the Big Bend 3 project, CBP will construct approximately 56 miles of barrier system in Hudspeth, Jeff Davis, and Presidio County, Texas. The contract for the Big Bend 3 project was awarded on March 5, 2026.

12. The Big Bend 4 project area includes portions of the Big Bend Ranch State Park and the Big Bend National Park. The contract for the Big Bend 4 project was awarded on May 11, 2026. As part of the Big Bend 4 project, CBP planned to construct approximately 17 miles of non-contiguous vehicle barrier system in strategic locations within Big Bend National Park and east of Big Bend National Park. CBP also planned to construct a new patrol road, improve existing roads, and install technology within Big Bend National Park. No new stadium or LED lighting is planned in Big Bend National Park as part of the Big Bend 4 project. Infrared illuminators will be used in place of any LED lighting for cameras that will need to operate at night. There is no barrier planned for construction within Big Bend Ranch State Park. Rather, CBP intends to construct a road with associated technology in portions of the Big Bend Ranch State Park.

13. As part of the Big Bend 5 project, CBP plans to construct approximately 156 miles of vehicle barrier system in Brewster, Terrell, and Val Verde County, Texas. Approximately 100 miles of the vehicle barrier system is within the Big Bend Sector and approximately 56 miles of vehicle barrier system is within the Del Rio Sector. The Big Bend 5 contract was awarded on June 2, 2026.

**THE CHALLENGED WAIVER**

14. On July 27, 2026, a waiver to facilitate the expeditious construction of barrier system and roads in the Big Bend and Del Rio Sectors for the Big Bend 5 project was published in the Federal Register ("the Big Bend 5 Waiver"). 91 Fed. Reg. 46939 (July 27, 2026). The Big Bend 5 Waiver was executed by Secretary Mullin pursuant to § 102 of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, div. C, tit. I, § 102(c), 110 Stat. 3009-546, 3009-554 (1996) (codified as amended at 8 U.S.C. § 1103 note).

15. The GPS points listed in the Big Bend 5 Waiver correspond to the Big Bend 5 project area. The Big Bend 5 project area is shown on the map that is attached as Exhibit A.

16. Plaintiffs' Motion for Preliminary Injunction and the Declaration of Charles Angell indicate that Charles Angell and Angell Expeditions, LLC own property located at 302 El Polvo Road, P.O. Box 165, Presidio County, Texas, Redford, Texas, 79846. The same property is identified by CBP as tract numbers BBT-PRS-2055 and BBT-PRS-2055-1. Motion at ¶¶ 3, 16; Angell Declaration at ¶¶ 7, 20. The Angell property is located within the Big Bend 2 project area. The project area for the Big Bend 2 project is shown on the Map that is attached as Exhibit B. As such, the Big Bend 5 Waiver does not apply to the project located near the Angell property, and the Big Bend 5 project area does not encompass the Angell property.

17. Similarly, Plaintiffs' Motion for Preliminary Injunction and the Declaration of Charles Angell express concerns that the Big Bend 5 Waiver and the Big Bend 5 project will impact the Big Bend National Park, the Big Bend Ranch State Park, and the Black Gap Wildlife Management Area. Motion at ¶18; Angell Declaration at ¶¶ 11, 13, 15, 17, 22, 25. Big Bend National Park, Big Bend Ranch State Park, and Black Gap Wildlife Management Area are all located within the Big Bend 4 project area, however. The project area for the Big Bend 4 project is shown on the Map that is attached as Exhibit C. As such, the Big Bend 5 Waiver, which Plaintiffs

have challenged in this litigation, does not apply to barrier construction in Big Bend National Park, Big Bend Ranch State Park, or Black Gap Wildlife Management Area, and the Big Bend 5 project area does not encompass those areas.

18. On February 17, 2026, a waiver to facilitate the expeditious construction of barrier system and roads in the Big Bend Sector was published in the Federal Register (the "Big Bend 2 Waiver"). 91 Fed. Reg. 7297 (February 17, 2026). The Big Bend 2 Waiver was executed by then-Secretary Noem pursuant to § 102 of IIRIRA. The Big Bend 2 Waiver covered multiple barrier system projects, including Big Bend 2. An amendment to the Big Bend 2 Waiver was signed by Secretary Mullin and published in the Federal Register on July 2, 2026. 91 Fed. Red. 40550 (July 2, 2026). This waiver covers barrier system construction in or around Mr. Angell's property in Redford, Texas.
19. A waiver covering the Big Bend 4 project was published in the Federal Register on May 15, 2026 (the "Big Bend 4 Waiver"). 91 Fed. Reg. 27969 (May 15, 2026). The Big Bend 4 waiver was executed by Secretary Mullin pursuant to § 102 of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, div. C, tit. I, § 102(c), 110 Stat. 3009-546, 3009-554 (1996) (codified as amended at 8 U.S.C. § 1103 note). On June 9, 2026, an amendment to the Big Bend 4 waiver, which was executed by Secretary Mullin, was published in the Federal Register. 91 Fed. Reg. 34831 (June 9, 2026). The amendment to the Big Bend 4 corrected the project area covered by the Big Bend 4 Waiver. This waiver covers barrier system construction in areas that include the Big Bend National Park, Big Bend Ranch State Park, and Black Gap Wildlife Management Area.

**PUBLIC OUTREACH**

20. On August 31, 2026, CBP agreed to pause all ground disturbing activities for the Big Bend 2 Big Bend 4 projects to allow for additional public engagement.
21. Both prior to and during the pause, CBP has conducted robust public outreach and engagement with stakeholders and interested parties about the Big Bend 2 and Big Bend 4 projects.
22. CBP's public outreach and engagement included targeted outreach to affected stakeholders, posting information about the projects on cbp.gov, and soliciting input from the general public regarding potential impacts from the Big Bend projects. *See*, *e.g.*, Vehicle Barrier System

Construction– Brewster, Terrell, and Val Verde Counties, Texas – July 2026 | U.S. Customs and Border Protection, available at https://www.cbp.gov/document/environmental-assessments/vehicle-barrier-system-construction-brewster-terrell-and-val (last accessed Aug. 24, 2026); Vehicle Barrier System and Road Construction– Brewster County, Texas – June 2026 | U.S. Customs and Border Protection, available at https://www.cbp.gov/document/environmental-assessments/vehicle-barrier-system-and-road-construction-brewster-county (last accessed Aug. 24, 2026).

23. CBP has also consistently maintained and updated the "Smart Wall Map" on cbp.gov, which shows the project areas and planned infrastructure for each border barrier system project in the USBP Big Bend Sector, including the Big Bend 2 and Big Bend 4 projects.

24. CBP and USBP officials have also had a series of meetings and engagements with stakeholders and interested parties regarding CBP's planned barrier system projects in the USBP Big Bend Sector, including the Big Bend 2 and Big Bend 4 projects. CBP's outreach and engagement began in March 2026 and included the following:

- Over 20 separate meetings with local officials from Culbertson, Jeff Davis, Brewster, Hudspeth, Presidio, and Terrell Counties, including local Sheriffs, County Commissioners, City Council Members, Judges, Mayors, and Police Chiefs;
- Regular, bi-weekly meetings with County Sheriffs and Judges from Culbertson, Jeff Davis, Brewster, Hudspeth, Presidio, and Terrell Counties;
- Multiple meetings with individual landowners and business owners;
- Targeted outreach to and discussions with local outfitters;
- A tour of Brewster County with the Brewster County Sheriff;
- Multiple meetings with representatives from Big Bend Telecoms, Texas Parks, Texas Tech, and the Texas Border Coalition; and
- An in-person meeting between the CBP Commissioner and officials from Brewster, Hudspeth, Jeff Davis, Presidio, Terrell, Val Verde Counties.

25. In total, CBP had over 40 separate meetings or engagements with stakeholders regarding the planned barrier system projects in the USBP Big Bend Sector, including Big Bend 2 and Big Bend 4.

26. During the pause, representatives from CBP and attorneys from the Department of Justice also met with plaintiffs' counsel in two cases in the U.S. District Court for the Western District of Texas concerning border barrier construction in the USBP Big Bend Sector. *See People for the La Junta for Preservation*, Case No. 5:26-cv-05245-OLG; *Angell v. Mullin*, Case No. 5:26-cv-05580-KC-RBF). Counsel for the parties in both cases subsequently made arrangements to conduct site visits of certain properties potentially impacted by the proposed construction.

27. In addition to the stakeholder meetings and outreach outlined above, CBP has had regular contact and consultation with the National Park Service ("NPS") and the Department of the Interior ("DOI") regarding the portions of the Big Bend 4 project that will be executed in Big Bend National Park. In addition to routine day-to-day discussions or consultation, CBP has had regular meetings with officials from NPS and DOI officials to discuss the Big Bend 4 project, including a meeting in May, three meetings in June, three meetings in August, and frequent meetings and communication in September.

28. The government, including officials from both CBP and the United States Army Corps of Engineers, which provides real estate support services to CBP, have also been meeting with individual landowners who own land that may need to be acquired for the projects. As detailed below, as part of the real estate acquisition process, CBP consults with landowners and gives them the opportunity to raise issues of concern.

**BIG BEND 2**

29. Beginning on September 30, 2026, CBP will lift the pause on ground disturbing activities for the Big Bend 2 project. The Big Bend 2 project will be substantially similar to what was originally planned.

30. As noted above, as part of the Big Bend 2 project, CBP will construct approximately 61 miles of barrier system in Presidio County, Texas, within the Big Bend Sector. The elements of the barrier system include 30-foot bollard-style pedestrian barrier, a road, and barrier system attributes, including, as appropriate to each area, cameras, infrared illuminators, sensors, and other detection technology.

31. The majority of the land within the Big Bend 2 project alignment is private land. Prior to accessing private land for surveys or other pre-construction activity, CBP secures a right of

access from the private landowner. Generally speaking, before constructing border infrastructure, CBP acquires a fee or easement interest in the property.

32. As part of the real estate acquisition process, CBP consults with landowners and gives them the opportunity to raise issues of concern. For example, CBP takes into account feedback from property owners concerning the alignment of the barrier system on the affected property, the need for continued access to the Rio Grande River, existing irrigation lines that must remain operable, sensitive resources that may be located on the property, other activities that are conducted on the property, and any other issues. CBP tries to accommodate landowner concerns where possible. For example, CBP has a long history of incorporating gates into barrier system to facilitate access for various activities. Gates have been added throughout the southwest border to facilitate access to border monuments and to address other access requirements through the barrier such as for cattle grazing, agriculture purposes, or recreational activities.

33. CBP's preference is always to acquire property voluntarily. However, where landowners refuse to engage with the government or the parties are unable to reach an agreement, CBP must refer these matters to the Department of Justice to file a condemnation action. Landowners who refuse to engage with the government also forego the opportunity to raise issues of concern that may be addressed through collaborative discussion.

34. Numerous landowners within the Big Bend 2 project area have refused to engage with the government or sign a voluntary rights of entry for survey. As such, CBP expects that in the coming weeks it will be referring numerous matters to the Department of Justice for potential condemnation actions.

