**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **CHARLES ANGELL and ANGELL EXPEDITIONS, LLC,** | § | |
| | § | |
| ***Plaintiffs*,** | § | |
| | § | |
| **v.** | § | **Case No. 5:26-cv-05580-KC** |
| | § | |
| **MARKWAYNE MULLIN, The Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; RODNEY S. SCOTT, Commissioner of U.S. Customs and Border Protection; U.S. CUSTOMS AND BORDER PROTECTION; JOSH B. BARRETT, Acting Chief Patrol Agent of the United States Border Patrol's Big Bend Sector; LIEUTENANT GENERAL WILLIAM H. GRAHAM, Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; and UNITED STATES ARMY CORPS OF ENGINEERS** | § | |
| | § | |
| ***Defendants*.** | § | |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT**

## TABLE OF CONTENTS


Table of Authorities ..... iii

I. Introduction ..... 1

II. Arguments & Authorities ..... 3

A. Plaintiffs Have Standing To Challenge § 102(c), Both Facially And As Applied. ..... 3

1. Plaintiffs Challenge § 102(c) Itself and the Waivers Illustrate the Statute's Defects. ..... 4

2. Plaintiffs' Injuries Are Concrete, Particularized, and Imminent ..... 5

3. Plaintiffs' Injuries Are Fairly Traceable to § 102(c) ..... 6

4. Plaintiffs' Injuries Are Redressable by an Injunction Against Reliance on § 102(c) ..... 7

5. Plaintiffs Have Standing to Challenge § 102(c) as Applied Through the July 27, 2026 Determination ..... 8

6. The July 2, 2026 Amended Determination Governs Angell's Property, and Plaintiffs Filed within Sixty Days ..... 9

7. Because the July 2, 2026 and July 27, 2026 Waivers Bracket the Big Bend 4 Segment on Both Sides, Complete Relief Necessarily Reaches It ..... 10

B. Section 102(c)'s Delegation Is Unconstitutional Because the Statute's Own Design Renders Its Intelligible Principle Unenforceable ..... 11

1. The Intelligible Principle Must Be Enforceable, Not Merely Identifiable ..... 11

2. Defendants' Response Confirms That the High-Entry Predicate Is Not an Enforceable Boundary ..... 12

3. The Waivers Are Evidence of § 102(c)'s Operation, Not Independent Targets of Relief. ..... 13

C. Section 102(c) Violates the Separation of Powers Because It Concentrates Predicate-Definition, Execution, Law-Nullification, and Review-Insulation in a Single Officer ..... 14

1. The Statute Concentrates Four Constitutionally Distinct Functions in a Single Officer ..... 16

2. Plaintiffs' Claims Target Structural Concentration, Not a Repackaged Delegation Theory ..... 17

3. The Safeguards Identified in Consumers' Research Are Absent Here ..... 19

4. Patchak Does Not Authorize This Combination of Powers ..... 20

D. The Secretary Violates the Take Care Clause by Disregarding the Statutory Limits Congress Placed on His Waiver Authority ... 20

E. Plaintiffs Are Likely to Succeed on Their Major Questions Claim Because § 102 Lacks Clear Congressional Authorization and the Secretary Manufactured an "Area of High Illegal Entry" ... 21

F. Plaintiffs Are Likely to Prevail on Their Due Process Claim Because Defendants Withheld Individualized Notice from a Known Landowner Facing Condemnation. ... 22

G. Plaintiffs Are Likely to Succeed on Their Eminent Domain and Takings Claims. ... 24

1. Federal Condemnation ... 25

2. State Condemnation Law ... 27

H. An Option Without Barriers ... 28

I. Plaintiffs Satisfy the Remaining Preliminary Injunction Factors. ... 29

1. Plaintiffs Will Suffer Irreparable Harm Absent an Injunction ... 29

2. The Balance of Equities Favors Plaintiffs ... 31

3. The Public Interest Favors an Injunction ... 32

J. FRCP 65(c) Bond ... 32

III. Requested Relief ... 33

Request for Expedited Hearing ... 37

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935)....................11, 12, 13

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Circuit 2013)....................21

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987)....................30

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023)....................16

*In re Border Infrastructure Env't Litig.*,
284 F. Supp. 3d 1092 (S.D. Cal. 2018), *cert. denied sub. nom. Animal Legal Def. Fund. v. DHS,* 586 U.S. 1035 (Dec. 3, 2018), *and aff'd*, 915 F.3d 1213 (9th Cir. 2019)....................24

*Buckley v. Valeo*,
424 U.S. 1 (1976)....................15

*City of New Haven, Conn. v. United States*,
809 F.2d 900 (D.C. Cir. 1987)....................14

*Clinton v. City of New York*,
524 U.S. 417 (1998)....................18, 19

*Ctr. for Biological Diversity v. McAleenan*,
404 F. Supp. 3d 218 (D.D.C. 2019)....................11, 24

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
661 F.2d 328 (5th Cir. 1981)....................29

*E. Bay Sanctuary Covenant v. Trump*,
909 F.3d 1219 (9th Cir. 2018)....................32

*Elrod v. Burns*,
427 U.S. 347 (1976)....................31

*Eng. v. Trump*,
279 F. Supp. 3d 307 (D.D.C. 2018)....................20

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025).................... *passim*

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)....7

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000)....5

*Friends of the Ruidosa Church, et al. v. Mark Wayne Mullin et al.*,
Case 3:26-cv-01099-KC .... *passim*

*Gundy v. United States*,
588 U.S. 128 (2019) (plurality opinion) ....15

*J.W. Hampton, Jr., & Co. v. United States*,
276 U.S. 394 (1928)....11

*Kaepa, Inc. v. Achilles Corp.*,
76 F.3d 624 (5th Cir. 1996) ....33

*Kelo v. City of New London, Conn.*,
545 U.S. 469 (2005)....24

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ....32

*Live365, Inc. v. Copyright Royalty Bd.*,
698 F. Supp. 2d 25 (D.D.C. 2010) ....16

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992).... *passim*

*Manzanita Band of Kumeyaay Nation v. Wolf*,
496 F. Supp. 3d 257 (D.D.C. 2020) ....30

*Mathews v. Eldridge*,
424 U.S. 319 (1976)....22, 24

*Mennonite Bd. of Missions v. Adams*,
462 U.S. 791 (1983)....24

*Mistretta v. United States*,
488 U.S. 361 (1989)....15

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950)....8

*N. Am. Butterfly Ass'n v. Wolf*,
977 F.3d 1244 (D.C. Cir. 2020) ....7, 23, 24

*Nken v. Holder*,
556 U.S. 418 (2009)....31

*Open Cmtys. All. v. Carson*,
286 F. Supp. 3d 148 (D.D.C. 2017)....31

*Opulent Life Church v. City of Holly Springs, Miss.*,
697 F.3d 279 (5th Cir. 2012)....31

*Panama Refining Co. v. Ryan*,
293 U.S. 388 (1935)....11, 13

*Patchak v. Zinke*,
583 U.S. 244 (2018)....20

*PennEast Pipeline Co., LLC v. New Jersey*,
594 U.S. 482 (2021)....25

*Presley v. City of Charlottesville*,
464 F.3d 480 (4th Cir. 2006)....23

*Rhode Island v. Trump*,
810 F. Supp. 3d 283 (D.R.I. 2025)....20

*Richland/Wilkin Joint Powers Authority v. United States Army Corps of Engineers*,
826 F.3d 1030 (8th Cir. 2016)....33

*Save Our Heritage Org. v. Gonzales*,
533 F. Supp. 2d 58 (D.D.C. 2008)....24

*Schroeder v. City of New York*,
371 U.S. 208 (1962)....24

*Sierra Club v. Froehlke*,
359 F. Supp. 1289 (S.D. Tex. 1973), *rev'd on other grounds*,
499 F.2d 982 (5th Cir. 1974)....33

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)....5, 6

*Texas v. U.S. Dep't of Homeland Sec.*,
123 F.4th 186 (5th Cir. 2024)....30

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....5

*Trump v. Sierra Club*,
588 U.S. 930 (2019)....31

*United States v. James Daniel Good Real Prop.*,
510 U.S. 43 (1993) .......... 22

*W. Virginia v. Env't Prot. Agency*,
597 U.S. 697 (2022) .......... 21, 22

*Wages & White Lion Invs., L.L.C. v. FDA*,
16 F.4th 1130 (5th Cir. 2021) .......... 30

*Whitman v. Am. Trucking Assocs.*,
531 U.S. 457 (2001) .......... 13

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 29, 31

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) (Jackson, J., concurring) .......... 18

**Statutes**

8 U.S.C. § 1103 .......... 1, 3

28 U.S.C. § 1651 .......... 34

40 U.S.C. § 3113 .......... 25, 26

40 U.S.C. § 3114 .......... 23, 25, 30

Illegal Immigration Reform and Immigrant Responsibility Act § 102(c) .......... *passim*