**BIG BEND 4**

35. For the Big Bend 4 project, CBP is actively considering adjustments to reduce the scope and avoid or minimize the impact of the original project based on the input it has received from NPS and other stakeholders. As noted above, CBP had originally planned to construct approximately 17 miles of noncontiguous vehicle barrier system within Big Bend National Park and to the east of the National Park. CBP also planned to construct a new patrol road, improve existing roads, and install technology within the National Park. CBP expects to

make a final decision on the revised scope of the Big Bend 4 project during the first week of October. The government will update the Court and parties promptly after a final decision is made. When a final decision is made on the scope of Big Bend 4, CBP will make a public announcement and share relevant information about the project via cbp.gov and local media outreach.

36. Once a final decision is made on the scope of Big Bend 4, CBP does not expect that ground disturbing activities will begin immediately. Additional time, likely a few weeks, will be required for any necessary contract administration actions to be taken, for the contractor to re-mobilize equipment and personnel, and other planning activity. Ground disturbing activities in the Big Bend 4 project area will begin after such actions are taken.

**ALLEGED HARMS**

37. Notwithstanding the fact that the challenged Big Bend 5 Waiver and project area do not cover the Angell property, Big Bend Ranch State Park, or Big Bend National Park, Plaintiffs set forth allegations of potential harm in those areas. The allegations of harm noted in Plaintiffs' Motion and Declaration include:

- Blocked access to the Rio Grande River; *see e.g.*, Declaration of Charles Angell at ¶ 22
- Loss of the use and enjoyment of his property in Redford, the Rio Grande River, and Big Bend National Park and Big Bend Ranch State Park; *see e.g.*, Declaration of Charles Angell at ¶¶ 24, 25.
- Permanent alteration of terrain, soils, drainage patterns, and wilderness character within, among other areas, the Big Bend National Park, the Big Bend Ranch State Park, and the Black Gap National Wildlife Management Area; *see, e.g.*, Motion at ¶ 53
- Damage to species occasioned by loss of habitats and the opportunity to protect habitats before disturbance; *see, e.g.*, Motion at ¶ 54
- Threats to archaeological sites and historic structures; *See e.g.*, Motion at ¶¶ 57.

Plaintiff's alleged harms are mistaken, overstated, and speculative.

38. Regarding Plaintiff's concerns about access to the Rio Grande River, as a part of both planning

border barrier system projects and consulting with landowners through the real estate acquisition process, and as noted above, CBP has a long history of incorporating gates into barrier system to facilitate access for various activities. Gates have been incorporated in barrier throughout the southwest border to facilitate access to border monuments and to address other concerns. For example, in USBP's Rio Grande Valley Sector, where barrier is constructed off the border to address treaty and floodplain issues, gates have been added to ensure access for emergency medical services, to accommodate access for farm machinery and equipment, and other purposes. For the Big Bend projects, CBP will consult with impacted landowners and other stakeholders about the installation of gates and other access-related issues as the project moves forward.

39. Moreover, as noted above, CBP is not planning to construct barrier within the Big Bend Ranch State Park. As such, allegations that river access within the Big Bend Ranch State Park will be eliminated or blocked by barrier are inaccurate. Additionally, as noted above, CBP originally planned to construct a limited amount of non-contiguous vehicle barrier, not 30-foot pedestrian barrier, within the massive expanse of the Big Bend National Park. Thus, allegations that river access within the Big Bend National Park will be eliminated or blocked are highly overstated and speculative. In any event, and as noted above, CBP is currently considering alterations to the original plan to reduce the scope of construction inside Big Bend National Park and expects to announce a final plan during the first week of October.

40. Plaintiffs allege, without any factual basis, that CBP's proposed construction activity within Big Bend National Park, Big Bend Ranch State Park, and surrounding areas will diminish their use and enjoyment of the area, alleging that CBP's activities will hinder their ability to conduct hiking and driving tours within the Big Bend National Park and the Big Bend Ranch State Park, and also impact their ability to conduct river expeditions on the Rio Grande River. These concerns are overstated and speculative.

41. There is no evidence that CBP's proposed construction activities will result in the closure of hiking trails or roads within the parks. While there may be some temporary closures of areas under active construction, these closures would be limited in scope and would not impact the entire park systems or all of the trails within the extensive trail systems of these parks. After

the Big Bend 4 project is complete, there should be little to no impact on Plaintiffs' or any other member of the public's ability to access areas within the parks.

42. Likewise, access to the Rio Grande River for river expeditions will not be impacted. As noted above, none of the Big Bend projects involve the installation or construction of waterborne barriers in the Rio Grande River. To the extent Plaintiffs require access to the Rio Grande River from their own property, as noted above, CBP has a long history of working with landowners and other stakeholders to install gates in barrier to allow access for various purposes. In locations where barrier is not being constructed, such as Big Bend Ranch State Park and large portions of Big Bend National Park, access to the river will not be impacted by barrier. As such, Plaintiffs' allegations that CBP's activities will restrict, impact, or otherwise impede Plaintiffs' ability to use the Rio Grande River, including for guided river tours, are significantly overstated and speculative.

43. Regarding Plaintiff's allegations concerning harms to biological or cultural resources, as part of every barrier infrastructure project, including the Big Bend projects, CBP conducts biological and cultural surveys of the project area to identify cultural or biological resources, including plant and animal species, artifacts, or historic or cultural sites, that may be within the project footprint. The results of those surveys are used in conjunction with the results of prior surveys, other existing data and literature, and any information provided by stakeholders and federal resource managers. Where there are identified resources, CBP develops means to avoid or minimize impacts where it is possible, which includes consultation with federal or state resource agencies and affected stakeholders.

44. For the Big Bend Sector projects, and as noted above, CBP did targeted outreach to affected stakeholders, to include the National Park, posted information about the projects on cbp.gov, and solicited input from the general public regarding potential impacts from the Big Bend projects.

45. Additionally, CBP has environmental monitors that observe construction activities and every CBP barrier construction contract includes Best Management Practices ("BMPs") that must be adhered to by the construction contractor. The BMPs for the Big Bend 2 and Big Bend 4 projects include measures that address the plaintiffs' allegations regarding environmental

harms (including species and habitat) and cultural harms (BMPs for Big Bend 4 attached as Exhibit D):

- Construction lights/temporary light poles and other pole-like structures used for construction should utilize anti-perch devices to discourage roosting by birds, light poles designed to prevent hunting perches for ravens and raptors, unnecessary lights turned off to avoid attracting wildlife (BMP No. 7);
- Areas around and beneath equipment must be checked for listed species and wildlife (BMP No. 29);
- Tree and brush removal in threatened and endangered species habitats will be minimized and will not interfere with active nesting (BMP No. 30)
- A biologist will present an environmental awareness program to all who will be on site prior to ground disturbing or vegetation removal/trimming to educate personnel on identification of species, description of habitat, and measures for avoidance or protection during construction (BMP No. 32);
- Pre-construction survey for migratory bird species to identify active nests prior to the start of any construction or clearing activities (BMP No. 33);
- Procedures for notification and possible removal of federally listed species found within the project area (BMP No. 34);
- Procedures to prevent the entrapment of wildlife species during construction (BMP No. 35);
- The BMPS for the Big Bend 4 project have a BMP that is specific to the Big Bend Gambusia and provides that prior to construction activities, a biologist will survey the project footprint and mark areas for avoidance and that if construction is to occur in an intermittent or perennial waterway, species relocation may be required; (BMP No. 39).[1]

---

[1] Based upon my understanding of the Recovery Plan for the Big Bend Gambusia, it appears that this species is only found

- Measures to prevent the introduction of invasive species (BMPs No. 16-18, 26);
- Storm Water Pollution Prevention Plan (SWPPP) prepared prior to construction activities and implemented to reduce erosion during construction activities, with special consideration to areas with highly erodible soils (BMP No. 8);
- Areas disturbed by past activities must be used for staging, parking, and equipment storage (BMP No. 13).
- If cultural resources (artifacts, features, sites, structures) are found work will stop in the immediate area until an environmental monitor can assess the resource (BMP No. 27);
- If human remains are encountered, work within 100 feet of the find will stop and appropriate state and federal agencies will be consulted (BMP No. 28).

**HARMS TO THE GOVERNMENT**

46. If the Court were to issue an injunction, it could result in substantial harm to the government. A court-ordered pause could result in CBP becoming liable for contractor delay claims or other increased costs from the contractors.

47. In addition to harming the government, enjoining CBP from further construction of border infrastructure will harm the general public. As stated in the Big Bend 5 Waiver, the Big Bend and Del Rio Sectors are areas of high illegal entry. Between fiscal year 2021 and fiscal year 2025, Border Patrol apprehended over 89,000 illegal aliens attempting to enter the United States between border crossings in the Big Bend Sector. In that same time period Border Patrol seized over 87,574 pounds of marijuana, over 867 pounds of cocaine, over 1,156 pounds of methamphetamine, over 12 pounds of heroin, and over 94 pounds of fentanyl. 91 Fed. Reg. 7297. In that same time period, Border Patrol apprehended over 1,410,330 illegal aliens attempting to enter the United States between border crossings in the Del Rio Sector.

---

within a handful of specifically delineated areas within the Big Bend National Park. *See* Big Bend Gambusia Recovery Plan, U.S. Fish and Wildlife Service (1984)(Attached as Exhibit E). As such, BMPs for the other Big Bend projects do not include a specific BMP for the Big Bend Gambusia.

Border Patrol also seized over 277 pounds of marijuana, over 198 pounds of cocaine, over 353 pounds of methamphetamine, and over five pounds of fentanyl. Though apprehension numbers in the Big Bend and Del Rio Sectors may have declined recently, as also stated in the IIRIRA waivers, the statistics cited above show that illegal aliens and drug smugglers regularly try to exploit the Big Bend and Del Rio Sectors. The lack of border barrier infrastructure within the Big Bend and Del Rio Sectors makes it harder for Border Patrol to achieve operational control of the border. Thus, if CBP is unable to construct additional border infrastructure in the Big Bend and Del Rio Sectors, they will remain areas that can be exploited by illegal aliens and drug smugglers.

***

This declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30th day of September 2026.