Texas Property Code Chapter 21 .......... 27

**Other Authorities**

49 C.F.R. § 24.102 .......... 25, 26, 27

91 Fed. Reg. 34,832 .......... 10

91 Fed. Reg. 40,550 .......... 9, 10

91 Fed. Reg. 46,940 .......... 7, 8, 10

FED. R. CIV. P. 15(c)(1)(B) .......... 9

FED. R. CIV. P. 71 .......... 25

FED. R. CIV. P. 65(c) .......... 32, 33

Plaintiffs Angell Expeditions, LLC ("Angell Expeditions") and Charles Angell (collectively, "Plaintiffs"), by and through their undersigned counsel, file this Reply in Support of Plaintiffs' Motion for Preliminary Injunction and Memorandum in Support ("Motion")[1] against Markwayne Mullin, The Secretary of Homeland Security (the "Secretary"); Department of Homeland Security ("DHS"); Rodney S. Scott, Commissioner of U.S. Customs and Border Protection (the "Commissioner"); U.S. Customs and Border Protection ("CBP"); Josh B. Barrett, Acting Chief Patrol Agent of the United States Border Patrol's Big Bend Sector; Lieutenant General William H. "Butch" Graham, Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; and United States Army Corps of Engineers (the "USACE" or the "Corps") (collectively, "Defendants") as follows:[2]

## I. INTRODUCTION

Defendants' Response recasts this case as a series of untimely disputes over waivers of laws in individual Federal Register notices. But Plaintiffs' claims go to exclusively constitutional violations, § 102(c) of Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), as amended (8 U.S.C. § 1103 note) itself, and not the waiver of law spawned by it. Plaintiffs challenge § 102(c) both facially and as applied to the Big Bend region. Plaintiffs' injuries are concrete and imminent: CBP has already commenced the condemnation process to take Angell's land and Defendants have announced plans for barriers in Big Bend 2, 4, and 5. This suit is also

---

[1] Plaintiffs filed an Application for Temporary Restraining Order ("TRO") (Doc. 2) contemporaneously with their Original Complaint (Doc. 1). The Parties' Joint Advisory (Doc. 10) currently holds the TRO in abeyance. Plaintiffs do not waive the right to seek temporary restraining order relief and reserve the right to bring the TRO application before the Court should circumstances require.

[2] Plaintiffs hereby incorporate their Original Complaint (Doc. 1) and all amendments thereto in their entirety.

timely because Plaintiffs filed within sixty days of both the July 2 and July 27 Determinations, squarely within the statutory window that Defendants claim forecloses review.

On the merits, § 102 limits construction to "areas of high illegal entry," a limitation the Secretary attempts to satisfy by combining the Big Bend and Del Rio Sectors and declaring each an area of high illegal entry.[3] The statute then places that determination beyond judicial review as part of the Secretary's sole discretion. The language of § 102 and its application violate both the separation of powers and nondelegation doctrines. Defendants compound the constitutional harm by commencing condemnation of Angell's property when it is not in an area of high illegal entry. Because the barriers are not authorized in the area, exercise of the right of eminent domain and appropriation of the funds for it are unconstitutional. In addition, as set forth in Exhibit A, Mr. Angell's Declaration, access to the Parks, the Rio Grande, and the Wild and Scenic River area, will be compromised by construction of 30-foot tall pedestrian barriers, and other intrusive infrastructure, along the Rio Grande. Mr. Angell's livelihood (river-runner) will be damaged, and the value of Angell Expeditions will decrease.

[3] CBP's use of terminology explaining segments of the Big Bend Region such as "Big Bend 2" and "Big Bend 4" are artificial contrivances to manipulate the analysis of border security. Section 102 speaks nothing to specific locations for barriers. And it says nothing about the Big Bend Region specifically. Section 102 only permits barriers in the vicinity of "areas of high illegal entry." Other than the duplicitous putative combining of the entire Del Rio Sector with the entire Big Bend Sector, CBP fails to identify one single geographic location in the Big Bend Region that is in the "vicinity" of an "area of high illegal entry." In doing so, Defendants reject the intelligible principle they are required to follow to make the delegation under Article I, section 1, constitutional.

Because Defendants have now lifted their "pause," the Court should grant the Motion and preserve the status quo before irreversible harm occurs.[4]

## II. ARGUMENTS & AUTHORITIES

### A. Plaintiffs Have Standing To Challenge § 102(c), Both Facially And As Applied.

Angell and Angell Expeditions personally and repeatedly use the Rio Grande access points and river segments reached by the July 27 waiver—Angell for his own use, and Angell Expeditions for permitted commercial guide operations. That direct use supplies a concrete, particularized stake that does not depend on aggregations of artificial sector-levels. Plaintiffs challenge § 102(c) itself, both on its face and as applied. The statute hands a single executive officer unbounded power to "waive all legal requirements" in his "sole discretion"—and then insulates that choice from meaningful scrutiny by limiting review to constitutional claims, imposing a sixty-day deadline keyed to the Secretary's own action, and eliminating ordinary appellate review in favor of discretionary Supreme Court certiorari. *See* 8 U.S.C. § 1103 note § 102(c)(1)(2) (Improvement of Barriers at Border; Waiver); Plaintiffs' Second Amended Complaint (hereinafter referred to as "SAC") ¶¶ 15, 17, 101 (alleging constitutional challenge to § 102(c) and its review limitations).

[4] The *Friends of the Ruidosa Church* injunction does not displace this Court's authority to grant Plaintiffs relief. First, Plaintiffs' claims are their own. CBP has targeted Angell's land for condemnation, and the border project threatens Angell Expeditions' river access and tour business—injuries no *Friends* plaintiff asserted. Ex. A (Angell Decl. in Support of Reply) ¶¶ 3–11; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Second, the *Friends* injunction does not protect those interests. It runs to other parties, dissolves once Defendants comply with the waived statutes rather than protecting Plaintiffs' land and river access, lasts only "until the Court orders otherwise," and reaches construction and ground disturbance—not the condemnation and access restrictions that threaten Plaintiffs now. *Friends of the Ruidosa Church, et al. v. Mark Wayne Mullin et al.*, Case 3:26-cv-01099-KC (Doc. 60, Defendants' Notice Regarding End of Big Bend Construction Pause) ("Notice"). And Defendants' recent pause on Big Bend 2 and 4 confirms that a tailored injunction preserving the status quo costs them nothing.

Plaintiffs satisfy each element of Article III standing: injury in fact, traceability, and redressability. *Lujan*, 504 U.S. at 560–61.

**1. Plaintiffs Challenge § 102(c) Itself and the Waivers Illustrate the Statute's Defects.**

Defendants argue Plaintiffs "challenge the wrong waiver." But from its first paragraph, Plaintiffs' Second Amended Complaint attacks § 102(c)(1) of IIRIRA itself, alleging that it grants the Secretary authority to "waive all legal requirements" in his "sole discretion," with "[n]o criteria [to] guide this power," "[n]o procedures [to] constrain it," and "[n]o court may review it except for constitutional violations." SAC ¶ 1. Plaintiffs allege the provision "is unconstitutional both facially and as applied to the Big Bend Sector." SAC ¶ 3. Among the remedies Plaintiffs seek is "invalidation of § 102(c)." SAC ¶ 75.

The Secretary's determinations show how the statute operates. His merger of the Big Bend and Del Rio Sectors, for instance, shows that the "high illegal entry" predicate imposes no real constraint and is not being followed as the intelligible principle for constitutionality.

That distinction disposes of the decisions Defendants cite. Defendants note that "[e]very judicial challenge to these determinations has been dismissed." Defs.' Resp. at 5. But those cases challenged the Secretary's *individual waivers*, and the courts upheld them by treating § 102's "necessary" application, "high illegal entry" predicate as the guiding intelligible principle. None address a challenge to the invocation of the statute's power itself.

Because Plaintiffs attack the statute's constitutionality, Defendants' waiver-by-waiver recitation misses the point. Finding § 102(c) unconstitutional and striking it would leave no waiver standing, regardless of which Federal Register notice announced it, and Plaintiffs need not sue separately over each notice the Secretary publishes under the same unconstitutional statute.

**2. Plaintiffs' Injuries Are Concrete, Particularized, and Imminent**

Article III requires injury that is concrete, particularized, and actual or imminent, not conjectural or hypothetical. *Lujan*, 504 U.S. at 560–61. A plaintiff who uses an area threatened with environmental or physical degradation has such an injury, *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181–85 (2000), as does a plaintiff with a personal stake in threatened property, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021) (explaining that Article III requires a concrete injury and a personal stake). Plaintiffs allege both: concrete injury to identified property, loss of livelihood and value, river access, and permit-dependent guide operations, and the environmental, scenic, and recreational conditions on which Plaintiffs' business operations depend—not an abstract objection to border policy. *See* SAC ¶¶ 18–21, 146–53 (alleging concrete property, access, business, and procedural injuries).