Paul Enriquez
Infrastructure Portfolio Director
Program Management Office Directorate
U.S. Border Patrol

# EXHIBIT A

# Big Bend Wall Projects

*BBT-5: Alpine, Sanderson, Comstock, & Del Rio Station*




## LEGEND

County Boundaries
Patrol Road
International Boundary
Sector

**Proposed Alignment**

Vehicle Barrier System

**State Land**

State Land

**Federal Land**

National Park Service Land

**If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1:521,000 1:521,000




**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO).** It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

# EXHIBIT B

# Big Bend Wall Projects

*BBT-2: Presidio Station*




## LEGEND

Ports of Entry

International Boundary

**Proposed Alignment**

Primary Vertical Wall System

**State Land**

State Land

**If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1:378,000 1:378,000




**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

# EXHIBIT C


Big Bend Wall Projects
BBT-4: Alpine Station
PRESIDIO COUNTY
d Ranch
BREWSTER COUNTY
Big Bend
National Park
LEGEND
County Boundaries
Patrol Road
International Boundary
Sector
Proposed Alignment
Vehicle Barrier System
State Land
State Land
Federal Land
National Park Service Land
*If sheet measures less than 11x17" it is a reduced print.
Reduce scale accordingly.
1:400,000
1:400,000
AREA ENLARGED
WARNING: This document is FOR OFFICIAL USE ONLY (FOUO).
It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

# EXHIBIT D

# ATTACHMENT B

## BEST MANAGEMENT PRACTICES

# BBT-4 Vertical Barrier and Attributes Design Build Construction Project

Brewster County, TX

US CUSTOMS and BORDER PROTECTION (CBP) BORDER PATROL PROGRAM MANAGEMENT OFFICE DIRECTORATE (PMOD)

**Best Management Practices – BBT-4 Vertical Barrier & Attributes (Alpine Station)**
**November 2025**

## Best Management Practices (BMPs) for General Terrestrial Construction Activities

1. Implement Customs and Border Protection (CBP) BMPs during all construction activities including proper handling, storage, and disposal of hazardous or regulated materials.
2. Collect and store all fuels, waste oils, and solvents in tanks or drums within a secondary containment system that consists of an impervious floor and earthen dike capable of containing 125 percent of the volume of the containers stored therein. These materials will be removed from the site during demobilization.
3. Refuel machinery following accepted guidelines, including refueling and storage shall take place away from the aquatic habitat; (not within 100 feet of a drainage channel, wetland, or other surface waters). A designated refueling area with spill protections readily available shall be reviewed by CBP prior to implementation. A contingency plan to control petroleum products accidentally spilled during the project shall be developed as part of all aquatic/in-water projects.
4. A CBP-approved Spill Protection Plan (SPPP) must be prepared and implemented by the contractor at the construction site to ensure that toxic substances are properly handled, stored, and disposed of. Contain spills immediately and use an absorbent (e.g., granular, pillow, sock) to absorb and contain the spill. Immediately report any spill of a hazardous or regulated substance to the CBP Project Manager and on-site environmental monitor. Drip pans will be used beneath equipment, and containment zones will be used when equipment is not being used, or when refueling vehicles and equipment.
5. Collect non-hazardous solid waste (trash and waste construction materials) and deposit in on-site receptacles. Maintain solid waste receptacles and dispose as required.
6. Only authorized contractors and government personnel are allowed within the construction site. With the exception of service dogs, no pets including emotional support pets, owned or under the care of any and all construction workers will be permitted inside the project's construction boundaries, adjacent native habitats, or other associated work areas. Service animals shall have formal official documentation from a licensed physician for CBP approval prior to being allowed onsite.
7. If construction or maintenance work activities occur during nighttime hours, all lights will be shielded to direct light only onto the work site, the minimum wattage needed will be used, and the number of lights will be minimized. If birds are roosting on temporary light poles and other pole-like structures used for construction activities, then anti- perch devices would be used to discourage roosting by birds. Light poles will be designed to prevent hunting perches for ravens and raptors. Unnecessary lights will be turned off to avoid attracting wildlife.
8. A Stormwater Pollution Prevention Plan (SWPPP) will be prepared prior to construction activities. Additional site-specific BMPs will be implemented as described in the SWPPP to reduce erosion and the impact of non-point source pollution during construction activities, giving special consideration to areas with highly erodible soils. Address highly erodible soils in the SWPPP. BMPs include such things as buffers around washes to reduce the risk of siltation and installation of water bars to slow the flow of water downhill.
9. Vehicular traffic associated with the construction activities must remain on established roads to the maximum extent practicable. No off-road vehicle activity will occur outside of the project footprint. Vehicle parking will be confined to the project footprint. Vehicles will not exceed 25 mph within the project area.

10. The project site will be accessed exclusively via designated access roads. Any new or improved access roads will include road construction and maintenance BMPs in their design and plan.

11. Maintain existing roads during construction and return the existing roads and staging areas to pre-construction conditions, if requested by the Government, once construction is complete. The widening of existing or created roadbed beyond the design parameters due to improper maintenance and use will be avoided or minimized. The width of all roads that are created or maintained by CBP should be measured and recorded using GPS coordinates and provided to the Government. Photo document and provide GPS coordinates where correction is needed. The government is to acquire GIS shape files from construction contractor at end of project.

12. The minimum number of roads needed for proposed actions must be constructed and maintained to proper standards. Roads constructed for project access must be closed and restored to natural surface and topography using appropriate techniques once no longer needed for the project. The GPS coordinates of roads that are thus closed must be recorded and provided to the Government. A record of acreage or miles of roads taken out of use must be maintained. Photo document efforts if they occur prior to completion of project. GIS files from the Contractor must be provided to CBP.

13. Areas disturbed by past activities must be used for staging, parking, and equipment storage. All staging, parking, equipment storage areas, and access roads, with their requested uses, will be approved by CBP. Prior to beginning any construction activity (including equipment mobilization, tree- trimming, clearing and grubbing, and road grading), contractor must stake and flag the perimeter of the work area, access routes, laydown yards, staging areas, turnarounds, and other areas approved for use. Recommend flagging and staking occur every 25-linear feet to prevent unauthorized impacts outside of the approved work area. Photo document and provide GPS coordinates of these areas to CBP.

14. If soil-binding agents are utilized, they must be applied during the late summer/early fall months to avoid impacts on federally listed species. Soil-binding agents must not be used in or near surface (within 100 feet) of waters (e.g., wetlands, perennial streams, intermittent streams, washes). Only apply soil-binding agents to areas that lack any vegetation.

15. All disturbed soils not paved that will not be landscaped or otherwise permanently stabilized by construction must have topsoil set aside to be used with species native to the project vicinity. CBP will provide a list of seed mix for each project area.

16. To prevent invasive species seeds, all hauling and construction equipment, including work and personal vehicles, must be washed at the identified facility prior to mobilization to the project area. All vehicles and equipment must be free of all attached soil, mud, vegetation, and other debris prior to mobilization to the construction site.

17. Invasive plants on any work area or shoreline must be treated through chemical or mechanical means. Herbicides must be used according to label directions. Herbicide application must be conducted by a licensed applicator, and daily report of chemical application rate mut be reported to CBP Construction PM or Environmental. Mechanical removal must be done in ways that eliminate the entire plant and remove all plant parts to a disposal area, with the exception of root mass left in-place for bank stabilization.

18. Any off-site materials (e.g., fill and gravel, straw bales, wattles, fiber rolls) must be weed-free to prevent the introduction of non-native species.

19. Preventative measures will be implemented to avoid the introduction of invasive plant species, including soil sourcing, topsoil oversight, and material inspection.

20. Dust control measures will be implemented to prevent hazardous conditions in terrestrial land associated

with the project (staging areas, access roads).

21. Concrete wash water will be collected in an area with an impervious floor and removed off-site for proper disposal to prevent toxicity to aquatic life.
22. A CBP-approved Fire Prevention and Suppression Plan (FPSP) must be developed and implemented for all activities that require welding or otherwise have a risk of starting a fire.
23. Groundwater extraction can occur with written approval by CBP. Groundwater wells shall be metered daily and meter readings provided to the onsite environmental monitor and CBP Project Manager daily.
24. Activities will pause during heavy rain or hazardous weather conditions, including avoiding traversing vehicles or equipment across flowing or standing watercourses.
25. Spray painting bollards shall be performed using equipment designed to minimize overspray. Spray painting bollards should not be conducted in high winds to prevent over spraying into adjacent vegetation.
26. Areas that are hydro-seeded for temporary erosion-control measures must use only native plant species appropriate to surrounding habitat types. Seed list must be approved by CBP environmental prior to application.
27. If cultural resources (artifacts, features, sites, structures) are encountered work shall stop in the immediate area (50 ft radius) until the environmental monitor can assess the significance of the find.
28. If human remains are encountered, work will stop within 100 feet of the find. Appropriate Federal and State agencies will be consulted for a path forward.
29. Areas around and beneath equipment in terrestrial and aquatic settings must be checked for listed species and wildlife to avoid "take" situations.
30. Tree and brush removal in threatened and endangered (T&E) species habitats will be minimized and will not interfere with active nesting as per the Migratory Bird Treaty Act.
31. Ground disturbing activities (e.g. vehicular travel, grubbing, vegetation removal, grading, storage of materials, installation of aerial targets, excavation, scraping, removal of large boulders etc) shall not be undertaken outside the approved project area.
32. Prior to ground disturbing activities, vegetation removal or trimming, a government biologist will present an environmental awareness program to all personnel who will be onsite, including but not limited to Government employees, contractors, contractor employees, supervisors, inspectors, and subcontractors. Included also will be general identification of the species, description of habitat, sensitivity of the species to human activity and describe measures for avoidance and protection of the species during construction. Following the education program, the photograph of the species will be posted in the office of the Contractor and resident engineer, where they must remain through the duration of the project. The Contractor will be responsible for ensuring that all their employees are aware of these species and that they may be present within the project area.
33. If construction or clearing activities are scheduled during the nesting season (typically March 1-September 15) the government will perform a preconstruction survey for migratory bird species to identify active nests prior to the start of any construction or clearing activity. If construction activities will result in the disturbance or harm of a migratory bird, then CBP may coordinate with the U.S. Fish and Wildlife Service (USFWS). Establish buffer zones around active nests until nestlings have fledged and abandoned the nest.
34. When an individual of a federally listed species is found within the project limits, notify the PM or CBP Construction Site Manager. Work may resume when the Government biologist safely removes the individual, or it moves away on its own. Individuals of federally listed species found in the project area and requiring relocation will be relocated by the Government biologist.

35. To prevent entrapment of wildlife species during construction, all excavated, steep walled holes or trenches more than 2-feet deep will either be entirely covered at the close of each working day with plywood or trench cover plates or provided with one or more escape ramps constructed of earth fill or wooden planks. The ramps will be located at no greater than 1,000-foot intervals and will be sloped less than 45 degrees. Each morning before the start of construction and before such holes or trenches are filled, they will be thoroughly inspected for trapped animals. Any animals discovered will be allowed to escape voluntarily (by escape ramps or temporary structures), without harassment, before construction activities resume, or removed from the trench or hole by a qualified biologist and allowed to escape unimpeded.