Defendants' own notice confirms imminence. CBP lifted the pause on ground-disturbing activities for Big Bend 2 beginning September 30, 2026. *See* Notice. Most of Big Bend 2's sixty-one-mile alignment, where Mr. Angell's residential and business properties are located, is privately owned, and CBP anticipates "a number" of condemnation referrals to the Department of Justice in the coming weeks. Notice, at 1–2. Moreover, both the Notice and Mr. Enriquez's Declaration (1) announce the end of the "pause", and (2) describe the project as no longer paused. That injury is certainly impending. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (explaining that imminent injury exists where a "threatened injury is certainly impending, or there is a substantial risk that the harm will occur" (internal quotation marks omitted)).

The Big Bend 4 part of the project follows on the same timeline. It contemplates vehicle barriers, a patrol road, and technology within Big Bend National Park, plus a road in Big Bend Ranch State Park. *See* Notice. (Big Bend 4 original scope; state-park road and technology).

Defendants expect a final revised decision in the first week of October, followed by remobilization before ground disturbance begins. *Id.* at 2–3 (remobilization sequence).

The record ties the work to be performed directly to Angell. A February 20, 2026 CBP "Notice of Interest" identified his parcels for potential access, acquisition, or condemnation. *See* PI Mot. at ¶ 20 (describing the February 20, 2026 CBP Notice of Interest and the identified parcels). A Texas Historical Commission archeologist also received a permit to work on a historic site on his property in anticipation of border-wall construction. *See id*. at ¶ 21 (describing historical archeological-related site work on Angell's property). Plaintiffs need not wait for the Government to carry out its threat before challenging the statute that authorizes it. *See Driehaus*, 573 U.S. at 164–67 (holding that a sufficiently imminent threat of enforcement supports pre-enforcement standing).

**3. Plaintiffs' Injuries Are Fairly Traceable to § 102(c)**

Traceability requires only a causal connection between injury and challenged conduct. *See Lujan*, 504 U.S. at 560–61. Section 102(c) is the authority Defendants invoke to erase legal protections, speed construction, and restrict review. *See* IIRIRA § 102(c)(1)(2) (Improvement of Barriers at Border; Waiver). The facial claim traces to the statute's pairing of law-nullification power with review insulation. *See* SAC ¶¶ 70–75, 91–103. The as-applied claim addresses Defendants' use of that power to move toward construction and condemnation, all affecting Plaintiffs' property and guide operations. *See* Ex. A-3; *see* Notice.

Defendants' waiver-mismatch argument fails. Angell's direct use of the areas the July 27 waiver reaches establishes his stake, and the Secretary's own method cuts against Defendants: the July 27 Determination attempts to aggregate the Big Bend and Del Rio Sectors and then drew a

project area within them.[5] *See* 91 Fed. Reg. 46,940–41 (July 27, 2026). Defendants cannot define the "area" broadly to satisfy the statute and then slice Angell's injuries by project segment in an effort to defeat standing. That injury is cognizable even before formal acquisition. *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1258–59 (D.C. Cir. 2020) (concluding a Fifth Amendment claim based on DHS's asserted control over border-adjacent property was neither premature nor moot). Plaintiffs' injuries are fairly traceable to § 102(c).

#### 4. Plaintiffs' Injuries Are Redressable by an Injunction Against Reliance on § 102(c)

Plaintiffs' injuries are redressable by the relief sought. Causation and redressability are usually "flip sides of the same coin[,]" because enjoining the challenged action ordinarily redresses the injury it causes. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024); *see Lujan*, 504 U.S. at 560–61. An order enjoining Defendants from relying on unconstitutional § 102(c) would redress Plaintiffs' injuries with the added effect of removing the mechanism that waives their protections and accelerates construction and condemnation. *See* SAC Prayer for Relief ¶¶ 184-85, 187, 189-200. Defendants would remain free to proceed only under constitutionally valid authority.

The same statute-level focus defeats Defendants' limitations objection. The facial challenge targets § 102(c)'s structure, not any particular waiver by the Secretary. *See* SAC ¶¶ 77–177. A facial claim accrues when the plaintiff is injured, not when the challenged instrument issues. And as applied, § 102(c)(2)(B) cannot bar Plaintiffs before they are injured or receive notice

[5] It is impossible to declare the entire Big Bend and Del Rio Sectors of 156 miles a high illegal entry areas and that every single grain of sand in the Sectors are in the "vicinity" of an area of high illegal entry. Moreover, Big Bend's apprehension of 89,000 (over a 5 year period) is approximately 6.3% of Del Rio (1,410,330). Even in combination with its "partner" sector (Del Rio); Big Bend's rate of illegal entry is not "high."

reasonably calculated to apprise them of the action affecting their property. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (holding that due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to [object]"). Plaintiffs have standing, both under constitutional analysis and pursuant to IIRIRA § 102(c)(2)(A), (B).

### 5. Plaintiffs Have Standing to Challenge § 102(c) as Applied Through the July 27, 2026 Determination

Angell, individually and through Angell Expeditions, runs river trips within the July 27 Determination's project area and in the immediate surrounding areas, rafting the Rio Grande both for his own recreation and for his guide business. SAC ¶ 18. That project area runs from approximately GPS point 29.728522, -102.683945 east to approximately GPS point 29.449892, -101.058017. 91 Fed. Reg. 46,940.

Plaintiffs regularly launch, run, and take out river trips at each of the following locations within this project area of the July 27, 2026 Determination and in the immediate surrounding areas: the 83-mile Lower Canyons segment designated Wild and Scenic in 1978; Dryden Crossing/Harrison Rock Ranch; the 54-mile Dryden Crossing-to-Langtry segment; Foster's Ranch; the Langtry river access road; the 15-mile Langtry-to-Pecos confluence segment; Pecos River boat launch/access; multiple Lake Amistad boat-launch/access sites from Highway 90; and Rough Canyon Marina, where the Devils River meets the Rio Grande/Lake Amistad. Ex. A (Angell Decl. in Support of Reply), at ¶ 4. Every one of these sites lies within the corridor the July 27 waiver opens to barrier construction, road building, staging, excavation, and fill activities.

Plaintiffs depend on these waters for their livelihood and recreation, and use of § 102 to authorize the July 27 Determination, issued under § 102(c), strips away the legal protections that

would otherwise govern construction at every one of these sites. That is a concrete and particularized injury within the very project area the Secretary defined.

### 6. The July 2, 2026 Amended Determination Governs Angell's Property, and Plaintiffs Filed within Sixty Days

Defendants concede that Angell's property lies in the Big Bend 2 project area, governed by "the February 17, 2026 Waiver, as amended on July 2, 2026" (Defs.' Resp. at 10; Enriquez Decl. ¶¶ 16, 18). Their own declarant states that the amended waiver "covers barrier system construction in or around Mr. Angell's property in Redford, Texas."

The July 2 notice "amends the February 17, 2026, [N]otice of [D]etermination by including additional legal requirements that are being waived." 91 Fed. Reg. 40,550 (July 2, 2026). It republished the February 17, 2026 Determination in full, carried its own July 2 effective date, and renewed the high-illegal-entry finding over the identical project area. The amended determination is therefore the operative waiver.

Defendants admit "[t]he amended waiver for the Big Bend 2 project was issued on July 2, 2026" (Defs.' Resp. at 11) yet insist "the statutory deadline to challenge [it] has expired" (Defs.' Resp. at 2). Plaintiffs filed their Original Complaint on August 28, 2026,[6] three days before the August 31, 2026 deadline.

Defendants also suggest the Original Complaint challenged only the July 27 waiver. Defs.' Resp. at 10–11. Not so. The Original Complaint expressly challenged § 102(c) as applied through

---

[6] IIRIRA 102(c)(2)(B) requires a constitutional claim to be "filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security". Plaintiffs filed their Original Complaint on August 28, 2026. *See* Plfs.' Compl. (Doc. 1). The later amended pleadings (Doc. Nos. 3, 14) arise out of the same conduct, transactions, and occurrences set out in the Original Complaint, so they relate back to August 28, 2026 under Federal Rule of Civil Procedure 15(c)(1)(B). Every timeliness question therefore runs from August 28, 2026.

the Secretary's earlier determinations, including the July 2, 2026 amended determination, which the Secretary reaffirmed as remaining "in full force and effect." Plfs.' Compl. ¶ 15 n.1; SAC ¶ 15 n.2. It pleaded injury from threatened condemnation of Angell's tracts, Plfs.' Compl. ¶¶ 19, 123; SAC ¶¶ 20, 137, and sought an injunction against ground disturbance "on or across Plaintiff's property," Plfs.' Compl. ¶ 154; SAC ¶ 196. And its facial attack on the waiver authority necessarily reaches every waiver issued under it, including the July 2 amended determination. Plfs.' Compl. ¶¶ 3, 144–45; SAC ¶ 3, 184–85.