**Species Specific**

36. **Hinckley Oak (*Quercus hinckleyi*):** Endangered plant species are known to occur in this project area. Government monitors will survey and mark plant populations for avoidance.
37. **Bunched Cory Cactus (*Coryphantha ramillosa*) and Lloyd's Mariposa Cactus (*Sclerocactus mariposensis*):** Avoidance of impacts to federally and state listed plant species is the preferred conservation measure. However, if it is determined that federally endangered and threatened cacti and other protected species cannot be avoided in place, salvage and translocation of plants to an area adjacent to the project area will be required. The contractor's qualified biologist shall prepare a plant salvage and translocation plan identifying plant species of concern that will be impacted by construction operations within the project area prior to scheduled construction activities. The plan shall include the following information:
    - A qualified biologist will be on site to oversee all translocation of plants.
    - Method of removal and placement.
    - Procedures for feeding & watering, if applicable.
    - Marking provisions for relocated plants identifiable during establishment period.
    - Establishment period (minimum 12 months) measures to be employed.
    - A monitoring plan for relocated species.
    - Relocate affected plants north of the project area.
    - Species should be relocated to a minimum of 10' away from proposed lighting & electrical features.
    - The north face of cacti will be marked so that the species are translocated in the same position.
38. **Salina Mucket (*Potamilus metnecktayi*) and Texas Hornshell (*Popenaias popeii*)**: The project area overlaps with Salina mucket and Texas hornshell designated critical habitat. No fill material shall be placed into or removed from any potential Salina mucket and Texas hornshell habitat without CBP review and approval. Erosion control measures will be put in place near waterways to avoid habitat impact. In-stream work during high flow periods will be avoided to minimize mollusk habitat impacts. If temporary stream crossings are necessary, use bridges or culverts instead of driving through the water. In addition, a biological monitor familiar with the species will be present during construction activities.
39. **Big Bend Gambusia (*Gambusia gaigei*):** Endangered and sensitive aquatic and riparian species are known to occur in this project area. Prior to construction activities, a CBP biologist would survey the project footprint and mark areas for avoidance. If construction is to occur in an intermittent or perennial waterway, species relocation may be required.

# EXHIBIT E

# BIG BEND GAMBUSIA

# RECOVERY PLAN



U.S. FISH & WILDLIFE SERVICE

1984

Albuquerque, New Mexico

# RECOVERY PLAN

FOR

BIG BEND GAMBUSIA

Gambusia gaigei Hubbs, 1929

PREPARED FOR

THE U.S. FISH AND WILDLIFE SERVICE

BY

THE-RIO GRANDE FISHES RECOVERY TEAM

APPROVED: Jerry L. Stegman
Acting Regional Director, Region 2

DATE: 9/19/84

## SUMMARY

1. Point or condition when species will be considered for delisting:

   The Big Bend gambusia may never be downliated or delisted because of its extremely limited distribution and tenuous habitat conditions. Downlisting the species to threatened classification could be considered if all recovery actions, a8 proposed In this Recovery Plan, are implemented.

2. What must be done to reach recovery:

   Steps to reach recovery include maintaining and enhancing habitats where Big Bend gambusia presently exist and establishing populations in other suitable locations. To fnaure against loss of the species a captive population must be maintained until survival of several population8 in the wild are assured.

3. Management needs to keep the species recovered:

   To keep the species recovered it will be necessary to monitor population8 to insure they are viable and the habitats are being managed to maintain the species.

## DISCLAIMER

This is the completed Big Bend Gambuaia Recovery Plan. It has been approved by the U.S. Fish and Wildlife Service. It dcea not necessarily represent official positions or approvals of cooperating agencies and It does not necessarily represent the views of all recovery team members/ individuals, who played the key role in preparing the plan. This plan is subject to modification as dictated by new findings and changes in species status and completion of tasks described in the plan. Goals and objectives till be obtained and funds will be expended contingent upon appropriations, prioritea, and other budgetary constraints.

The Big Bend Gambuaia Recovery Plan dated September, 1984, was prepared by the U.S. Fish and Wildlife Service In cooperation with the Rio Grande Fishes Recovery Team.

The recovery plan is based upon the belief that State and Federal conservation agencies and knowledgeable, interested individuals should endeavor to preserve the Big Bend gambuaia and its habltat and to restore them, as much as possible, to their historic status. The objective of the plan is to make this belief a reality.

The recovery team members have used the beat information available to them and their collective knowledge and experience in producing this recovery plan. It is hoped the plan will be utilized by all agencies, institutions, and Individuals concerned with the Big Bend gambusia and the Rio Grande Village ecosystem to coordinate conservation activities. Periodically, and as the plan is implemented, revisions will be necessary. Revisions will be the responsibility of the recovery team and implementation is the task of the managing agencies, especially the National Park Service, Texas Parks and Wildlife Department and the U.S. Fish and Wildlife Service.

## ACKNOWLEDGMENTS

The Big Bend Gambuala Recovery Plan, dated September 17, 1984, was prepared by the U.S. Fish and Wildlife Service in cooperation with the Rio Grande Fishes Recovery Team composed of the following individuals:

Dr. Clark Hubbs, Department of Zoology, University of Texas, Austin, TX
Dr. Salvador Contreraa-Balderaa, Universidad Autonoma de Nuevo Leon, Monterrey, Mexico
Dr. Anthony Echelle, Biological Sciences, Oklahoma State University, Stillwater, OK
Mr. Buddy Jensen, Dexter National Fish Hatchery, Dexter, NM
Mr. Michael D. Hatch, New Mexico Department of Game and Fish, Santa Fe, NM
Mr. Floyd Potter, Texas Parks and Wildlife Department, Austin, TX

Other Individuals instrumental in plan formulations Include:

Mr. Gerard A. Hoddenbach, National Park Service, Santa Fe, NM
Mr. Gilbert Lusk, Park Superintendent, Big Bend National Park, TX
Mr. Mike Fleming, Resource Management Specialist, Big Bend National Park, TX
Mr. Bill Werrel, Water Resources Coordinator, National Park Service, Fort Collins, CO

Literature citation should read as follows:.

U.S. Fish and Wildlife Service. 1984. Big Bend Gambusia Recovery Plan, U.S. Fish and Wildlife Service, Albuquerque, New Mexico.

Additional copies may be obtained from:

Fish and Wildlife Reference Service
1776 E. Jefferson Street, 4th Floor
Rockville, Maryland 20852
Telephone: (301) 468-1737 Ext. 236 or 290
Toll Free - l-800-582-3421

U.S. Fish and Wildlife Service
Office of Endangered Species
P.O. Box 1306
Albuquerque, New Mexico 87103
Telephone: (505) 766-3972

TABLE OF CONTENTS

Summary...*.. i

Disclaimer.... ii

Acknowledgments .... iii

PART I - INTRODUCTION

Introduction.... 1
Taxonomic Status.... 1
Distribution and Description of the Habitat.... 2
Associated Species.... 4
Reproduction.... 5

Competition .... 5
Development .... 6
Recharge Zone.... 7
Runoff.... 8

Habitat Modification.... 9

Conservation Efforts.... 10

PART II - RECOVERY

Objective .... 14

Stepdown Outline.... 14

Narrative .... 16

Literature Cited.... 30

PART III - IMPLEMENTATION SCHEDULE.... 32

PART IV - APPENDIX

Replies to Comments.... 36

Monitoring Procedures.... 43

PART I

# BIG BEND GAMBUSIA RECOVERY PLAN

## INTRODUCTION

The Big Bend gambuaia (Gambuaia gaigei) la a livebearing fish, up to 30 mm long, restricted to one spring outflow near Rio Grande Village in Big Bend National Park, Brewster County, Texas.

Threats to the species include a very limited total environment, a declining spring flow that maintains the environment, and competition with Gambuaia affinia.

The species is a relatively plain, yellowish poeciliid whose faint lateral stripe is the most pronounced dark mark on the body. There la also a bar beneath the eye and a faint, dark chin bar. The male's anal fin is rolled into a tube-like gonopodlum for transferring sperm into the female, has a pronounced elbow, with only one or two segments. Hubbs and Springer (1957) give a &tailed description of the Big Bend gambuaia.

## TAXONOMLG STATUS

The Big Bend gambusia was described by Hubbs (1929). Rosen and Bailey (1966) considered Gambusia gaigei a senior synonym of Gambusia hurtadoi and Gambusia alvarezi, but this opinion was not accepted by Rivas (1963), Peden (1973), Alvarez (1970), or Miller (1978); G. gaigei remains a distinct species.

Moat authors place the Big Bend gambuaia In the Gambuaia nobilia species group (Hubbs and Springer 1957, Minckley 1962, Peden 1973); however, Rivas (1963) divided the G. nobilia group Into the G. nobilia and G. senilis groups and placed G. gaigei in the latter.

## DISTRIBUTION AND DESCRIPTION OF THE HABITAT

The Big Bend gambuaia is known only from spring habitats of Texas in the vicinity of Boquillaa Crossing and Rio Grande Village in Big Bend National Park. The precise native occurrence is somewhat in question; the details are addressed in Hubbs, et al. (1977a). That study concluded that at least two populations originally existed--one at Boquillaa Spring, approximately 200 meters north of Boquillas Crossing and a second at Spring 4 just east of the present Rio Grande Village Campground (Figure 1). Other names for Boquilias Spring are Boquillas Crossing and Beaver Marsh Springs, and other names for Spring 4 are Campground Springs (Brune 1981), Weden Spring, Graham Ranch Warm Springs, Rio Spring, and Pumphouse Spring. Big Bend gambusia possibly once existed in other springs in the vicinity of Rio Grande Village (notably Spring 1.) The population once inhabiting Boquillas Spring is extinct and the population in Spring 4 has been extirpated. The Big Bend gambuaia now consists or descendants of the Spring 4 population being maintained in a nearly natural park refugium (Fig. 2) and at Dexter National Fish Hatchery, New Mexico.




Figure 1. Yap of the Rio Grande Village Area of Dig Bend National Park.




Figure 2. Rio Grande Village Campground showing location of Big Bend gambusia habitat.

The current stocks are all derived from three individuals taken from a declining Spring 4 population in 1956.

All documented natural occurrences of Big Bend gambusia are from spring outflows. The two springs of natural occurrence differ substantially in outflow temperature. Spring 4 has an outlet temperature of 32-35.5°C (Moore 1980) and Boquillas Spring had a temperature of about 23°C on March 6, 1982. However, the fish inhabiting Spring 4 did not live in the springhead itself (Hubbs 1959), but downstream where the temperature was influenced by ambient air temperatures. Recorded water temperatures (summers of 1954-56) from the Spring 4 outflow ditch, densely inhabited by Big Bend gambusia, were 28-32.5°C with air temperatures in the mid-20s. The temperatures in the large "overflow pool" (Figure 2), sparsely inhabited by Big Bend gambusia, were cooler and near ambient. Recorded temperatures from the refugium also fluctuate widely dependent upon air temperature and location.

The habitats originally occupied by the Big Bend gambusia were recorded as springfed marshes (Hubbs 1929). Dense aquatic vegetation (submerged and emergent) presumably occurred in clear, shallow water. Alt hough the present refugium has open water with depths in excess of one meter, the Big Bend gambusia is most abundant among the vegetation (primarily Typha and Charn) near the shore.

In summary, the natural habitat occupied by G. gaigei was clear, shallow water fed by warm springs. Although the Big Bend gambusia will exist in other habitats, the rapid replacement by mosquitof ish (Gambusia affinis) (see Threats) in eurythermal water suggests that the Big Bend gambusia

is best adapted to warm-spring areas. Other members of the Gambusia nobilis species group in U.S. waters also are abundant in springs, especially in those area6 inhabited by mosquitofish downstream.