### 7. Because the July 2, 2026 and July 27, 2026 Waivers Bracket the Big Bend 4 Segment on Both Sides, Complete Relief Necessarily Reaches It

Defendants place Big Bend National Park and Big Bend Ranch State Park in Big Bend 4, under the May 15, 2026 Determination as corrected on June 9, 2026. Enriquez Decl. ¶ 19. The corrected segment runs from approximately GPS point 29.325866, -104.046466 to approximately GPS point 29.728522, -102.683945. 91 Fed. Reg. 34,832. Its western endpoint is exactly the eastern endpoint of the July 2 amended determination. *See* 91 Fed. Reg. 40,550 ("Starting at approximately GPS point 31.037623, -105.579877 and extending south and east to approximately GPS point 29.325866, -104.046466"). Its eastern endpoint is exactly the western endpoint of the July 27 waiver. *See* 91 Fed. Reg. 46,940 ("Starting at approximately GPS point 29.728522, -102.683945 and extending east to approximately GPS point 29.449892, -101.058017"). Together, the three determinations describe one continuous corridor carved out through the same § 102(c) authority.

Plaintiffs challenge § 102(c) facially and as applied, and their standing rests on concrete injuries flowing from two timely determinations: July 2 and July 27. If the statute falls, every waiver issued under it falls too, whenever published or in content. Complete relief on Plaintiffs' timely claims therefore reaches the Big Bend 4 segment between those two determinations.

### B. Section 102(c)'s Delegation Is Unconstitutional Because the Statute's Own Design Renders Its Intelligible Principle Unenforceable

Plaintiffs challenge § 102(c)'s structure and its application to Big Bend, where it directly injures them. They do not challenge the validity of any individual waiver determination or bring a freestanding APA challenge to a Federal Register notice. SAC ¶¶ 77–177; PI Mot. ¶¶ 30–37. Section 102(c) is self-consuming because it lets the Secretary decide what counts as an "area of high illegal entry," find that condition met by aggregating separate areas, waive the laws that would allow anyone to test that finding, and then invoke § 102(c)(2)'s limits on judicial review to shield the finding from scrutiny.

#### 1. The Intelligible Principle Must Be Enforceable, Not Merely Identifiable

An intelligible principle must constrain. Congress must "lay down by legislative act an intelligible principle" for the delegate to follow. *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). Courts and the public must also be able to '"ascertain whether the agency' has followed the law." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025) (quoting *OPP Cotton Mills, Inc. v. Administrator of Wage and Hour Div., Dept. of Labor*, 312 U.S. 126, 144 (1941).

The Court has enforced that limit when Congress failed to impose real standards. In *A.L.A. Schechter Poultry Corp. v. United States*, Congress gave "no standards" to limit approval of fair-competition codes. 295 U.S. 495, 541–42 (1935). In *Panama Refining Co. v. Ryan*, Congress declared "no policy", "no standard", and "no rule" for the petroleum-transport prohibition. 293 U.S. 388, 430 (1935). In both cases, the defect was the same: nothing in the statute let a court measure the Executive's action against a standard Congress had set. The nondelegation doctrine's rarity underscores judicial care, not judicial surrender. *See, e.g., Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 249 (D.D.C. 2019) (holding Congress supplied an intelligible principle to confine the Secretary's waiver authority by limiting waivers to those the Secretary

deems "necessary to ensure expeditious construction" of border barriers in "areas of high illegal entry").

**2. Defendants' Response Confirms That the High-Entry Predicate Is Not an Enforceable Boundary**

Defendants list only two "meaningful boundaries" on the Secretary's authority: geographic and temporal. Defs.' Resp. at 14. Defendants do not treat "areas of high illegal entry" as an enforceable boundary. In fact, they disregard it or change it. That election is telling. Defendants point to boundaries when they need to show an intelligible principle demonstrating constitutionality, but when Plaintiffs ask whether that predicate was applied or met, Defendants call the finding unreviewable. A predicate Defendants leave off their list of limits and then shield from review cannot be one of the "boundaries" *Consumers' Rsch.* requires. *See* 606 U.S. at 672–73. Such conduct makes the delegation unconstitutional. *See A.L.A. Schechter Poultry Corp.*, 295 U.S. at 542.

The record shows why. Defendants concede the July 27 waiver covers Big Bend 5—roughly 156 miles of vehicle barrier, about 100 in the Big Bend Sector and 56 in the Del Rio Sector. Defs.' Resp. at 7–8. Big Bend alone recorded roughly 3,000 apprehensions in FY2025. Only by combining a portion of it with Del Rio could the Secretary manufacture a "high illegal entry" finding. PI Mot. ¶¶ 12–13. Yet § 102(a) permits construction only in "areas of high illegal entry"—the phrase meant to cabin § 102(c)'s authority. IIRIRA § 102(a); *see* IIRIRA § 102(c)(1)–(2). With no statutory definition of "area," no threshold for "high," and no reviewable standard for aggregating unlike sectors, the Secretary may pick the area, pool the data, and declare the result "high." The limit on the Secretary's authority in the form of the intelligible principle collapses just when it should bind him.

Defendants cannot treat that finding as both a limiting principle and an unreviewable fact. If the predicate saves the delegation, a court must be able to test it. If no court can, it is a label, not a principle. *See Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 474 (2001) (Congress must supply an "intelligible principle", and a statute that provides "literally no guidance for the exercise of discretion" fails).

That is the self-consuming delegation. The Secretary does not apply the "high illegal entry" requirement. He redefines it to reach any stretch of border he chooses, however low its entry rate, then waives every legal requirement in his "sole discretion" and insists no court may test the result. That is the "unfettered discretion" the nondelegation doctrine forbids. *Panama Refining*, 293 U.S. at 430; *see also A.L.A. Schechter Poultry*, 295 U.S. at 541–42.

The Court need not resolve facial validity to grant preliminary injunctive relief. It need only find Plaintiffs likely to succeed on their as-applied claim through a myriad of deficiencies and rewriting that makes the alleged intelligible principle illusory. At Big Bend, the Secretary defined the limit, found it met by aggregating or segmenting the project as needed, waived the laws that would have tested that finding, and foreclosed judicial review. When one official does all of that, no one can "ascertain whether the agency" has stayed within the bounds Congress set. *See Consumers' Rsch.*, 606 U.S. at 672–73. As applied here, § 102(c) supplies no intelligible principle—only the Secretary's unfettered sole discretion without an enforceable boundary—and is therefore unconstitutional.

### 3. The Waivers Are Evidence of § 102(c)'s Operation, Not Independent Targets of Relief

Defendants again try to make this a waiver-by-waiver APA case. Defs.' Resp. at 9–12, 16–20. It is not. Plaintiffs challenge § 102(c)'s structure—facially and as applied—and use the Big Bend determinations as evidence of how that structure works. SAC ¶¶ 77–177. That distinction

matters because courts routinely distinguish a continuing challenge to the legal framework authorizing executive action from a request to review a particular executive act already taken under that framework. *See City of New Haven, Conn. v. United States*, 809 F.2d 900, 904–05 (D.C. Cir. 1987).

The Big Bend determinations demonstrate how § 102(c) operates. Defendants say different waivers cover Angell's property, the Parks, and Big Bend 5. They rely on that segmentation for standing and limitations defenses, and they argue the "high illegal entry" finding is not reviewable as a constitutional matter even though it is used as the intelligible principle. Defs.' Resp. at 6–12, 19–20. Those positions show how § 102(c) operates unconstitutionally as applied here. Namely, the Secretary draws the geographic lines, waives the laws that would otherwise constrain the project pays lip service to the intelligible principle, and then invokes § 102(c)(2)'s limits on judicial review so that no court can test whether the high-entry predicate was met.

The Court need not resolve facial validity to grant relief. It need only hold Plaintiffs are likely to succeed on their as applied § 102(c) claim. At Big Bend, the Secretary alone decides what is defined as an area of high illegal entry, finds that condition met by aggregating or segmenting the project as needed, waives the laws that would have tested that finding, and then forecloses any judicial inquiry into whether the condition was actually satisfied. Because the Secretary ignores and does not follow § 102(c), it supplies no intelligible principle at all—leaving only discretion without an enforceable boundary. Therefore, it is unconstitutional.

### C. Section 102(c) Violates the Separation of Powers Because It Concentrates Predicate-Definition, Execution, Law-Nullification, and Review-Insulation in a Single Officer

Defendants call Plaintiffs' separation-of-powers claim nondelegation "repackage[d]." Defs.' Resp. at 18. That is wrong.