## ASSOCIATED SPECIES

Big Bend gambusia have been found associated with at least five other fish species within their native range. These included, at Spring 4, two minnows (Notropis braytoni and N. lutrensis), another poeciliid (Gambusia affinis), an ictalurid (presumably Ictalurus punctatus) and a centrarchid (Lepomis cyanellus). The channel catfish and green sunfish (potential predators) were reported to have been purposefully stocked into the overflow pool of Spring 4; perhaps the other specie6 accidentally were placed into the pool along with these game specie6 (Hubbs and Springer 1957, Hubbs and Broderick 1963). These predators were removed and their impacts reportedly were minimal (Hubbs and Echelle 1972). The two potentially competitive minnows also were eliminated, but the mosquitofish survived and apparently is a serious competitive and predatory threat to Big Bend gambusia. A second introduction of green sunfish occurred in 1968, apparently as an accident by campers who wished to "help the conservation program" (Hubbs and Echelle 1972). These also were eliminated with few noticeable effects on the Big Bend gambusia. At the present time, no fishes are known to coexist with Big Bend gambusia.

At least 18 other fish species inhabit the Rio Grande adjacent to the habitat6 of the Big Bend gambusia (Hubbs et al. 1977b) but are not syntopic with the Big Bend gambusia. They could move into the campground area in the event of a large-magnitude flood.

Other species found with Big Bend gambusia 'include aquatic invertebrate6 that may be prey items for G. gaigei, crayfish, a variety of potential avian predators, and various plant6 including bulrushes, Cattails, saltcedars, and cottonwoods, which provide cover and/or shade.

## REPRODUCTION

The Big Bend gambusia is viviparous (bear6 living young). Hubbs and Broderick (1963) report two broods totalling 40 young from two small females. The species reproduces in laboratory tanks and at the Dexter National Fish Hatchery in ponds fed by well water. Otherwise, virtually nothing is known about reproduction in the species. However, it is probable that, once inseudnated, females can store sperm for long periods, e.g., several months, and that interbrood intervals in individual females is on the order of l-2 months. These are general features of reproduction in Gambusia species. Factors limiting reproduction are unknown, but photoperiod, temperature, and food availability all affect fecundity and interbrood intervals in poeciliids.

## COMPETITION

The evidence that competition with G. affinis is deleterious to

the survival of Big Bend gambusia population6 is primarily circumstantial. Other factors such as predation on young may be involved (Meffe 1983). Also, Gambusia gaigei does not flourish in the presence of Gambusia affinis (Hubbs et al., 1977a). The recorded evidence of this includes: (1) the replacement of Gambusia gaigei by Gambueia affinis in the Spring 4 outflow (1954-56); (2) replacement of Gambusia gaigei by Gambusia affinis in the first refugium (Fig 2; 1960-1961); (3) the failure of reintroduced Gambusia gaigei to establish a population in Boquillas Spring where Gambueia affinis now thrive; (4) the rapid replacement of Gambusia gaigei by Gambusia affinis in artificial pools near Brownsville. This last example included disappearance of mature Gambusia gaigei within 3 months of the first appearance of Gambusia affinis suggesting that c&petition or predation on adults as well as the young. In general, the rates of replacement were most rapid in eurythermal habitats (fluctuating temperatures) and slowest in warm, springrun habitats (constant temperatures).

## DEVELOPMENT

Visitors to Big Bend National Park continue to increase with coincidental impacts on the park's natural resources. In the future, satisfaction of additional visitor needs will require careful planning to avoid overburdening the Rio Grande Village area with new demand.6 for water and space. Current visitor use of the Rio Grande Village area may be approaching the maximum commensurate with management for survival

of the Big Bend gambusia, with the main threat being increased pressure on the park to provide additional facilities. Water supply for Rio Grande Village presently is pumped from Spring 4, utilizing most of the natural flow from this spring.

RECHARGE ZONE

Spring 1 and Spring 4 are Important for sustaining Gambusia gaigei in the Rio Grande Village area of Big Bend National Park. These springs (about 270 meters apart) have been developed, altering their natural flows. Chemical water analyses show, them to have been almost identical during the past 24 years and strongly suggest that both springs have a common source. Spring6 1 and 4 are intermediate thermal springs, part of a cluster of six known thermal springs concentrated in this area of the Big Bend of the Rio Grande. Temperatures of the spring cluster are in the 30–50°C range with the warmest temperatures in Hot Springs and temperatures in Springs 1 and 4 near 34°C. The points of issue of Springs 1 and 4 are located along the contact of the upthrow side of the Santa Elena Limestone of Cretaceous Age (Moore 1980).

Thermal water issuing from both springs is of ancient origin with the principal. recharge zone located in higher elevations of the Sierra del Carmen (Moore 5.980). The fault system, formed in Mesozoic times during development of the Sierra del Carmen, serves both as a means for collecting and recharging the groundwater system as well

as an avenue by which groundwaters are discharged In a spring line. In addition to the concentrated flows of Springs 1 and 4, diffused seepage occurs in the vicinity.

No land-use changes or significant water developments are anticipated over the recharge zone; however, monitoring of Spring 1 and Spring 4 discharges should continue so that potential changes in water quality or quantity are detected as early as possible.

RUNOFF

Surface runoff and Rio Grande flooding are two continual threats to the existence of Cambusia gaigei. Periods of unusually high precipitation could result in surface runoff causing significant silt deposition and/or erosion in both the refugium and/or springruns. Flooding or broad surface runoff could provide an avenue for invasion of Gambusia gaigei habitats by Gambusia affinis (or other undesirable species) and renew the threat of biological contamination. The greater of the two threats is flooding by the Rio Grande. Flow in the Rio Grande near Big Bend is regulated primarily by water released from Presa Luis L. Leon into the Rio Conchos in Mexico. Cooperative efforts should be maintained with the Republic of Mexico to prevent water releases Large enough to flood Rio Grande Village. However, high rainfall and seasonal runoff in the Rio Grande are not predictable nor fully controllable and could result in flooding of Gambusia gaigei habitat.

## HABITAT MODIFICATIONS

The history of spring visitation by scientists interested in observing and collecting Big Rend gambusia is sketchy and has led to considerable discussion about which spring is the type locality and which springs were once occupied by the species. This is covered in detail by Hubbs et al. (1977a).

Available evidence is that the type locality (Boquillas Spring) dried during the 1950s. Although flows have now resumed, the waters are occupied by dense populations of Gambusia affinls. Thus, in its present condition, the type locality is no longer a favorable habitat for Big Band gambusia. The other actual or potential habitats for Big Bend gambusia are the outflows of Spring 1 and Spring 4.

Spring 4 originally flowed almost due west about 20 meters and then southwest for about SO meters to a conjunction with runoff draining the northeast side of the Rio Grande Village valley (Fig. 2). The joined streams flowed about 200 meters south to the Rio Grande. In 1951, the flow was diverted by a dike so that it flowed directly south into a Large overflow pool. This pool is now a choked, cattail slough; excess water flows south to join the old channel just prior to entry into the Rio Grande. Presently, some water flows through both courses; the original flow passes through a wooded grove until it crosses the nature trail. Beyond that point, it enters another cattail slough associated with a beaver pond. The diverted part of the stream is filled with cattails

until It crosses the nature trail (the trail occupies &he crest of the dam forming the overflow pool). Most of the water from Spring 4 is used as a water supply for Rio Grande Village.

Little is known concerning the early history of Spring 1. Early maps suggest an outflow to the east toward Berkeley House. Other changes in the area are discussed under conservation efforts.

CONSERVATION EFFORTS

Over the years, there have been projects designed to modify spring outflows through ditches and ponds to enhance the, appearance of the "oasis image" of the Rio Grande Village area. Since the 1950s, these projects have been cognizant of Big Bend gambusia requirements.

Chief conservation efforts have been to ensure the survival of the Spring 4 population. The various problems are treated In Hubbs and Broderick (1963), Wauer (1973), Hubbs et al. (1977a), Hubbs and Williams (1979). The initial difficulties occurred in 1954 through 195_ when Gambusia affinis was observed to be replacing Big Bend gambusia in Spring 4. The October 9, 1956, renovation involved an unsuccessful effort to eradicate Gambusla affinis from Spring 4. On that date, live Big Bend gambusla were removed from the Spring 4 outflow. Subsets of the Live sample were

introduced Into potentially suitable Park Service waters. All of these fish died; the only remaining living individuals were three fish maintained In Austin and returned to the park the following spring (1957). These fish were stocked into the first refuglum pond built during the 1956-57 winter. Subsequently, Gambusia affinis were noted to be abundant in the refugium pond. On April 16, 1960, 15 Big Bend gambusia were removed from the initial refugium and taken to Austin. During the summer, the current refugium near Spring 1 was constructed and filled with Spring 4 water. Twenty fish were placed in this refuglum August 7, 1960.

During 1968, green sunfish were unexpectedly observed in the new refugium pond and these predators were eliminated.

A massive mortality of Big Bend gambusia in the refugium was noted in December 1975. The observations are in accord dth cold shock le thali ty (Hubbs and Williams i979). In August 1976, the few remaining fish in the refugium were supplemented by descendents of the 1960 stocks that had been maintained in Austin.

In late 1976, a constant flow-through system based on pumped water from Spring 1 was established in the refugium. This system was designed to mitigate the effects of thermal extremes such as those that presumably caused the December 1975 mortality. Overflow water drained to the south and into a saltcedar/cattail thicket. The overflow wa: er was concentrated in an overflow ditch (Fig. 3). In January 1978, Big Bend gambusia from




Figure 3. Overflow ditch of Big Bend **gambusia refugium pond.**

the refuglum were placed in the overflow drainage ditch and they now flourish In the ref uglum and in its drainage ditch.

A stock of Big Bend gambusia was first taken to Dexter National Fish Hatchery in 1974. Low winter temperatures eliminated several stockings at Dexter, but present procedures call for maintaining some fish in warmer hatch-house waters throughout the tinter. This change has allowed the present population to survive since 1981, and guarantees replacement of Big Bend gambusia in the event of a massive mortality of the species in Big Bend National Park.

Future management goals for recovery of the species include the supplement of spring flows from wells, extending the outflow from Spring 1 to form a slow, shaded creek, redirecting the flow from Spring 4 to form a stream which will approximate predevelopment conditions, eradication of G. affinis from the campground area, and the establishment of Big Bend gambusia in other suitable locations.

# PART II

# RECOVERY

## Objective

The ultimate goal of this recwery plan is to secure survival of the Big Rend gambusia in a natural setting. This goal should result from implementation of the recovery plan proposed below. because of the extremely limited distribution and tenuous habitat conditions, Big Rend gambusia may never be downlisted or at least delisted.

## Step-Down Outline

Primary goal: Assure the survival of'the Big Bend gambusia (Gambusia gaigei) through improvement of its status.