Nondelegation asks whether Congress has supplied an "intelligible principle" to guide the delegee's exercise of discretion. *Gundy v. United States*, 588 U.S. 128, 135–36 (2019) (plurality opinion) (explaining the nondelegation inquiry asks whether Congress supplied an intelligible principle and begins by identifying the task delegated and the instructions Congress provided); *Mistretta v. United States*, 488 U.S. 361, 372–73 (1989) (quoting *J.W. Hampton, Jr. & Co.*, 276 U.S. at 409, for the rule that Congress must lay down an intelligible principle to which the delegee must conform).

Separation of powers asks whether Congress has assigned, retained control over, or combined functions in a way the Constitution commits to a different branch or officer. *Buckley v. Valeo*, 424 U.S. 1, 122–24 (1976) (explaining that the Constitution vests legislative, executive, and judicial powers in separate branches and that courts "enforce the principle of separation of powers embodied in the Constitution when its application has proved necessary"); *Mistretta*, 488 U.S. at 382 (describing separation-of-powers doctrine and confirming the Supreme Court "ha[s] not hesitated to strike down provisions of law that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or another coordinate Branch").

Section 102(c) fails both inquiries.

As with their nondelegation claim, Plaintiffs do not ask the Court to set aside any individual waiver determination. The Determinations—including the Big Bend 2, Big Bend 4, and July 27 Determinations—are evidentiary examples of how § 102(c) operates. They show the Secretary defining the statutory predicate of an area of high illegal entry, invoking waiver authority to set aside statutes, and using the statute's review limits to insulate that predicate from scrutiny.

Structural constitutional claims may challenge the statutory arrangement that gives an agency or officer allegedly unconstitutional authority without turning every action taken under that statute into the direct object of review. *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 195 (2023) (recognizing "agency adjudications are generally ill suited to address structural constitutional challenges"). Likewise, courts distinguish a broad constitutional attack on a statute from a suit seeking review of a particular agency order or rule. *See Live365, Inc. v. Copyright Royalty Bd.*, 698 F. Supp. 2d 25, 32–34 (D.D.C. 2010) (determining that a constitutional facial challenge to a statute is separate from a challenge to agency action).

**1. The Statute Concentrates Four Constitutionally Distinct Functions in a Single Officer**

Section 102(c) concentrates four powers in one officer. The Secretary defines the predicate by choosing what "area" qualifies as an area "of high illegal entry." IIRIRA § 102(a). He invokes the statute on that basis. He waives "all legal requirements" he deems necessary. IIRIRA § 102(c)(1). And § 102(c)(2) limits review to constitutional claims, imposes a sixty-day deadline, eliminates ordinary appellate review, and channels review to discretionary certiorari. IIRIRA § 102(c)(2)(A)–(C).

Each power may theoretically be permissible in isolation. Section 102(c) is different. It lets one officer define the trigger, pull it, erase the laws that would test it, and shield the trigger from review. That accumulation is the vice. The Federalist No. 47, at 298 (James Madison) (Clinton

Rossiter ed., 1961) ("The accumulation of all powers, legislative, executive, and judicial, in the same hands . . . may justly be pronounced the very definition of tyranny."). [7]

Defendants' Response confirms why the Determinations and the waivers are no more than probative evidence of the § 102(c) defects. Defendants represent that Angell's property is in the Big Bend 2 project area, covered by the February 17, 2026 waiver as amended on July 2, 2026; that Big Bend National Park and Big Bend Ranch State Park are in the Big Bend 4 project area, covered by the May 15, 2026 waiver as amended on June 9, 2026; and that the July 27 waiver covers Big Bend 5, which combines portions of the Big Bend and Del Rio Sectors. Defs.' Resp. at 6–8, 9–12.

The Court should treat those admissions as evidence against Defendants. They show Defendants segment the projects and waiver notices when doing so helps their standing and limitations arguments, while still relying on the same unconstitutional § 102(c) authority to bypass ordinary legal constraints.

**2. Plaintiffs' Claims Target Structural Concentration, Not a Repackaged Delegation Theory**

Defendants collapse two doctrines. Nondelegation asks whether Congress gave an intelligible principle. *Consumers' Rsch.*, 606 U.S. at 672–73. Separation of powers asks whether the statute keeps each branch's powers where the Constitution placed them. U.S. Const. art. I, § 1; art. II, § 1; art. III, § 1. A statute can satisfy one inquiry and fail the other. Section 102 fails both.

[7] Quoting Montesquieu, the Federalist Papers made the point in the following manner: "When the legislative and executive powers are united in the same person or body, says he, there can be no liberty, because apprehensions may arise lest *the same* monarch or senate should *enact* tyrannical laws to *execute* them in a tyrannical manner. Again: Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for *the judge* would be *the legislator*. Were it joined to the executive power, *the judge* might behave with all the violence of *an oppressor*." (citing The Federalist No. 47, *supra*, at 303) (internal quotation marks omitted) (emphasis in original).

Section 102(c) fails the structural inquiry. Even if "areas of high illegal entry" do serve as an intelligible principle in the abstract, § 102(c) disables the checks that would make it one. The Secretary defines the predicate—the geographic project areas and the undefined amount of illegal entry that counts as "high"—satisfies it, waives the laws that would test it, and invokes review provisions that prevent ordinary scrutiny. That is not broad discretion. It is unchecked discretion known to Madison and Montesquieu as tyranny.[8]

*Youngstown* and *Clinton* show why Defendants' "repackaged" label fails. Even when Congress has acted, courts still have to ask whether the resulting structure respects the Constitution. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1952) (Jackson, J., concurring) ("Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system."); *see, e.g., Clinton v. City of New York*, 524 U.S. 417, 446–47 (1998) (illustrating structural defect and concluding "[t]he critical difference between this statute and all of its predecessors, however, is that unlike any of them, this Act gives the President the unilateral power to change the text of duly enacted statutes. None of the Act's predecessors could even arguably have been construed to authorize such a change."). Congress may make legal consequences turn on facts found by the Executive, but it may not let one officer define the predicate, execute the statute, nullify constraining laws, and shield the predicate from review. *See* PI Mot. ¶¶ 31, 37, 40.

Plaintiffs identify a single structural defect—the same officer controls the predicate, the waiver, and the review shield. That is concentration, not mere combination. As Justice Kennedy also wrote in his concurrence in *Clinton*, "Liberty is always at stake when one or more of the

[8] "By increasing the power of the President beyond what the Framers envisioned, the statute compromises the political liberty of our citizens, liberty which the separation of powers seeks to secure." *Clinton*, 524 U.S. at 452 (Kennedy, J., concurring).

branches seek to transgress the separation of powers." *Clinton*, 524 U.S. at 450 (Kennedy, J., concurring).

**3. The Safeguards Identified in *Consumers' Research* Are Absent Here**

Some broad delegations of power can survive constitutional scrutiny because the Executive remains bound by "the scope of Congress's authorization" and "any restrictions set forth in that statutory text." *Consumers' Rsch.*, 606 U.S. at 705 (Kavanaugh, J., concurring).

But § 102(c) removes those safeguards where they matter most. It lets the Secretary waive "all legal requirements" in *his* sole discretion to construct a border wall in the areas *he* defines as "areas of high illegal entry."

Section 102(c)(2) then strips away the remaining checks. It bars all statutory causes of action, bars constitutional claims filed more than sixty days after the Secretary acts under the Determinations—without meaningful notice to the known individuals the action will harm—and eliminates intermediate appellate review as of right by channeling review to discretionary certiorari. IIRIRA § 102(c)(1)(2) (Improvement of Barriers at Border; Waiver).

Much like a legislative veto that changes the law, the Secretary in his sole discretion can define any area of illegal entry, whether objectively high or low, to mean a high area of illegal entry, and he can free himself of any statutory constraint or intelligible principle in § 102 in *his* sole discretion, and as set forth here, is attempting to do so. The Secretary's 2026 Determinations regarding the border wall construction and related activities in the Big Bend region prove he is not abiding by any statutory constraint in building the wall. He is simply choosing to erect barriers, build roads, and conduct other destructive activities in the vicinity of the southern border in *his* sole discretion and far outside "areas of high illegal entry" that form the "intelligible principles" created to restrain just such conduct.

#### 4. *Patchak* Does Not Authorize This Combination of Powers

*Patchak v. Zinke* does not address this issue. 583 U.S. 244 (2018). *Patchak* involved Congress's power to withdraw jurisdiction over a class of land-in-trust disputes. *Id*. at 253–56. It did not involve a statute that lets one executive officer define the factual predicate for law-nullifying authority and then make that predicate practically unreviewable.

Congress may channel jurisdiction. It may not use jurisdictional design to insulate an unconstitutional concentration of executive power. Section 102(c)(2) completes the self-insulating structure. It locks a door the Secretary already closed. That is why Defendants' separation-of-powers answer fails. The Constitution does not permit Congress to concentrate power in one officer and then remove the ordinary checks that would keep that power within lawful bounds.