1.0 Maintain and enhance the existing Big Bend gambusia population and Its habitat.

1.1 Identify population needs.

1.11 Competition with Gambusia affinis
1.12 Prey species biology
1.13 Reproductive variables
1.14 Predation
1.15 Surviorship
1.16 Diseases and parasites
1.17 Habitat requirements

1.2 Monitor existing population and habitat.

1.3 Evaluate, maintain, and enhance habitat.

1.31 Supplement spring flow

1.32 Manage Spring 1

1.33 Manage Spring 4

1.34 Irrigate campground from a well

1.35 Eradicate Gambusla affinis from campground area

1.36 Minimize campground impact

2.0 Establish Big Bend gambusia in suitable locations.

2.1 Determine suitable locations . .

2.2 Stock Big Bend gambusia in Spring 4

2.3 Use Big Bend gambusia for mosquito control in the Big Bend area

2.4 Monitor released populations

2.5 Manage Introduced populations

3.0 Maintain a captive population of Big Bend gambusia.

4.0 Produce information for public consumption.

4.1 Information phamplet

4.2 Interprecivc programs

4.3 News releases

5.0 Enforce Federal and State laws.

5.1 Status

5.2 Habitat integrity

Narrative

Recovery Goal: Assure the survival of the Big Bend gambusia (*Gambusia gaigei*) through improvement of its status.

1.0 Maintain and enhance the existing Big Bend gambusia population and its habitat.

The only known natural population of Big Bend gambusia inhabits a refugium in Big Bend National Park. The recovery team recommends that the first priority for recovery of the species be enhancement of suitable habitat. Unless the environment is appropriately modified to assure continuity, survival of the species remains under continued threat. In addition, the exceedingly small geographic rang is of great concern because one seemingly minor environmental change could exterminate the species from the wild.

1.1 Identify population needs

It is essential to understand the biology and ecology of Big Bend gambusia. In the event the status of the species declines, causative factors can be identified and remedied as quickly as possible.

1.11 Assess potential for competition with Gambusia affinis. Gambusia affinis is a known and continuing potential competitor with G. gaigei. It is essential to understand competitive interactions between Big Eend gambusia and G. affinis because of the serious and persistent threat the latter species poses to the former. Studies should be conducted to better understand the competitive inter-actions for food and space between these two species. Contrast the biological requirements of each species whereever appropriate.

1.12 Determine food preferences and prey biology.

Inventory the prey species present in the refugium and in potential restoration sites. In addition, conduct studies to determine food preferences of Big Bend gambusia and seasonal food availability.

1.13 Determine reproductive variables of Big Bend gambusia.

Additional knowledge of the reproductive biology (reproductive season, fecundity, interbrood Interval) of the species is not urgent to this recovery plan but studies should be pursued wherever possible to develop a reproductive data base useful to enhance perpetuation of the species.

1.14 Determine effects of predation.

*Lepomis cyanellus* has been linked to a decline of Big Bend gambusia during the 1960s. Determine effects of predation by potential predators (birds, sunfish, etc.). This study should involve selectivity on Big Bend gambueia by predators.

1.15 Determine survivorship by age groups.

Little is known about survivorship curves for Big Bend gambueia. Mortality rates for each life history stage should be determined and that information incorporated into a plan for reducing mortality.

1.16 Determine diseases and parasites.

No data are available on the diseases and parasites affecting Big Bend gambusia. As the species occupies limited space, an epidemic could seriously impact chances of survival. Advance knowledge of the diseases and parasites of Big Bend gambusia could be of assistance in containing an epidemic.

1.17 Determine habitat requirements.

Valuable Insight for protection and enhancement of Big Bend gambusia would be gained from a study of seasonally varying habitat associations including physical, chemical, and biotic elements of present habitat and potential restoration sites.

Develop an adequate and dependable water source to satisfy the basic habitat requirement of Big Bend gambusia. Diminished spring outflows have resulted in loss of some of the original Big bend gambusia habitat. The human demand for water in the park is likely to exacerbate the problem. Spring flows in the refugium and potential restoration sites must be enhanced.

1.2 Monitor Big Bend gambusia and its habitat.

Conduct long term population and monitoring studies of Big Bend gambusia focusing interests on habitat conditions, population numbers , condition, and age structure of fish. Should any of these or other factors suggest decline in the population or degradation of habitat, causative factors must be identified and corrected. Every proposed activity which might adversely affect the Big Bend gambusia or its habitat must be critically reviewed.

1.3 Evaluate, maintain, and enhance habitat.

Big Bend gsmbusia survivorship is dependent upon availability of a warm spring habitat. The species survives well in other habitats only in the absence of G. affinls; but the adverse effect of G. affinis is least important in warm springrun environments.

1.31 Supplement spring flow.

The two major warm springs within the historic range (Springs 1 and 4) have adequate available outflow volumes for stable Big Bend gsmbusia populations. The ground water in the vicinity of the Rio Grande Village Campground emerges at several locations. Wells should be dug into the aquifer upstream from the outflows of Springs 1 and 4. Water from these wells should be available to supplement the flows from Springs 1 and/or 4 when either flow is diminished. Each spring (see 1.32 and 1.33 below) should have consistent flow to maximize the stenothermal warm environment most optimal for Gambusia gaigei populations. Flow rate is less critical than maintenance of stenothermal conditions typical of springrun habitats.

1.32 Manage Spring 1.

Spring 1 is used to provide water for the existing refugium. The outflow from the pool now drains into a saltcedar/cattail thicket. This outflow should be extended along the present asphalt road in the form of a slow, shaded creek. No water should be permitted to reach the Rio Grande. It should be dispersed on flatlands in the vicinity of the maintenance yard. The vegetation developing along the slow creek should be monitored carefully. Cattails and bullrushes should be removed to preclude overgrowth. Appropriate native shade trees should be encouraged.

1.33 Manage Spring 4.

The outflow from Spring 4 contained the ancestors of the present stocks of Big Bend gambusia, and some individuals may still exist in the dense vegetation. Excess water not needed for the fish could be used for domestic use in the campground, but priority should be placed on habitat for the endangered species. All water for fish use should be directed into the original channel. Redirection of flow can be achieved by removal of a portion of the existing dike blodcing flow towards the old channel and placing dirt across the ditch carrying water to the overflow pool. Concentration of the water in the channel that flows across the nature trail will recreate a stream that approximates presumed predevelopment circumstances.

The flow in the **combined** stream should **follow** the natural stream course. The stream should have a consistent flow with minimal **shallow,** still water; however, the flow should not be directed through a straight channel. Factors **that** might cause ponding of the stream (beaver activities, cattail growth, etc.) should be prevented.

1.34 Irrigate the campground from a well.

The present practice of using water directly pumped from the Rio Grande to water vegetation in Rio Grande Village should be discontinued to avoid contamination with G. afflnis. A shallow well should be dug into the river gravel in a secure location at least **50** meters from the river bank. This **well** (or wells) should be the source of irrigation water for the campground.

1.35 Eradicate Gambusia affinis **from** campground area.

Any population of Gambusia **affinis** near **waters** inhabited by Gambusla **gaigei** is a potential source of an introduction; thus, all likely sources of contaudnatioa should be removed. Populations of **G. affinis** exist In most exposed open water in the vicinity of Rio **Gra.ıde** Village. Those populations should be eliminated. Many of the populations can be elindnated by drying of the pools. Use of irrigation

water (from the well(s) described In 1.34) should be monitored carefully so water does not accumulate in low spots. Such inadvertant pooling should be allowed to dry so that a crust forms across the bottom; however, subsequent to canplete drying, overflow water may be allowed to accumulate In these ponds. When G. affinis has been eradicated frw all poads in and adjacent to the campground, the only sources of potential contamination will be populations in the Rio Grande and in the outflow from Spring 4. It is not fess ible to eradicate G. affinis from the Rio Grande and past attempts in Spring 4 have been unsuccessful; however, any activities that enhance G. affinis abundance in either area should be avoided.

1.36 Minimize campground Impact

Any activities at the Rio Grande Village Campground that adversely impact Big Bend gambusia must be avoided. Campsites close to Splng 1 or 4 outflows till be reevaluated. Nearby campsites should be closed and new or replacement campsites be located a greater distance from the springruas or sources. Alternate camping localities elsewhere in the park should be considered to protect Gambusia gaigai habitat.

2.0 Establish Big Bend gambusia in suitable locations.

Only warm spring habitats within the Boquillae Spring - Rio Grande Village area (Figure 1) are suitable for introduction of Big Bend gambusia.

Purposes of this action are to: (1) increase the numbers of viable stocks within the historic range of the species; (2) provide transplantation experiments in a variety of situations and thereby gain increased understanding of the breadth of conditions tolerated by the species; (3) provide situations where **genetic/ecological** interactions with G. affinis **can** be exandned in natural conditions; and (4) reduce the size of the resident G. affinis **population,** thereby reducing the threat to G. gaigei.

In the long run, G. affinis will be a persistent **component** of the local fauna with which G. **gaigei** must contend. The consequences of interaction between the **two** species must be understood.

2.1 Determine suitable locations to stock Big Bend gambusia

Spring 4 **is** the only warm spring habitat currently suitable for **G. gaigei,** however, ponds in the campground may also be suitable.

2.42 Establish emergency response procedures

When routine monitoring reveals a degradation of the status of Big Bend gambusia or habitat, procedures for assuring survival of the species should be developed and ready to be put into affect.

2.5 Manage introduced populations

3.0 Maintain a Captive Population of Big Bend Gambusia

Big Bend gambusia should be maintained at Dexter National Fish Hatchery to provide a'resgrve gene pool in the event that the species experiences a severe population decline in its natural setting. Standard procedures at the hatchery should be followed. This facility has the capability to safely overwinter G. gaigei and to isolate the species from other gambueine fishes. The captive populations can be used to provide research specimens (both live and preserved) to agencies and institutions conducting research on G. gaigei. If needed, designated studies can also be carried cut at the holding facility. The stock at Dexter should be checked annually to verify the genetic integrity of the captive population.

4.0 Information Base

Funds and manpower should be expended to provide public information on survival problems and recovery efforts relevant to Gambusia gaigei in Big Bend National Park.

4.1 Information pamphlet

Information relative to the uniqueness, taxonomy, biology, distribution, and habitat requirements of the Big Bend gambusia should be prepared and made available to enhance public awareness of endangered species in general, and this species in particular.

4.2 Interpretive Programs

Information derived from such pamphlet should be presented to the visiting public in park interpretive programs and in visitor center displays.

4.3 News Releases

Noteworthy events regarding the Big Bend gambusia should be publicized through the dissemination of appropriate and timely news releases.

5.0 Law Enforcement

The Big Bend gambusia is currently protected under Federal and Texas laws. It occurs only in Big Bend National Park where all natural resources are federally protected and where National Park Service law enforcement personnel are readily available. State and Federal enforcement agencies and divisions of the National Park Service

2.2 Stock Big Bend gambusia in Spring 4

Once actions described in 1.33 have been implemented, Big Bend gambusia should be transported from Spring 1 refugium to the upper portion of the Spring 4 run. Transplantation of at least 100 females and 100 males is recommended. Repeated efforts should be made if initial introduction(s) are unsuccessful.

Spring 4 should provide a valuable opportunity to examine resource utilization differences and genetic interaction between G. gaigei and G. affinis.

2.3 Use Big Eend gambusia for mosquito control in Big Bend area.

At present the park maintains a large pool which receives overflow irrigation water from the campground area (Figure 1). This pool represents a large reservoir of G. affinis which is a threat to the well being of Big Bend gambusia. This pool should be stocked with Gambusia gaigei after Implementation of 1.35.