### D. The Secretary Violates the Take Care Clause by Disregarding the Statutory Limits Congress Placed on His Waiver Authority

As Defendants note, "The Constitution requires that the President shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. *See* Defs.' Resp. But Defendants' analysis is incomplete. The Take Care Clause extends beyond the President to the agencies of the Executive Branch. *See Rhode Island v. Trump*, 810 F. Supp. 3d 283, 308–09 (D.R.I. 2025) (holding that the actions taken by the agencies in question violated the Take Care Clause after appropriations funding the functions of the agencies were allocated, only to have the agencies shutter those programs). The People "vote for the President . . . [a]nd the public must be able to hold the President accountable for his Take Care Clause responsibilities across the *entire* executive branch . . . [which is] especially true regarding an office . . . which is vested with unilateral, unchecked authority to bring enforcement actions" and is a "core" function of the Executive branch. *Eng. v. Trump*, 279 F. Supp. 3d 307, 328–29 (D.D.C. 2018) (emphasis added). Here, the appointed head of an agency, Secretary of Homeland Security Markwayne Mullin, is enforcing § 102, which limits

his authority in the form of an intelligible principle limiting barriers to "areas of high illegal entry." The Secretary refuses to follow this limitation and thus refuses to "comply with the law as it has been set by Congress." *In re Aiken Cnty.*, 725 F.3d 255, 257 (D.C. Circuit 2013). This refusal abandons faithful execution of the law as Congress wrote it and offends the Constitution. The Secretary's rewriting of the intelligible principle eliminates it.

### E. Plaintiffs Are Likely to Succeed on Their Major Questions Claim Because § 102 Lacks Clear Congressional Authorization and the Secretary Manufactured an "Area of High Illegal Entry"

When the "history and breadth of the authority that [the Department of Homeland Security] has asserted" and "the economic and political significance of that assertion" give "a reason to hesitate before concluding that Congress meant to confer such authority," courts require clear congressional authorization. *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022) (internal quotations omitted). This is such a case. "[B]oth separation of powers principles and a practical understanding of legislative intent" should make this Court "reluctant to read into ambiguous statutory text the delegation claimed to be lurking there." *Id.* (internal quotations omitted)

Defendants ignore the statute's vagueness entirely, proclaiming that § 102 "unequivocally authorized DHS to construct barriers along the southern border." Defs.' Resp. at 22. A statute that leaves at least six material terms of the statute undefined is not "unequivocal authoriz[ation]" of anything.[9]

Section 102 lets the Secretary waive laws to build barriers in "areas of high illegal entry," but Congress never said what that means. And Congress does not "use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme."

---

[9] Defendants effectively concede Plaintiffs' vagueness claim by failing to address it in their Response.

*W. Virginia*, 597 U.S. at 723 (quoting *MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 229 (1994)). Yet that is exactly what the Secretary has done. By combining the Del Rio and Big Bend Sectors, he manufactured his own "area of high illegal entry." On that logic, he could build anywhere, however few the crossings, simply by adding sectors together until the total reaches whatever undefined number counts as "high." By doing this, the Secretary has emasculated the intelligible principle that serves as the sole limitation on his own power by rendering the restraint on his power null, and the only limit on his power becomes no limit at all.

### F. Plaintiffs Are Likely to Prevail on Their Due Process Claim Because Defendants Withheld Individualized Notice from a Known Landowner Facing Condemnation.

The Fifth Amendment requires "no person shall . . . be deprived of life, liberty, or property, without due process of law." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993) (cleaned up). It further requires notice and an opportunity to be heard *before* the government deprives that person of their property interest. Defendants seek not only to enter Angell's property but also to "initiate eminent domain [or] condemnation proc[eedings]," and in fact, have already done so. Courts weigh three factors to determine the constitutional sufficiency of the process due:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Each factor favors Plaintiffs.

Here, the private interest could hardly be of greater weight. Angell holds fee simple title to the Presidio County parcels CBP has targeted—land that has been in his family for generations, where he lives, and from which he and Angell Expeditions reach the Rio Grande to run their guide operations. SAC ¶ 137. *Second*, the risk of erroneous deprivation is acute, and the value of

additional safeguards is high, because the Secretary has waived the very statutes and procedures that would ordinarily build a record and test the government's need for Angell's land, leaving Angell no meaningful opportunity to be heard before the threatened condemnation. *Third*, the burden on the government is minimal. Defendants already knew Angell's identity, address, and parcels, and providing him individualized notice and an opportunity to object would impose no meaningful delay on construction. *See N. Am. Butterfly Ass'n*, 977 F.3d at 1265.

Defendants respond that they followed "appropriate procedures in attempting to acquire a portion of Plaintiff Angell's property," Defs.' Resp. at 25, that no deprivation has yet occurred, and that Angell's only recourse is a post-taking suit for just compensation in the Court of Federal Claims. *See id.* But even the authority Defendants cite requires notice before the government initiates judicial condemnation proceedings—precisely what CBP threatened when it warned Angell of referral to the Department of Justice under the Declaration of Taking Act. *Presley v. City of Charlottesville*, 464 F.3d 480, 490 (4th Cir. 2006); SAC ¶ 138.

This characterization disregards the process due to Angell before Defendants may move to condemn his property. Defendants knew Angell's name, address, and the specific parcels they sought—BBT-PRS-2055 and BBT-PRS-2055-1—no later than February 20, 2026, when CBP sent him a "Notice of Interest" threatening referral to the Department of Justice for condemnation under the Declaration of Taking Act. Yet neither that letter nor anything that followed, through and including the July 27, 2026 Determination, gave Angell individualized notice of the Determination, the waiver's effect on statutory and procedural protections, the sixty-day deadline to bring constitutional claims, the precise property interest sought, the basis for compensation, or a meaningful opportunity to object before the threatened deprivation. Where a property owner's identity and address are known or readily ascertainable, notice by publication alone does not satisfy

due process. *Schroeder v. City of New York*, 371 U.S. 208, 212–13 (1962); *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791 (1983). Individualized notice was readily available to Defendants. They simply chose not to provide it.[10]

**G. Plaintiffs Are Likely to Succeed on Their Eminent Domain and Takings Claims.**

Defendants recast Plaintiffs' Takings Clause claim as a statutory claim in constitutional clothing. Defs.' Resp. at 24. It is not. Plaintiffs do allege that IIRIRA § 102(a) authorizes construction only in "areas of high illegal entry," that the Big Bend Sector is not such an area, and that Defendants therefore lack authority to condemn Angell's property. SAC ¶ 160. But that statutory predicate is the factual premise of a constitutional violation, not a substitute for one. The Fifth Amendment permits the government to take private property only "for public use," and the public-use requirement is a constitutional limit on the eminent domain power. *See Kelo v. City of New London, Conn.*, 545 U.S. 469, 477 (2005); SAC ¶ 161. Courts defer to public-use determinations only when they rest on valid legislative authorization. Where Congress has not authorized construction at the site, there is no public use for the taking to serve, and the condemnation violates the Constitution itself.

[10] Plaintiffs do not invoke the "cumulative error theory" Defendants attribute to them. Plaintiffs' cumulative due process claim is an as-applied challenge under *Mathews* to the combined operation of § 102(c)(2): the bar on non-constitutional claims, a sixty-day filing deadline that runs from Federal Register publication rather than individualized notice to known owners like Angell, and certiorari-only appellate review. Each feature may be defended in isolation, but together, with the record-generating statutes waived and irreversible construction proceeding while any review is pending, they deprive known affected owners and operators of a meaningful constitutional forum and render the statute's preservation of constitutional claims illusory in practice. SAC ¶ 153; *Mathews*, 424 U.S. at 335. The cases listed to the court by Defendants have all been dismissed because they challenged the waiver and not the constitutionality of § 102 itself. *See McAleenan*, 404 F. Supp. 3d 218; *In re Border Infrastructure Env't Litig.,* 284 F. Supp. 3d 1092 (S.D. Cal. 2018), *cert. denied sub. nom. Animal Legal Def. Fund. v. DHS,* 586 U.S. 1035 (Dec. 3, 2018), *and aff'd*, 915 F.3d 1213 (9th Cir. 2019); *Save Our Heritage Org. v. Gonzales,* 533 F. Supp. 2d 58 (D.D.C. 2008); *N. Am. Butterfly Ass'n*, 977 F.3d 1244.

Second, Defendants' insistence that no taking has yet occurred does not defeat relief. Defs.' Resp. at 24. Injunctive relief is available to prevent threatened harm, not just to remedy completed harm. CBP's February 20, 2026 Notice of Interest expressly threatened condemnation under the Declaration of Taking Act, and under that Act title vests in the United States as soon as a declaration is filed and estimated compensation is deposited. 40 U.S.C. § 3114(b). Plaintiffs' claim therefore turns on authority, not valuation. Defendants may not build any barrier, or condemn land to build one, outside the vicinity of an area of high illegal entry. IIRIRA § 102(a). Once title vests and construction begins, no later compensation award can undo a taking the Constitution never permitted.