2.4 Monitor relocated populations of Big Bend gambusia.

To assess the success of transplantations and other management actions, all known populations at Big Bend should be sampled at least twice annually. Such monitoring should be coupled with assessments of habitat quality.

2.41 Establish monitoring procedures and schedules

Sample all sites twice a year, in February and August. Extreme care should be taken to guard against inadvertent transport of eggs/embryos of G. affinis and other fishes. The procedures for sampling is appended to this plan.

2.411 Preset.;: refugium should sample, preserve, and catalogue at least 15 specimens, unless such sample represents more than 1 percent of the standing populations numbers.

2.412 Similar sampling in the overflow stream from Spring 4 done by sources selected by the National Park Servive in consultation with the Fish and Wildlife Service.

should be provided information relevant to Big Bend gambusia identification, legal status, distribution and maintenance. Habitat integrity should be emphasized to avert actions (intentional or unintentional) or projects that would be deleterious.

5.1 Status

Enforcement agencies (Federal and State) will be kept advised of the legal status of the Big Bend gambusia and its habitat according to State and Federal laws so they may properly identify the species and be aware of the potential threats and hazards to its continued existence.

5.2 Habitat integrity.

Agencies with jurisdiction over project activities which could modify the existing habitat in any way should be kept informed of the status of the Big Bend gambusia, its distribution and needs. Section 7 consultation requirements mandate that Federal project specifications preclude any adverse effect on listed species. Protection of the species is a joint responsibility of the U.S. Fish and Wildlife Service, the National Park Service, the State of *Texas,* and to an extent, the Republic of Mexico.

# LITERATURE CITED

Alvarez del Villar, Jose. 1970. Pecea Mexicanos (claves). Serie investigacion pesquera, estudia No. 1. 166 pp.

Brune, Gunnar. 1981. Springs of Texas. Vol. I. Branch-Smith, Inc. Fort Worth.

Hubbs, Carl L. 1929. Studies of the fishes of the or&r Cyprinodontes VIII. Gambusia gaigei, a new species from the Rio Grande. occ. Pap. Mus. Zool. Univ. Mich. 198:1-11.

Hubbs, Clark. 1959. High incidence of vertebral deformities in two natural populations of fishes inhabiting warm springs. Ecology 40:154-155.

_____ and Harold J. Broderick. 1963. Current abundance of Gambusia gaigei, an endangered fish species. Southwestern Naturalist 8:46-48.

_____ and Anthony A. Echelle. 1972. Endangered non-game fishes of the upper Rio Grande Basin. In: Endangered vertebrates in the Southwest. William C. Huey (ed.). New Mexico Department of Game and Fish: 147-167.

_____, James E. Johnson, and Roland H. Wauer. 1977a. Habitat Management Plan for Big Bend Gambusia, Big Bead National Park, Texas. National Park Service.

_____, Robert R. Miller, Robert J. Edwards, Kenneth W. Thompson, Edie Marsh, Gary P. Garrett, Gary L. Powell, D. J. Morris, and Robert W. Zerr. 1977b. Fishes inhabiting the Rio Grande, Texas-Mexico, between El Paso and the Pecos confluence. In: Importance, Preservation and Management of Riparian Habitat. A symposium. USDA Forest Service, General Technical Report. RM-43. R. Roy Johnson and Dale Jones (eds.). 91-97.

_____, and Victor G. Springer. 1957. A revision of the Gambusia nobilis species group, with descriptions of three new species, and notes on their variation, ecology, and evolution. Texas J. Sci. 9:279-327.

_____, and John G. Williams. 1979. A review of circumstances affecting the abundance of Gambusia gaigei, an endangered fish endemic to Big Bend National Park. In: Proceedings First Conference on Scientific Research in the National Parks, Vol. 1. Robert Linn (ed.). 631-635.

Meffe, Gary K. 1983. Ecology of species replacement in the Sonoran topminnow (Poeciliopsis occidentalis) by mosquito fish (Gambusia affinis) in Arizona. Ph.d. dissertation. Arizona State Univ. Tempe, AZ

Miller, Robert R. i978. Composition and derivation of the native fish fauna of the Chihuahusn desert region. In: Transactions of the Symposium on the Biological Resources of the Chihuahuan Desert Region, U.S.-Mexico. Roland H. Wauer and David H. Riskind (eds.), National Park Service, GPO, Washington, D.C.: 365-381.

Minckley, Wendell L. 1962. Two new species of fishes of the genus Gambusia (Poeciliidae) from northeastern Mexico. Copeia 1962: 391-396.

Moore, G. 1980. Aquifer test of geothermal Spring 4, Rio Grande Village, Big Bend National Park, National Park Service, Water Resources Report No. 80-8. Southwest Regional Office, Santa Fe, NM 87501.

Peden, A. E. 1973. Variation in anal spot expression of gambueine females and its effect on male courtship. Copeia 1973: 250-263.

Rivas, L. R. 1963. Subgenera and species groups in the poeciliid fish genus Gambusia Poey. Copeia 1963: 331-347.

Rosen, D. E. and R. M. Bailey. 1966. The poeciliid fishes (Cyprinodontiformes), their structure, zoogeography, and systematics. Bull. Amer. Mus. Nat. Hist. 126: 1-176.

Wauer, Roland H. 1373. Naturalists Big Bend. Peregrine Prod., Santa Fe, New Mexico.

I

PART III

IMPLEMENTATION SCHEDULE

The table that follows is a summary of scheduled actions and costs for the Big Ben Gambusia Recovery Plan. This table indicates the priority in scheduling tasks to meet the objectives, which agencies are responsible for these tasks, a timetable for accomplishing them, and their estimated costs. Implementating Part III is the action of the recovery plan that, when accomplished, will satisfy the prime objective.

GENERAL CATEGORIES FOR IMPLEMENTATION SCHEDULES

Information Gathering _ I or R (Research)

1. Population status
2. Habitat statue
3. Habitat requirements
4. Management techniques
5. Taxonomic studies
6. Demographic studies
7. Propagation
8. Migration
9. Predation
10. Competition
11. Disease
12. Environmental contaminant
13. Reintroduction
14. Other information

Acquisition - A

1. Lease
2. Easement
3. Management agreement
4. Exchange
5. Withdrawal
6. Fee title
7. Other

Management - M

1. Propagation
2. Reintroduction
3. Habitat maintenance and manipulation
4. Predator and competitor control
5. Depredation contra 1
6. Disease control
7. Cther management

Other - 0

1. Inform& Ion and education
2. Law enforcement
3. Regulations
4. Administration

Task Priority

Priority' 1 - An action that must be taken to prevent extinction or to prevent the species from declining irreversibly.

Priority 2 - An action that must be taken to prevent a significant decline in species population habitat quality or some other significant negative impact short of extinction.

Priority 3 - All other actions necessary to provide for full recovery of the species.

PART III - IMPLEMENTATION SCHEDULE

| GENERAL CATEGORY (1) | PLAN TASK (2) | TASK # (3) | PRIORITY # (4) | TASK DURATION (5) | RESPONSIBLE AGENCY FWS REGION (6) | PROGRAM (6a) | OTHER (7) | FISCAL YEAR COSTS* (EST.) N85 (8) | N86 | N87 | COMMENTS (9) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| R10 R11 R9 R6 R3 | Identify population needs | 1.1 | 1 | 3 years | 2 | FR RES | NPS | 10,000 | to ,000 | L0, 000 | Consist of eubtaske 1.11 through 1.17 |
| 11 and I2 | Monitor populations and habitat | 1.1 | 2 | ongoing | 2 | SE | NPS | 1. ,000 | L ,000 | [illegible],000 | |
| M3 | Supplement spring flow | 1.31 | 2 | 1 year | 2 | SE | NPS | 25,000 | | | |
| M3 | Manage springs 1 and 4 | 1.32 1.33 | 2 | ongoing | 2 | SE | NPS | | | | |
| M3 | Provide water to the campground from a well | 1.34 | 3 | 1 year | 2 | | NPS | | | | |
| M4 | Eradicatre *G. affinis* from campground area | 1.35 | 3 | 1 year | 2 | FR SE | NPS TP&W | [illegible],000 | | | |
| M3 | Minimize campground impact | 1.36 | 3 | 2 years | 2 | SE | NPS | | | | |
| M2 | Determine suitable stocking locations | 2.1 | 3 | 1 year | 2 | SE | NPS TP&W | [illegible],000 | | | |
| M2 | Stock Big Bend Gabmusia | 2.2 | 3 | ongoing as necessary | 2 | SE | NPS TP&W | | | | |
| M7 | Control mosquitos with Big Bend Gambusia | 2.3 | 3 | ongoing | 2 | SE | NPS | | | | |

*Costs refer to USFWS expenditures only.

# PART III - IMPLEMENTATION SCHEDULE

| GENERAL CATEGORY (1) | PLAN TASK (2) | 'ASK # (3) | 'RIORITY # (4) | 'ASK DURATION (5) | RESPONSIBLE AGENCY FWS REGION (6) | PROGRAM (6a) | OTHER (7) | FISCAL YEAR COSTS (EST.)* FY85 (8) | FY86 | FY87 | COMMENTS (9) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| M2 | Monitor relocated population8 | !.4 | 3 | ongoing | 2 | SE | NPS | see c&t associated dth T sk 1.2 | | | |
| M1 | Maintain a captive population | ).0 | 2 | ongoing | 2 | SE FR | | ,000 | 5,000 | ,000 | |
| 01 | Prepare a information pamphlet | .1 | 3 | l year | 2 | SE | NPS | ,000 | | | |
| 01 | Conduct interpretive program | .2 | .3 | ongoing | .2 | SE | NPS | | | | |
| 02 | Enforce all laws to protect the species | | 3 | ongoing | 2 | LE | NPS | ,000 | 5,000 | ,000 | |

* Cost r fer to USPWS expenditures only

PART IV - APPENDIX

## APPENDIX I

Replies to Comments

A-l Recovery plan changed to put water needs of Big Bend gambusia ahead of campground domestic water use.

A-2 Agreed and Recovery Plan changed accordingly.

A-3 The Preface section of the recovery plan was transferred to the Disclaimer section and NPS added.

A-4 Corrected.

A-5 The paragraph was not changed since it adequately describes the taxonomic status of the species.

A-6 Rewr i t ten.

A-7 Corrected.

A-8 Sentence was rewritten.

A-9 Corrected.

A-10 Changed.

A-11 Changed as suggested.

A-12 Changed as suggested.

A-13 A short discussion of threats has been Included.

A-14 The Literature Cited section was changed to Miller (1978).

A-15 The Recovery Team discussed the wording of the Taxonomic section of the recovery plan and decided that the section should remain as written because it is more accurate. Some changes for clarity have been added.

A-16 Changed as suggested.

A-17 Map changed as suggested.

A-18 Discussion of future management goals added.

A-19 The discussion of the primary objective was rewritten to expand upon recovery goals and habitat limitations.

A-20 Added as suggested.