Eminent Domain is the taking of a property without the owner's consent. While the phrase "Eminent Domain" does not appear in the constitution, The Takings Clause of the Fifth Amendment impliedly recognizes the existence of such a power. *See PennEast Pipeline Co., LLC v. New Jersey*, 594 U.S. 482, 494 (2021). The Fifth Amendment says that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Supreme Court has made clear that the federal eminent domain power operates the same way whether the Government proceeds through an upfront taking or a direct condemnation proceeding. *See PennEast Pipeline Co., LLC*, 594 U.S. at 508. Either way, the power reaches only as far as Congress has authorized it, and here Congress authorized acquisitions only in the vicinity of areas of high illegal entry.

**1. Federal Condemnation**

Three authorities govern federal condemnation: the Condemnation Act, primarily 40 U.S.C. § 3113, Federal Rule of Civil Procedure 71, and 49 C.F.R. 24. The savings provision, IIRIRA § 102(b)(1)(C)(ii)(II), affects all federal condemnation in this case. "Nothing in this

subparagraph may be construed to affect the eminent domain laws of the United States or of any State." Further, 49 C.F.R. 24.101(d) states:

> Federally assisted projects. For projects receiving federal financial assistance, the provisions of §§24.102.,24.103, 24.104, and 24.105 apply to the greatest extent practicable under state law. (*See* §24.4(a).)

Defendants' Response addresses the Takings Clause and the moment of the taking of Angell's property. Condemnation, however, is a process and not a moment in time. It is the process by which the government exercises the power of eminent domain. The power of eminent domain is an implied constitutional right. The Condemnation Act found at 40 U.S.C. §3113 invokes it, and 49 C.F.R. 24 governs its exercise. That part of the Federal Regulations applies to any acquisition of real property for a direct federal program such as construction of the border wall, and it imposes several mandatory procedures on condemnation. For example:

> As soon as feasible, the Agency shall notify the owner in writing of the agency's interest in acquiring the real property and the basic protections provided to the owner by law and this part.
>
> The Agency shall make every reasonable effort to acquire the real property expeditiously by negotiation. Before the initiation of negotiations, the real property to be acquired shall be appraised[.]

49 C.F.R. § 24.102(a), (b), (c)(1).

On February 20, 2026, CBP, through Paul Enriquez, Director-Infrastructure Portfolio (and Defendants' declarant in support of their Response), wrote Angell to give notice of the government's interest in acquiring all or some of his property for governmental purposes. The February 20, 2026 letter formally notified Angell of the potential acquisitions of portions of his property, potential access needed across or adjacent to his property, and any real estate or boundary considerations that may arise as project design the "Border Wall Advances". Although the taking of Mr. Angell's property has not yet occurred, Defendants have begun the condemnation process.

The mandatory requirements ("shall") of owner notification and the making of "every reasonable effort to acquire the real property expeditiously by negotiation" have begun. 49 C.F.R. § 24.102(a). Angell seeks to enjoin any further use of eminent domain power and the condemnation process because Defendants may build the border wall only in an area of high illegal entry, Angell's property is not in the "vicinity" of such an area, and Defendants therefore cannot exercise eminent domain at his property.

**2. State Condemnation Law**

IIRIRA § 102(b)(1)(C)(ii)(II) states: "[n]othing in this subparagraph may be construed to – affect the eminent domain laws of the United States or of any State". Because Defendants' actions cannot "affect the eminent domain laws of … any State," Texas condemnation law also applies.

Texas has a comprehensive process for the exercise of eminent domain power through condemnation. It starts with Article I, § 17 of the Texas Constitution which states in pertinent part: "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made …." Under Texas eminent domain law, Mr. Angell has a cause of action for any of his property "damaged or destroyed" as well as for "taking" of his property.

Chapter 21 of the Texas Property Code governs eminent domain through condemnation. Among other requirements:

(1) Disclosures and initial offer (§ 21.0111);

(2) Provision of Landowner's Bill of Rights statement (§ 21.0112);

(3) A bona fide offer is required under § 21.0113; and

(4) A final offer (§ 21.0113).

Only after satisfying these requirements may a condemning entity file a Petition in Condemnation under Texas law.

Because § 102(b)(1)(C)(ii) preserves state eminent domain law, Defendants must follow state as well as federal condemnation law. Defendants have commenced federal condemnation without authorization, and the Court should enjoin it. Texas law also requires condemning entities to complete specific procedures before exercising eminent domain, Defendants have **not** properly followed those procedures, and condemnation at Angell's property is unauthorized in any event. An injunction should issue on these grounds as well.

**H. An Option Without Barriers.**

Defendants proceed as though the use of barriers is essential to border security in the Big Bend Region. This fundamental premise of Defendants is wrong. At numerous locations throughout the Big Bend and elsewhere, less invasive methods than the use of barriers have been employed effectively. No more so than in Terrell County, Texas. There, Thaddeus C. Cleveland is the Sheriff in charge of border security for his county. As set forth more fully in his declaration attached hereto as Exhibit B, Sheriff Cleveland has designed and implemented a 21st Century, technology-based border security system using no barriers of any kind for Terrell County that was constructed several years ago and has been operating effectively since that time.

Sheriff Cleveland has created a similar, technology-based, barrier-less border security system that could be used in the Big Bend 2 Sector and across Big Bend National Park; a true option without barriers. As Sheriff Cleveland explains, his alternative approach would employ a combination of linear ground detection (Ex. B ¶¶ 18–20), the consideration of targeted bollard-style fencing in urban areas (Ex. B ¶¶ 21–24), relocatable autonomous surveillance towers (RAST) (Ex. B ¶¶ 25–27), mobile surveillance capabilities (Ex. B ¶¶ 28–29), aerial surveillance by unmanned drones (Ex. B ¶¶ 30–31), all creating an integrated detection and response architecture that can protect the southern border without the use of barriers (Ex. B ¶¶ 32–33). The efficiency and effectiveness of Sheriff Cleveland's system come at a much lower cost than the barrier-focused

alternative provided by CBP. Overall, Sheriff Cleveland's system would cost $532 million compared to the $1.223 billion award for the federal Big Bend Project 2. The line-items costs making up the $532 million include: $50 million for 25 GDIT RAST ($2 million each); $90 million for 3 MQ-9/predator B-class unmanned aircraft ($30 million each); $17 million for 68 miles of fiber optic infrastructure ($250,000 per mile); a potential $375 million for up to 15 miles of bollard-style barriers. [11] The resulting $532 million in costs is approximately 43.5% of the $1.223 billion that would be expended under CBP's plan. An even more detailed review of Sheriff Cleveland's alternative is contained in his declaration.

## I. Plaintiffs Satisfy the Remaining Preliminary Injunction Factors.

Defendants' remaining arguments rest on two premises. First, Plaintiffs' harms are speculative, and second, border security outweighs whatever harm Plaintiffs suffer. Defs.' Resp. at 29–34. Neither premise holds.

### 1. Plaintiffs Will Suffer Irreparable Harm Absent an Injunction

An injury is irreparable if it "cannot be undone through monetary remedies." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). Plaintiffs' injuries meet that standard on Defendants' own record. Defendants have lifted the Big Bend 2 pause, anticipate "a number" of condemnation referrals to the Department of Justice in the coming weeks, and expect to remobilize on Big Bend 4 once a revised decision issues in early October. Notice at 1–3. Harm on a schedule the government itself has announced is not speculative; it is "likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

[11] Of this amount, $375 million is attributable to the potential use of bollard-style walls in urban areas. If bollard-style walls are not selected, the total cost associated with Sheriff Cleveland's system is $157 million. $157 million is 12.8% of CBP's budgeted amount for protection at Big Bend 2.

Nor can money repair these injuries. Under the Declaration of Taking Act, title vests in the United States upon the filing of a declaration and deposit of estimated compensation. 40 U.S.C. § 3114. Once that happens, no damages award restores Angell's right to exclude, his residence, his Rio Grande access, or the property on which Angell Expeditions stores its equipment and runs its guide business. PI Mot. ¶ 52. The Fifth Circuit treats the loss of control and use of property, and a continuing physical intrusion on it, as irreparable precisely because compensation for past injury cannot prevent future interference. *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 211–12 (5th Cir. 2024). And because federal agencies "generally enjoy sovereign immunity for any monetary damages," the lost trips, customer goodwill, and route access Angell Expeditions will suffer are unrecoverable. *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).