A-21 Some generic information has been gained about G. affinis competition with Gila topminnows (Paeciliopsis occidentalis). That data has already been incorporated in this plan, but a great deal of specific knowledge is still lacking.

A-22 Discussion added concerning potential for exotic fish introduction if pumping from the river occurs.

A-23 Number is unknown at present. Investigation of potentials in various springs will have to be accomplished.

A-2 4 Changed.

A-25 Changed accordingly.

A-26 The Implementation Schedule has been rewritten as suggeeted.

A-27 Changed as suggested.

38

TEXAS
PARKS AND WILDLIFE DEPARTMENT
4200 Smith School Road Austin, Texas 78744

COMMISSIONERS

EDWIN L. COX JR
Chairman, Athens

GEORGE R. BOLIN
Vice-Chairman, Houston

WM. O. BRAECKLEIN
Dallas

WM. L. GRAHAM
Amarillo

RICHARD R. MORRISON, III
Clear Lake city

W. B. OSBORN, JR
Santa Elena

PERKINS D. SAMS
Midland

DR. RAY E. SANTOS
Lubbock

WM. M. WHELESS, III
Houston

RD
DRD
AA
AFF
AWR
AHR
LE
PAO
EEO
FILE SE
CL5-184

| End. Sp. R-2 | |
|---|---|
| JOHNSON | |
| LANGOWSKI | |
| Bowman | |
| Burton | |
| Corley | |
| Halvorson | |
| Holln. | |
| CHARLES D. TRAVIS Executive Director | |
| Botanist | |
| Hopp | |
| Padilla | |
| SANCHEZ | |
| FILE | |

May 18, 1984

Mr. Michael J. Spear
Director, Region 2
U. S. Fish and Wildlife Service
P. O. Box 1306
Albuquerque, New Mexico 87103

Dear Mike:

This is in response to your letter of March 29, 1984 regarding the agency review draft recovery plan for the Big Bend gambusia.

Overall, the recovery plan embodies strategies which, when implemented, should ensure survival of the species. The plan should succeed although, in view of the restricted distribution and problems for survival continually facing this species, recovery to the point of delisting or downlisting does not appear likely.

Our comments have been incorporated into the returned draft. Many of them relate to minor typographical errors, but two warrant additional discussion here. Recovery Outline Narrative 1.33 places the needs of
A-1 campground domestic water above the needs of the Big Bend gambusia. It would seem appropriate in a fish species recovery plan that the needs of people would be subordinate. Another source of water for people should be sought--perhaps purified Rio Grande water. In 2.32, reference is made to recovery team approved
A-2 actions. Shouldn't this be recommended actions?

Thank you for the opportunity to comment on this matter.

Sincerely,

Charles D. Travis
Executive Director

CDT:FEP:aeh

Enclosure

RECEIVED
BSF & W-REG. 2
MAY22 1983
OFFICE OF THE
REGIONAL DIR.

FWS REG 2
RECEIVED
MAY 24 '84
SE

J V
Burton

**United States Department of the Interior**

NATIONAL PARK SERVICE
**Big Bend National Park**
**Big Bend National Park, Texas 79834**

IN REPLY REFER TO:

N1621

May 14, 1384

Memorandum

Jo: Assistant Regional Director, U.S.Fish and Wildlife Service, Region 2

From: Superintendent, Big Bend National Park

Subject: Agency Review Draft Recovery Plan for Big Bend Gambusia, (Gambusia gaigei Hubbs 1929)

Qur comments on the Draft Recovery Plan are as follows:

A-3 1. Preface, paragraph 3, last sentence - Omit Texas Parks and Wildlife Department and insert National Park Service.

A-4 2. Page 1, Part I, Introduction, second paragraph, fourth line - Omit see.

A-5 3. Page 1, Part I, Taxonomic Status - This paragraph needs clarification.

A-6 4. Page 2, Part I, Distribution and Description of Habitat, first paragraph, first sentence - This sentence should read: The Big Bend Gambusia is known only from spring habitats in the vicinity of Eoquillas crossing and Rio Grande Village in Big Bend National Park.

A-7 5. Figure 2 - The Barkley Cabin is misspelled. Berkeley is the correct spelling.

A-8 6. Page 6, # 2, Development, second sentence - Omit one "in the future."

A-9 7. Page 10, paragraph 2, second line - Barkley House is misspelied. Berke'iey is the correct spelling.

We appreciate the opportunity to comment on the Draft Recovery Plan.

H. Gilbert Lusk

H. Gilbert Lusk

ORD
AA
AFF E
AWR
AHR
LE
PAO
EEO
2-FILE SE
- CL -

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
WASHINGTON, D.C. 20240

ADDRESS ONLY THE DIRECTOR,
FISH AND WILDLIFE SERVICE

End. Sp. R-2
JOHNSON
LANGOWSKI
Bowman
Burton
Cailay
Halvorson
Hoffman
Chell
Stefferud
Botanist
Hopp
Pattie
SANCHEZ
FILE

In Reply Refer To:
FWS/OES

Memorandum

To: Regional Director, Region 2 (ARD/AFF)

From: Director

Subject: Big Bend Gambusia Recovery Plan - Agency Review Draft

Attached is a copy of the subject plan with numerous editorial and substantive comments indicated in the margins. The majority of these items were brought to your attention in the Technical Review Draft. Please pay close attention to the comments noted on pages 2, 3, 6, 11, 13, 15, 17, 18, and 21 of the attached plan. Some of the more substantive comments are reiterated below:

A-10 1. Title page: The title page should include only the title, publisher, Director's signature line, and the date.

A-11 2. Disclaimer page: Refer to the Recovery Planning Guidelines for the format of the Disclaimer page. A Disclaimer page should immediately follow the title page. The disclaimer paragraph used in the Preface (page i, paragraph 4) should begin the Disclaimer page. The proper acknowledgement for the plan should be indicated as follows:

> The Big Bend Gambusia Recovery Plan, dated ____________, prepared by the U.S. Fish and Wildlife Service in cooperation with the Rio Grande Fishes Recovery Team.

The list of team members and consultants should be included on the Disclaimer page. Also, the Disclaimer page should identify the source of additional copies:

> Fish and Wildlife Reference Service
> 1776 E. Jefferson Street, 4th Floor
> Rockville, Maryland 20852
> 301/468-1737, ext. 231, or
> Toll Free 1-800-582-3421

FWS REG 2
RECEIVED
JUN 8 '84
SE

A-12 3. The Table of Contents should follow the Disclaimer page. To be consistent with other plans, the headings for the parts of the plan should be changed to: Part I - Introduction; Part II - Recovery; Part III - Implementation Schedule; Part IV - Appendix.

REC'D
FWS-Region 2
JUN 7 1984
AFF.

The Literature Cited section should be the last section of Part II and immediately precede Part III - Implementation Schedule. The Objective should be identifed in the Table of Contents.

A-13 4. Page 1, Introduction: The introduction should include a brief discussion of the threats to the Gambusia gaiqei.

A-14 5. Page 1, Taxonomic Status: The reference to Miller (1978) is listed as Miller (1977) in the Literature Cited section.

A-15 6. Page 1, Taxonomic Status: The first two sentences are confusing. We suggest the following rewrite:

> The Big Bend gambusia was described by Hubbs (1929). Although there has been some disagreement (Rosen and Bailey, 1966) regarding the synonomy of the species, the toncensus is that Gambusia gaigei is a valid species (Rivas, 1966; Peden, 1973; Alvarez, 1970; Miller, 1977).

A-16 7.. Page I, Taxonomic Status; This paragraph should be divided into two paragraphs: one on the synonomy discussion and another on the relationship, of G. gaiqei to the G. senilis species group. .

A-17 8. Figure I: The map would convey more information if the locations of present and extinct populations were labeled.

A-18 9. Page 12: To complete the management scenario, briefly discuss future management goals.

A-1910. Page 15, Part II: The discussion cf the primary objective should include quantifiable goals witn regard to the habitat and the species. Logically, the goals should correspond to the factors for which the Big 'Bend gambusia was listed.

If it appears likely the species cannot be reclassified or delisted, this should be clearly stated and the quantified goal for maintaining or preventing extinction of the species should be stated.

A-20 11. Page 15, Stepdown Outline: Add the following subtasks under Task 2.0:

> 2.1 Determine suitable locations
> 2.5 Manage introduced populations

A-21 12. Page 17, Task 1.11: Since competition with G. affinis is a problem for most small listed fishes in Region 2, could this threat be studied on a more general basis and the data applied to more than' one species?

A-22 13. Page 20, Task 1.34: Please add some discussion on the necessity of this task. What will be enhanced by the accomplishment of this task?

A-23 14. Page 21, Task 2.0: Approximately how many potential sites exist for reintroduction?

A-24 15. Page 24, Appendix: Refer to the Recovery Planning Guidelines. The Appendix should be moved to the end of the plan, with a title page immediately preceding it.

A-25 16. Implementation Schedule: Refer to the Recovery Planning Guidelines. Include a title page for the Implementation Schedule. The title page should include the definitions for the task priorities, general implementation categories, and abbreviations. Attached are examples from another plan.

A-26 17. Implementation Schedule: The Implementation Schedule is not acceptable. Recovery tasks should be identified as specifically as possible because this schedule will become the key for all Service activities (including funding recovery actions) involved in the recovery of the species. As you know, the review of permit proposals, Section 7 consultations, unsolicited proposals, State Federal Aid proposals,, and all other funding requests will be examined against the recovery plan and corresponding Implementation Schedule. Subtasks must be included if the Implementation Schedule is to be useful.

A-27 18. Implementation Schedule: Task 1.0 should be priority 1.

We hope these comments will be helpful in preparing the final draft. If you feel that any of these comments do not warrant revision of this draft, please provide your rationale, via return memorandum, prior to the Regional Director's approval. Upon approval, please send a copy of the signature page. Also, please send 30 copies of the printed plan when it is available.



Attachments

APPENDIX II

Monitoring Procedures

Sampling should be done biannually (February and August) with 3mm mesh seines; 3-meters long (pond) and 1.5-meters long (stream). Five seine hauls should be made at roughly equidistant points around the perimeter of the refugium pond. Each haul should begin 3-5 meters offshore and extend to the shore. Two seine hauls should be made in the pond outlet stream, one haul near the pond outlet, the other near the terminus. These hauls should be 2-3 meters long and should be made in the direction of s treamflow. The pond and ditch should be visually examined to ascertain presence of any other species. All seines used should be sun dried before use to preclude introduction 'of other fishes. Samples of 15 Big Bend gambusia (preferably males) should be preserved from both localities (pond and ditch) in separate labeled jars with 10% formalin. The preserved sample should be obtained from the first seine haul(s). If the fish are scarce, the number preserved may be reduced to avoid depletion of the population. All other fish captured should be visually examined to ensure that no other species are present; of particular concern is the mosquitofish, Gambusia affinis. Because of the difficulty of field separation of Gambusia species, selection of onsite supervisory personnel should be reviewed by the recovery team. The preserved specimens should be stored in an appropriate museum. The park should maintain a written log regarding time when collections were made, personnel involved, and disposition of samples. State and park collecting permits will be acquired before collections are made.