Defendants' assurances do not change the analysis. They say CBP "has a long history of incorporating gates" into barriers and that construction will have "little to no impact" on park access. Defs.' Resp. at 33–34 (citing Enriquez Decl. ¶¶ 38–42). But a gated barrier across Angell's land is itself a permanent physical occupation that strips his right to exclude. SAC ¶ 157. And a promise to minimize harm through surveys and best practices concedes that construction will occur. It does not show the resulting harm can be undone. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

*Manzanita Band* does not help Defendants. There, the tribe failed "to make out a certain, great, and imminent injury" because it could not tie its harm to specific sites within the construction zone. *Manzanita Band of Kumeyaay Nation v. Wolf*, 496 F. Supp. 3d 257, 263 (D.D.C. 2020). Plaintiffs identify specific parcels, launch points, and river segments within the very project areas

Defendants defined. SAC ¶¶ 18–21, 137. Their constitutional injuries are independently irreparable as well. *See Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012); *Elrod v. Burns*, 427 U.S. 347, 373 (1976). No later damages award can restore the separation of powers or supply the process due before a taking.

**2. The Balance of Equities Favors Plaintiffs**

When the government is the opposing party, the balance of equities and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). And the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). If § 102(c) cannot constitutionally be applied here, an injunction costs Defendants nothing to which they are entitled.

Defendants' reliance on *Trump v. Sierra Club* and *Winter* is misplaced. The *Sierra Club* stay rested on the government's showing "that the plaintiffs have no cause of action." Defs.' Resp. at 30 (quoting *Trump v. Sierra Club*, 588 U.S. 930, 930 (2019)). Plaintiffs' constitutional claims, by contrast, are expressly preserved by § 102(c)(2)(A). And *Winter* did not involve the threatened condemnation of family land held for generations, a residence, and the business operated from it. SAC ¶ 137.

Defendants' own conduct confirms the point. CBP voluntarily paused ground-disturbing work on Big Bend 2 and Big Bend 4 to allow public engagement and is "actively considering adjustments" to Big Bend 4. Defs.' Resp. at 7–8, 34. A government that can pause, and has previously paused, this work on its own initiative cannot claim irreparable harm from a court-ordered pause of the same work. The requested injunction is tailored to Plaintiffs' property, river access, and documented guide routes, and it leaves Defendants free to proceed under constitutionally valid authority. On the other side of the scale, Plaintiffs face the loss of their land, home, and livelihood. The equities favor relief.

### 3. The Public Interest Favors an Injunction

"[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). The public likewise "has an interest in ensuring that statutes enacted by their representatives are not imperiled by executive fiat." *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1255 (9th Cir. 2018) (cleaned up). Those interests are at their height where, as here, a single officer claims the power to define, satisfy, and shield from review the only limit Congress placed on his authority.

Plaintiffs do not dispute that border security matters. The question is whether pausing construction in this Sector while the Court decides whether § 102(c) may lawfully be applied here disserves that interest. It does not. The Big Bend Sector recorded approximately 3,000 apprehensions in FY2025, the lowest on the southern border. PI Mot. ¶ 12. Defendants answer with FY2021–2022 encounter figures and nationwide drug-seizure statistics, Defs.' Resp. at 32–33, but neither shows that construction in this Sector during the pendency of this case is needed to address crossings occurring here now.

Finally, Defendants argue that Congress "overruled" Plaintiffs' environmental interests by authorizing waiver. Defs.' Resp. at 33. But Congress cannot authorize what the Constitution forbids, and Plaintiffs' claims rest on the Constitution, not on the statutes the Secretary waived. The public interest is served by preserving the status quo until the Court decides whether the Secretary may lawfully exercise this power at all.

## J. FRCP 65(c) Bond

Rule 65(c) of the Federal Rules of Civil Procedure requires a party seeking a preliminary injunction to provide security, usually in the form of a bond, to pay for costs and damages sustained

by a wrongfully enjoined or restrained party. However, in light of the important public interest and constitutional protections, the bond requirement may be waived or only a nominal bond may be required. *See Richland/Wilkin Joint Powers Authority v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016) (citing *Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002)); *Sierra Club v. Froehlke*, 359 F. Supp. 1289, 1386 (S.D. Tex. 1973), *rev'd on other grounds*, 499 F.2d 982 (5th Cir. 1974). Moreover, no bond should be so high it precludes a party from exercising its right to sue for unconstitutional acts and conduct.

The Fifth Circuit has held the amount of security required pursuant to Rule 65(c) "is a matter for the discretion of the trial court" and the court "may elect to require no security at all." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (quoting *Corrigan Dispatch Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 303 (5th Cir. 1978)). The Court should exercise that discretion here. Plaintiffs are an individual and a small business challenging the constitutionality of unprecedented government action. An excessive bond would prevent Plaintiffs from fully exercising their rights to bring suit and seek redress for constitutional wrongs. The strong public interest, the constitutional nature of Plaintiffs' claims, the absence of any demonstrated compensable damages from maintaining the status quo, and the chilling effect of an excessive bond all warrant waiving security or imposing only a nominal bond.

Because of the voluntary pause, Defendants have acknowledged the cost of stopping can be borne. Pursuant to Federal Rule of Civil Procedure 65(c), Plaintiffs respectfully request the Court waive the security requirement or impose a nominal bond.

## III. REQUESTED RELIEF

**WHEREFORE,** Plaintiffs respectfully request the Court hold an expedited hearing on their Motion for Preliminary Injunction within ten (10) days of this filing or otherwise at the

Court's earliest convenience, and in a non-evidentiary hearing with oral argument on the papers filed, and grant the following relief:

1. Plaintiffs request an order enjoining Defendants from relying on the July 27, 2026 Determination or § 102(c) to commence or continue construction, blasting, excavation, road-building, ground disturbance, vegetation clearing, staging expansion, access activity, condemnation activity, spoil disposal, mobilization for work, or other irreversible commitments affecting Angell's property, Rio Grande access, boat-launch routes, and in both the Big Bend National Park and Big Bend Ranch State Park in the nearby vicinity and at any locations where Angell Expeditions' documented commercial guide operations take place.

2. Plaintiffs respectfully request the Court use its inherent powers and under the All Writs Act, 28 U.S.C. § 1651 to command Defendants to provide to this Court and to Plaintiffs any and all techniques, methods, equipment, and deployment strategies (other than in connection with construction of pedestrian or vehicle barriers) to secure the Southern Border to date.

3. If the Court holds the Determination or § 102 unconstitutional or inapplicable as applied to their protected interests, Plaintiffs further request that the Court require Defendants to seek leave before resuming any previously enjoined, restrained, or "paused" activity and to show lawful authority, disclose the relevant project plans and property interests, and demonstrate compliance with any statutory and regulatory requirements no longer validly waived. This requested relief is constitutional and plaintiff-specific; it does not ask the Court to adjudicate freestanding statutory claims barred by § 102(c)(2)(A), or the validity of any waiver.

4. A preliminary injunction enjoining Defendants from commencing or continuing any construction, blasting, excavation, road-building, or ground disturbance activities on or across Plaintiffs' property pending resolution of this action, and enjoining action exercising the power of Eminent domain or the process of condemnation to acquire any of Plaintiffs' property;

5. A preliminary injunction enjoining Defendants within the Big Bend Sector, Mr. Angell's property, or the nearby vicinity, including on or in the vicinity of Mariscal Mountain, from continuing the Project in any way, including ground disturbance, blasting, excavation, wall barrier, water barrier, or wall-panel installation, new road construction, vegetation clearing, staging expansion, spoil disposal, mobilization for work, receipt of building and construction materials, equipment and vehicles for the Project and other irreversible commitments;

6. An order directing the Department of Homeland Security to disclose and provide copies of documents related to construction and all other contracts, funding sources, property interests, technical plans, environmental surveys and assessments, state-law permits, and International Boundary and Water Commission submissions;

7. A preliminary mandatory prospective injunction requiring Defendants to restore those areas previously disturbed, damaged or harmed by Defendants' activities on the Project;

8. Such other and further relief as the Court deems just and proper.

Dated: October 7, 2026

Respectfully submitted,

*/s/ Frederick W. Addison, III*
Frederick W. Addison, III
Texas State Bar No. 00903350
raddison@munsch.com
Randall W. Miller
Texas State Bar No. 24092838
rwmiller@munsch.com
Emily C. Means
Texas State Bar No. 24137036
emeans@munsch.com
Caroline Rumbolo
Texas State Bar No. 24131637
crumbolo@munsch.com
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**COUNSEL FOR PLAINTIFFS**

**REQUEST FOR EXPEDITED HEARING**

As set forth in Plaintiffs' Requested Relief, Plaintiffs respectfully request the Court set a non-evidentiary hearing with oral argument on their Motion for Preliminary Injunction within ten (10) days of filing this Reply, or at the Court's earliest convenience.

*/s/ Frederick W. Addison, III*
Frederick W. Addison, III

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing instrument was served upon all counsel of record via the Court's CM/ECF system on October 7, 2026.

*/s/ Frederick W. Addison, III*
Frederick W. Addison, III